IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

DAMONTA JENNINGS,

      Plaintiff,

      v.                           Case No. 2022CV01205

CHARLES DOMBECK, et al.,

      Defendants.

## DECLARATION OF LAURA SUKOWATY, M.D.

I, **LAURA SUKOWATY, M.D.**, declare pursuant to 28 U.S.C. § 1746 and under the penalty of perjury, that the following is true and correct.

1. I make this declaration based upon my personal knowledge and upon review of the records kept in the course of the regularly conducted business activity at the Wisconsin Department of Corrections (DOC).

2. I am employed by the Wisconsin Division of Adult Institutions, Bureau of Health Services, as an Associate Medical Director, also known as a Physician Supervisor. I have been employed in this capacity since September 28, 2020.

3. I have been licensed as a physician in the State of Wisconsin continuously since February 24, 1995.

4. In my capacity as an Associate Medical Director, I am responsible for professional medical services to inmates in accordance with Corrections and Bureau

of Health Services policies, procedures, and standards. I supervise approximately 14 physicians and nurse practitioners in my region as Associate Medical Director. Along with the Health Services Manager, I meet with the Warden, psychological services supervisors, and security staff in formulating medical policies and operational procedures. I also implement these policies at the unit level.

5. As an Associate Medical Director, I have access to all records made and maintained by the Department of Corrections.

6. It is my understanding that the Court allowed Plaintiff Damonta Jennings to proceed on an Eighth Amendment deliberate indifference claim against Mary Moore, Charles Dombeck, Robert Weinman, Ashley Haseleu, Dr. Daniel LaVoie, and myself for an alleged delay in receiving corneal cross-linking surgery. (Dkt. 39:8.) The Court also allowed Jennings to proceed on a claim of medical malpractice against Moore and negligent supervision against Weinman and Haseleu under Wisconsin-state law related to the alleged delay. (Dkt. 39:8.)

7. I have reviewed Jenning's certified medical records attached hereto as **Exhibit 1000.**

### Plaintiff's Medical Care

8. June 2, 2021, Jennings had a consultation with Dr. Reddy at UW for his eye condition. (Ex. 1000, 182.)

9. Dr. Reddy suspected keratoconus and recommended glasses and topography, an imaging study which maps the surface curvature of the cornea. Crosslinking was not recommended at that time. (Ex. 1000, 184.)

2

10.  On September 22, 2021, Jennings again saw Dr. Shilpa Reddy. Dr. Reddy diagnosed Jennings with keratoconus in both eyes and noted that it was "likely" that corneal cross-linking would help Jennings. However, she also noted there was no secure facility for corneal cross-linking at UW, recommended to be done by non-UW provider. In the meantime, she referred Jennings to a Cornea specialist. (Ex. 1000, 178.)

11.  Dr. Reddy did not request approval for this procedure from DOC or state that the procedure was urgent in any way.

12.  Accordingly, Jennings' provider, APNP Mary Moore, did not take steps to get prior authorization for this procedure. However, on March 2, 2022 APNP Moore referred Jennings to optometry for glasses to help address his keratoconus. APNP Moore left Waupun in April 2022. (Ex. 1000, 82.)

13.  Jennings was seen on March 28, 2022, at University Station Eye Care Clinic by Dr. Kevin Kurt, Optometrist. (Ex. 1000, 169-174.)

14.  Dr. Kurt provided Jennings with glasses but also recommended corneal cross-linking procedure. He sent a letter to DOC requesting approval for corneal cross-linking (Ex. 1000, 169-174.)

15.  When a DOC patient is seen by an offsite provider, it can take a few days to receive and process the records from that offsite visit into HSU electronic medical record system.

16.  On April 6, 2022, I received an email from APNP Charles Dombeck, stating that UW was requesting Jennings be sent to a local, non-secure site for the

corneal cross-linking procedure as soon as possible. UW believed that the corneal cross-linking may help prevent the need for a corneal transplant. (Ex. 1000, 171, 315.)

17. Dombeck also inquired if this case would need Class III approval, however, I had already discussed this with Dr. LaVoie and the corneal cross-linking procedure did not need pre-approval so Jenning's procedure would be approved. (Ex. 1000, 315.)

