DAMONTA JENNINGS,

        Plaintiff,

  v.

CHARLES DOMBECK, et al.,                    Case No. 22-cv-01205

        Defendants.

**DECLARATION OF BETHANY SOUTH
IN SUPPORT OF DEFENDANT BETHANY SOUTH'S MOTION FOR SUMMARY
JUDGMENT**

I, Bethany South, certify under penalty of perjury that the following is true and correct to the best of my recollection:

1.      I am an adult resident of the state of Wisconsin.

2.      I am a Defendant in the above-captioned case. I make this declaration on the basis of my personal knowledge of the facts set forth herein.

3.      At all times relevant to this action, I was an independent contractor with the Wisconsin Department of Corrections ("DOC") pursuant to my March 22, 2016, Independent Contractor Agreement with Richter Professional Services, Inc. I hold a license to practice optometry in the state of Wisconsin.

4.      Pursuant to my March 22, 2016, Independent Contractor Agreement, my duties were to contact Wisconsin DOC facilities and the clients therein to provide service in accordance with professional standards and handbook guideline.

5. During the relevant time, I was not the only optometrist working as an independent contractor within the DOC to provide optometry services to inmates.

6. As an independent contractor with the DOC, I worked within numerous correctional facilities throughout the state.

7. As an optometrist working as an independent contractor with the DOC, I performed primary eye care including basic eye exams using the equipment available to me at the correctional institutions. I am not an ophthalmologist nor a surgeon.

8. To extent of my impact on patient scheduling for care with me was when I would provide my availability to the various correctional facilities. In other words, I would tell the correctional facilities on which dates I would be present at that facility to provide services.

9. I provided a basic eye exam for Plaintiff on March 11, 2021, and on May 10, 2022. Those are the only dates when I provided care to Plaintiff.

10. I did not prescribe Jennings with a pair of glasses on March 11, 2021, because I knew that he was going to be seeing an offsite provider for testing and knew that his prescription could change based on that appointment. Additionally, glasses are not very effective for correcting the blurred vision symptom of keratoconus, and they would not have been a benefit to Plaintiff. Additionally, ordering glasses takes up to four weeks at a minimum and we are subject to the timeline of the third-party vendor supplying the glasses. I also understood at this time that due to Covid-19 procedures, Jennings was confined to a 10 x 10 room within the WCI.

11. In preparing this declaration, I reviewed the off-site reports for Plaintiff's visits on June 2, 2021, September 22, 2021, and March 28, 2022, which records co-defendants produced in discovery in this case at Bates Nos. 00335 - 00350. My initials are not on these documents, which means that I did not review these documents when Jennings came back from those offsite visits. I

2

have no independent recollection of reviewing Plaintiff's off-site reports prior to my review after co-defendants produced the same records in discovery in this case. No DOC employees provided the offsite visit reports to me for review. If I reviewed Plaintiff's off-site records prior to this litigation, it would have only been a brief review during Plaintiff's appointment with me on May 10, 2022.

12.    In all circumstances, the DOC makes the determination regarding whether recommendations by off-site providers will need prior-authorization and/or will be ordered. As an independent contractor, I am not authorized to determine whether recommendations by off-site providers will need prior-authorization and/or will be ordered.

13.    I am aware that the DOC has a Class III committee that determines whether patients in the DOC's care can receive certain non-urgent, elective specialty care and procedures. I am aware that Class III specialty care and procedures are for cases that can involve progressive pain and/or dysfunction and for which adequate care would include a procedure for as soon as scheduling permits, but any delay of which care will not result in a medical detriment.

14.    As an independent contractor, I am not authorized to initiate applications to the Class III committee review for a patient's non-urgent, elective specialty care and procedures.

15.    As an independent contractor, I do not review and respond to Health Services' Request submitted by patients in the care and custody of the DOC unless a DOC Health Services Unit staff member contacts me about a health services request.