18. On April 8, 2022, Dombeck messaged me that he would order the consultation (Ex. 1000, 315.)

19. If UW was recommending the procedure be completed by a non-UW provider, the responsibility falls on them to find another specialist to refer to. (Ex. 1000, 178.)

20. On April 8, 2022, Haley Bassuener, LPN, left a message with UW to have triage nurses call her back to discuss Jennings' scleral lens and corneal cross-linking procedure (Ex. 1000, 143.)

21. On April 20, 2022, Bassuener followed up and called to get an update from UW regarding Jennings' corneal cross-linking procedure (Ex. 1000, 142.)

22. Bassuener called on two separate occasions before UW returned her call. On April 28, 2022, UW informed Bassuener that UW was referring Jennings to Valley Eye Associates for the cross-linking. (Ex. 1000, 142.)

23. On July 6, 2022, Jennings was seen by Dr. Michael Vrabec at Valley Eye Associates where he was diagnosed with keratonous in both eyes and collagen cross-linking procedure was recommended for both eyes. (Ex. 1000, 166.)

4

24.     On July 9, 2022, collagen cross-linking procedure was rescheduled to have both eyes done at the same time and follow ups were also scheduled. (Ex. 1000, 140.)

25.     Valley Eye Associates first informed Bassuener that the earliest they could schedule Jennings was November, however, they were able to get him scheduled sooner. (Ex. 1000, 314.)

26.     The corneal crosslinking procedure was scheduled for August 25, 2022. (Ex. 1000, 314.)

27.     On August 19, 2022, Jennings submitted two HSRs where he referenced his procedure was "in less than 1 week from today's date." (Ex. 1000, 314.)

28.     Bassuener was instructed to contact the Administrative Captain about the security breach and told that the surgical procedure needed to be rescheduled. She rescheduled the procedure for the soonest date the clinic had available. (Ex. 1000 314.)

29.     It is DOC policy that an inmate not be informed in advance of the time and date of offsite visits and procedures. The inmate possessing this information poses security risks to the institution and correctional staff. For example, an inmate could coordinate with individuals outside the prison to attempt escape or to meet and receive contraband.

30.     October 13, 2022, Jennings underwent the cross-linking procedure.

31.     On October 21, 2022 it was reported Jennings was "doing well" after crosslinking procedure (Ex. 1000, 155.)

### Conclusions

32. The HSM and AHSM positions are administrative in nature, meaning the HSM/AHSM does not generally evaluate, diagnose, determine a course of treatment for, prescribe medications for, or have any direct patient care contact with an inmate patient. Instead, medical care is provided by HSU nursing staff and Advanced Care Providers (physicians and nurse practitioners), within the scope and authority of their respective positions and they do not provide direct care to patients.

33. As registered nurses, Weinman and Haseleu do not have the authority to prescribe medication (other than over-the-counter drugs), refer patients to offsite specialists, order imaging studies, or override the treatment decision of the dentists, physicians, nurse practitioners, and/or physician assistants. The same is true for an LPN.

34. Offsite Advanced Care Providers do not have prescription authority within any Corrections' institution. Therefore, when an inmate patient returns from an offsite visit with a prescription, it is the Corrections ACP who is responsible for reviewing the offsite ACP's recommendations and deciding whether or not to follow them based on whether or not they are appropriate for use in an institution setting.

35. Dr. LaVoie was not involved in the treatment of or decision-making regarding Jennings' keratoconus.

36. To a reasonable degree of medical certainty, it is not likely that the brief delays in Jennings undergoing the cross-linking procedure led to a need for corneal transplant.

6

37.     Corneal cross-linking often only delays further worsening of corneal ectasia rather than fully prevents it. It is more likely than not that Jennings would have needed corneal transplant regardless of the cross-linking procedure.

*Pursuant to 28 USC § 1746, I verify under penalty of perjury that the statements in this declaration are true and correct and based upon my personal knowledge.*

Executed this 1st day of October, 2025.

s/Laura Sukowaty
**Laura Sukowaty, M.D.**