16.    My responses to Plaintiff's health care services requests, to the extent that DOC Health Services Unit staff members contacted me about a health care service request, were reasonable and appropriate. The complaints described in those health care services requests were not emergent complaints and were complaints that could be addressed through a written response

3

to the Plaintiff or by asking DOC staff to place Jennings on my schedule for a basic eye exam when appropriate. In all circumstances, the DOC Health Services Unit staff members would complete written responses, or responses otherwise, to the Plaintiff's health care service requests. The DOC Health Services Unit staff members would also make the decision to schedule Plaintiff for a health care visit in response to his health care services requests and would complete such scheduling. My involvement with scheduling patients only extends to informing the various DOC institutions on which dates I am available at their institution for appointments.

17. In my experience as an independent contractor with the DOC, there are times when an off-site provider's recommendation cannot be accommodated by the DOC. For example, an off-site provider has recommended that a patient wear sunglasses lenses indoors in the past. However, dark-colored lenses violate the DOC's safety procedures. As such, the DOC did not approve the off-site recommendation. Similarly, prior to my interactions with Plaintiff, I knew that a patient with a keratoconus diagnosis went through the Class III committee review process for a corneal-crosslinking procedure. In that case, the Class III committee denied the corneal-crosslinking procedure. It was my understanding at the time that the Class III committee determined that a corneal crosslinking for a patient with keratoconus was an elective, non-covered care service that was not medically necessary. I was not aware of this prior keratoconus patient suffering any further or progressive issues after not receiving a corneal cross-linking procedure.

18. When I was reviewing Plaintiff's electronic health care record during the May 10, 2022, I saw an order for corneal crosslinking. At that time, I only saw an order and understood that the DOC had not yet determined if the procedure was covered. When I saw an order for a corneal crosslinking procedure for Plaintiff in his electronic health record during my visit with him on May 10, 2022, I remembered the prior experience with the Class III committee denying a corneal

4

crosslinking procedure for a patient with keratoconus because the committee determined that the procedure was a non-covered care service. My understanding at the time was that the DOC understood corneal crosslinking to be a non-covered care service that was not medically necessary. I also understood at that time that while corneal crosslinking, if successful, could stop the progression of the underlying keratoconus disease, keratoconus symptoms can be addressed through non-surgical means including contact lenses.

19. I cancelled the order for Plaintiff's corneal crosslinking on or around May 10, 2022, because I understood that corneal crosslinking was a non-covered, elective procedure. At that time, I did not believe that Plaintiff's health would be in jeopardy if he did not receive the corneal crosslinking procedure because I understood that the blurry vision symptom of keratoconus can be addressed by use of contact lenses.

20. At that time, I was not aware that Dr. Laura Sukowaty had previously approved Plaintiff's corneal crosslinking procedure.

21. At that time, I also did not have information regarding the specifics of Plaintiff's keratoconus condition because I did not have the requisite equipment at the Waupun Correctional Institution to map his keratoconus, and I did not study his off-site medical records in detail because my scope of care was to provide a basic eye exam. I see an average of 22 patients within DOC patients per day and do not have time to study the patients' medical records in detail before and during each visit. As such, I did not know the details of the offsite provider's recommendation for corneal crosslinking.

22. Further, in my experience, patients can live with keratoconus without having a corneal crosslinking procedure or a corneal transplant for years and even decades without experiencing any significant worsening of the disease. Some patients do not ever require corneal

crosslinking or a corneal transplant at all. A corneal transplant procedure is a very rare occasion. A patient with keratoconus that never receives treatment through either corneal crosslinking or a corneal transplant would not go blind and would not have no-light-perception vision loss. The vision loss would be in the form of blurred vision, which can be addressed with contact lens use.

23. On or around May 10, 2022, I did not believe that the Plaintiff, a patient with keratoconus was in risk of harm without a corneal crosslinking procedure based on my education, training, and experience, as described above. As such, I did not believe that Plaintiff was in risk of harm without a corneal crosslinking procedure, which I understood the DOC did not cover.

24. Plaintiff did not serve me with a notice of claim.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated this 3rd day of October, 2025.

*/s/ Bethany South*
Bethany South