2025 WL 2476653
Only the Westlaw citation is currently available.
United States Court of Appeals, Seventh Circuit.

Cordell SANDERS, Plaintiff-Appellant,
v.
Andrea MOSS, et al., Defendants-Appellees.

No. 23-1335
|
Argued February 10, 2025
|
Decided August 28, 2025

**Synopsis**
**Background:** State prisoner filed § 1983 action, alleging that prison's health care provider, as well as individual mental health providers, exhibited deliberate indifference to his mental health needs in violation of the Eighth Amendment. The United States District Court for the Central District of Illinois, Jonathan E. Hawley, United States Magistrate Judge, 2023 WL 2161522, granted summary judgment for the providers. Prisoner appealed.

**Holdings:** The Court of Appeals, Lee, Circuit Judge, held that:

prisoner could not prevail on claim alleging that individual providers acted with deliberate indifference to medical needs in providing him with mental health treatment;

prisoner could not prevail on claim alleging that individual providers acted with deliberate indifference in recommending that he be placed in segregation;

prisoner could not prevail on claim alleging that individual providers acted with deliberate indifference in recommending that he be docked yard time;

manner in which one individual provider reviewed prisoner's medical history before recommending solitary confinement did not constitute deliberate indifference;

individual providers' recommendations that prisoner be placed in segregation did not cause him harm;

health-care provider's alleged practice of refusing mental health treatment until inmate harmed himself or threatened to do so was not widespread; and

alleged failure by health-care provider to promulgate policy describing what mental health professionals should do when participating in disciplinary proceeding did not support imposition of *Monell* liability.

Affirmed.

Rovner, Circuit Judge, concurred with opinion.



EXHIBIT

20

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

Appeal from the United States District Court for the Central District of Illinois. No. 1:16-cv-1366 — **Jonathan E. Hawley**, *Judge.*

**Attorneys and Law Firms**

Steven J. Horowitz, Kathleen L. Carlson, Attorneys, Leslie Kuhn-Thayer, Sidley Austin LLP, Chicago, IL, Gregory Cui, Attorney, Roderick & Solange Macarthur Justice Center, Washington, DC, for Plaintiff-Appellant.

Julie Ann Teuscher, Attorney, Cassiday Schade LLP, Chicago, IL, for Defendants-Appellees.

Andrew Tutt, Attorney, Arnold & Porter Kaye Scholer LLP, Washington, DC, for Amicus Curiae John F. Stinneford.

Marissa A. Lalli, Attorney, Wilmer Cutler Pickering Hale & Dorr LLP, Boston, MA, for Amici Curiae Terry A. Kupers, Craig Haney, Pablo Stewart.

Jessica Lynn Ellsworth, Attorney, Hogan Lovells US LLP, Washington, DC, for Amici Curiae Martin Horn, Steve Martin, Dick Morgan, Emmitt Sparkman, Phil Stanley, Eldon Vail.

Before Easterbrook, Rovner, and Lee, Circuit Judges.

**Opinion**

Lee, Circuit Judge.

**\*1** Despite suffering from serious mental health issues, Cordell Sanders, an inmate formerly at Pontiac Correctional Center, was forced to spend eight years in segregation housing after committing multiple disciplinary offenses. Pursuant to 42 U.S.C. § 1983, he sued the prison's health care provider, Wexford Health Sources, as well as his mental health care providers, Andrea Moss, Kelly Haag, Todd Nelson, Linda Duckworth, and Stephen Lanterman, for exhibiting deliberate indifference to his mental health needs in violation of the Eighth Amendment.[1] The district court granted summary judgment for the defendants.

On appeal, Sanders contends that the individual defendants failed to provide adequate mental health services and to advocate for him during his disciplinary proceedings to lessen his sanctions. As for Wexford, Sanders argues that the company employed a widespread practice of denying mental health treatment to inmates until they were in crisis. He also claims that Wexford had an obligation to enact a policy its mental health providers could follow when participating in disciplinary proceedings, but failed to do so.

This case is a tragic one. We have no doubt that Sanders struggled with severe mental health needs while at Pontiac and that his prolonged time in segregation did little to address them. But the question before us is whether the record contains evidence from which a rational jury could find that the defendants' conduct violated Sanders's Eighth Amendment rights. This is a difficult standard to meet, and, despite the voluminous record, we discern no evidentiary basis from which a jury could find in Sanders's favor and affirm.

**I**

Because Sanders challenges the district court's order granting summary judgment to the defendants, we recount the facts in a light most favorable to him. *See Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015).

In 2004, Sanders was sentenced to twenty years in prison for homicide. He was sixteen at the time. Since entering the Illinois Department of Corrections (IDOC), Sanders has committed a myriad of offenses, including assaulting and threatening staff,

repeatedly engaging in sexual misconduct, and damaging property. These incidents generated "tickets" for which he received disciplinary action. Such sanctions took the form of segregation, reduction of outdoor yard access, and other restrictions. Relevant here, as a result of his violations, Sanders was placed in segregation at Pontiac for over eight years from 2009 until 2017.[2]

### A. Sanders's Providers

**\*2** IDOC contracts with Wexford Health Sources to provide mental health services for inmates at Pontiac. Moss, Haag, Nelson, Duckworth, and Lanterman are current and former Wexford health professionals who treated Sanders at Pontiac. Moss, Haag, and Lanterman are licensed clinical social workers, while Nelson and Duckworth are employed as mental health professionals. (For ease of reference, we will call them "the Providers.") They, along with other mental health professionals at Pontiac, diagnosed Sanders with various mental issues, including antisocial personality disorder, intermittent explosive disorder, schizoaffective disorder, and depressive disorder.

The Providers evaluated Sanders when he attended periodic individual and group therapy sessions. According to Sanders, some of these sessions lasted no longer than five to ten minutes. The Providers also performed brief assessments outside of his cell while he was in segregation. And they met with him when he engaged in suicidal behavior. And, although the Providers did not treat Sanders on a consistent, ongoing basis while he was at Pontiac, the undisputed record indicates that other mental health providers offered similar mental health services to Sanders during this time frame.

In addition to these providers, Wexford also employed psychologists and psychiatrists to treat inmates at Pontiac. These professionals assessed Sanders on a regular basis, created individualized treatment plans for him, and managed his medications, which included antidepressant, psychotropic, and mood-stabilizing drugs.

#### 1. Andrea Moss

Moss first evaluated Sanders during an individual therapy session in April 2013. During this session, Sanders complained to Moss about having to "do 100% of [his] time" and not having the opportunity for good-time credit. Moss did not treat Sanders again that year, but, throughout 2014, 2015, and early 2016, Moss observed Sanders more than a dozen times while he was in segregation and evaluated him during individual therapy sessions.

Whenever Moss met with Sanders, he denied having suicidal or homicidal ideations. Sanders had remarked to Moss that "the only time" he left the cell was when he met with her. In Moss's view, however, Sanders generally presented appropriately and only occasionally displayed inappropriate mood, behavior, concentration, and affect.[3]

Moss recommended that Sanders receive an outpatient level of care, except for one instance on October 27, 2015, when Sanders tried to commit suicide.[4] After the attempt, Lanterman met with Sanders to evaluate him.

Sanders would meet with Moss again eight days later. At that meeting, he denied being suicidal. Rather, Sanders was upset that his shoes had been taken away and told Moss, "This is the only way I get anything done [because] no one is responding to my grievances." Out of an abundance of caution, Moss evaluated his suicide risk, placed him on suicide watch, and recommended that he receive crisis care.

#### 2. Stephen Lanterman

**\*3** Lanterman initially encountered Sanders while he was conducting rounds in the segregation housing area in April 2015. He noted that the meeting was unremarkable.

When they met three months later, Sanders relayed that he heard unintelligible voices and felt suicidal. Sanders also complained that a correctional officer spat on him and falsely accused him of some unspecified misconduct. Lanterman was concerned about Sanders's appearance, behavior, and mental status, but Sanders denied experiencing suicidal or homicidal ideations. Nevertheless, based on his observations, Lanterman placed Sanders on suicide watch, so that he could be monitored every ten minutes.

The next day, Sanders reported to Lanterman that he felt better and had time to cool off. He again denied feeling suicidal and said that he was taking his medication. For his part, Lanterman noted that Sanders's mood and mental state were stable. And, while Lanterman took Sanders off suicide watch, he recommended that Sanders be placed in crisis care.

Lanterman next treated Sanders on October 27, 2015, the day Sanders attempted suicide. During the examination, Sanders told Lanterman that he had overdosed on pills. At the conclusion of the appointment, Lanterman diagnosed Sanders with major depression with psychotic affects, recommended that he receive crisis care, and placed him on suicide watch.

Lanterman examined Sanders again the next day. Sanders explained that he was depressed and angry the day before because the facility had taken away his yard access. But he once again denied having suicidal or homicidal thoughts. Lanterman noted that Sanders was calm, coherent, and had a congruent affect (that is, his emotional expressions aligned with his mood). Lanterman maintained his recommendation that Sanders receive crisis care and placed him on suicide watch.

Two days later, on October 30, 2015, Sanders met again with Lanterman and said that Prozac seemed to be helping his mood. He also reiterated that he was not having suicidal thoughts. And so, Lanterman took Sanders off suicide watch but continued crisis care.

August 2016 was the next time Lanterman encountered Sanders while performing rounds in the segregation unit. He continued to see Sanders during routine segregation rounds through November 2016 with no reported concerns.

### 3. Todd Nelson

Nelson first assessed Sanders in January 2015. Sanders had called for a crisis team member because, he claimed, he had no access to the yard for a year or a TV for the prior three years. During their session, Sanders told Nelson that he was not contemplating suicide and was not a danger to others. Nelson marked down three risk factors (feelings of hopeless or helplessness, signs of depression, and increased anxiety) and five protective factors (opposition to suicide, future orientation/sense of hope, support system, sense of responsibility, and compliance with medication). Based on this evaluation, Nelson did not order crisis care and recommended that Sanders be returned to segregation housing. Nelson explained to Sanders that he should direct his concerns about yard and TV privileges to security personnel.

A year passed before Nelson saw Sanders again for an individual therapy session in January 2016. According to Nelson, Sanders seemed fine and presented no issues of note. Nelson continued to see Sanders when he made segregation rounds and during individual therapy sessions through April 2016. During this period, the only problem Sanders raised related to the expiration of his medication, which Nelson remedied by arranging for it to be re-ordered.

**\*4** On July 24, 2016, Sanders overdosed on medication and was placed on suicide watch. Nelson was assigned to treat Sanders the following day. Sanders told Nelson that he had dislocated his thumb "during a staff assault" and became suicidal when the medical staff failed to see him. And so, he overdosed on Motrin. However, Sanders informed Nelson that he felt better and did not have any suicidal or homicidal ideations. Nelson observed that while Sanders was fully oriented, appropriately groomed, and had a clear and coherent thought process, he was guarded and suspicious and exhibited a flat affect. At the same time, Nelson found Sanders to be cooperative, appropriate, stable, and noted that there were no signs of psychosis. Nelson nonetheless recommended that Sanders remain on suicide watch.

Nelson then evaluated Sanders daily for four consecutive days. On one of the days, Sanders bit his own arm. Sanders told Nelson that the biting was his attempt to get medical attention for his injured thumb. The next day, Sanders professed his realization that biting his arm to get medical attention displayed poor judgment. He told Nelson that he knew the appropriate procedure to obtain medical attention.

After repeatedly observing that Sanders was stable, cooperative, and presenting appropriately, as well as the absence of any psychotic affects, Nelson removed him from suicide watch on August 2, 2016. Nelson continued to see Sanders during segregation rounds through February 2017 with no reported concerns.

### 4. Kelly Haag

Haag met Sanders for the first time when conducting segregation rounds in August 2015. Sanders informed her then that he was "o.k." and Haag did not notice anything amiss. Her observations of Sanders during segregation rounds in November 2015, June 2016, and July 2016, were similarly unremarkable.

Haag next saw Sanders in December 2016 during his group therapy session. Based on their interactions, Haag found that Sanders displayed improved impulse control and insight with no observable signs of psychosis, agitation, or distress. According to Haag, she explained to Sanders how to go about requesting mental health services or crisis care in times of need. He acknowledged understanding this process.

Haag met with Sanders in at least seven additional group therapy sessions from December 2016 through March 2017. Haag also continued to see Sanders during segregation rounds in March and April 2017, all without any reported concerns. On one occasion, Haag noted that Sanders's inability to refrain from behaviors that resulted in disciplinary infractions indicated poor impulse control. But, at Haag's assessments, Sanders repeatedly denied having suicidal or homicidal ideations and generally presented appropriately.

### 5. Linda Duckworth

Duckworth met with Sanders only a handful of times between February 2015 and August 2016. During their first encounter, Sanders told Duckworth that he was upset about receiving a disciplinary ticket for masturbating in front of a female officer, so he broke a sprinkler. Sanders refused to talk further about it in front of the other officers who were present. At the conclusion of the examination, Duckworth found Sanders's behavior, mood, and affect inappropriate but recommended an outpatient level of care.

Later that same afternoon, Sanders threatened to cut himself with a paper cup, and Duckworth came by his cell to speak with him. According to Sanders, he had been falsely accused of the ticket for masturbating, and his property had been taken away for three days. Duckworth provided Sanders with deep breathing and meditation exercises to help him cope with stress. She observed him to be alert, attentive, fully oriented, mildly distressed, and at minimal risk of suicide and, thus, recommended that he continue outpatient care.

**\*5** Duckworth later treated Sanders in two individual therapy sessions in May and July 2015 and saw him during one segregation round in May 2016. At no time did she see anything of concern. Duckworth assessed Sanders with various disorders, including mood disorder, antisocial personality disorder, schizoaffective disorder, intermittent explosive disorder, adjustment order, and narcissistic traits.

Duckworth's final encounter with Sanders was in August 2016 to evaluate his suicide risk. She assessed certain risk factors, including Sanders's concerns about serving too much segregation time and having lost his underwear in May 2015; his difficulty adjusting to the loss of freedom, status, and privilege; his murder conviction; and his prior suicide attempts. Duckworth also found countervailing factors, including Sanders's opposition to suicide, his support system, his coping and problem-solving skills, and his compliance with psychotropic medication. Based on her examination, she recommended that Sanders return to segregation housing rather than crisis care.

**B. Sanders's Disciplinary Proceedings**

When an inmate is accused of a major violation of prison rules, the case is heard by the "Adjustment Committee." The committee holds a hearing and determines whether the individual committed the alleged offense. It then recommends what it believes to be the appropriate discipline to the warden, including possible segregation.

For inmates, like Sanders, whom IDOC has designated as being "seriously mentally ill," the Adjustment Committee follows a 2014 IDOC administrative directive and solicits input from the relevant Wexford mental health providers in a Mental Health Disciplinary Review form. To complete the form, the mental health provider reviews the inmate's mental health records and the disciplinary report and opines on whether: (1) the individual's mental illness may have contributed to the behavior at issue; (2) segregation is likely to significantly impact the inmate's mental health; and (3) the offender's mental health should be considered when determining the appropriate discipline. The mental health provider can also recommend a specific term of segregation or no segregation time at all. The provider plays no role in deciding whether the inmate committed the alleged misconduct.

Under the IDOC directive, the Adjustment Committee must consider the opinions of the mental health provider in the Mental Health Disciplinary Review form. If the mental health provider recommends a specific term of segregation or no segregation, the directive requires the committee to adopt the provider's recommendation. If the committee disagrees and believes that a more restrictive disciplinary action is necessary, it must appeal that decision to the warden, who makes the final determination.

At one time or another, each of the Providers either completed a Mental Health Disciplinary Review form or participated on the Adjustment Committee for Sanders.

For example, in May 2015, Sanders faced the Adjustment Committee for sexual misconduct, and Moss recommended no more than six months of segregation time, yard restriction, and "C grade" placement.[5]

In September 2015, Sanders came before the committee for writing "a sexually graphic and wholly inappropriate" letter to a court reporter. Nelson recommended a recreation restriction. The Adjustment Committee, which included Lanterman, followed Nelson's recommendation and assessed one month of yard restriction. Days later, after Sanders committed another sexual misconduct offense, Nelson recommended a segregation term of two months, and the committee followed Nelson's recommendations.

**\*6** Sanders was brought before the Adjustment Committee again on October 27, 2015, after disobeying multiple orders to remove items covering his cell window. Haag recommended zero to three months of segregation as well as other less severe restrictions. The committee, which included Moss, adopted Haag's recommendations and did not recommend segregation.

Duckworth sat on the Adjustment Committee to hear two sets of violations by Sanders on July 24, 2016, and July 27, 2016. He had been ticketed with assaulting staff after throwing liquid on officers, threatening to stab them, disobeying multiple orders, damaging property, and impairing surveillance. The committee adopted the mental health provider's recommendation of one year of segregation along with lesser restrictions.[6]

**C. Wexford**

According to Sanders, Wexford employed a practice of ignoring the mental health needs of inmates until they reached a crisis state. At his deposition, he testified that on November 3, 2015, he knocked on his cell door while Moss was walking down the gallery to tell her that he needed to talk, but Moss did not respond. He was later informed by a prison guard that Moss told the guard that she did not want to speak with Sanders unless he was suicidal. Sanders also testified that Moss had indicated to him on another occasion that she would only see him if he was suicidal, but he could not remember when that occurred. Sanders admitted, however, that he was seen by another mental health professional on November 3, just not Moss.

Sanders also faults Wexford for failing to issue guidance explaining exactly what a mental health provider must do when participating in disciplinary proceedings. He points to Nelson's testimony that he did not review Sanders's mental health records prior to completing the Mental Health Disciplinary Review form but relied on input from colleagues who regularly treated Sanders. In a similar vein, Lanterman testified that he did not necessarily meet with an accused inmate every time he completed the form and that, when he sat on the Adjustment Committee, he relied on the opinions of the reviewing provider. Additionally, Sanders points to Duckworth's testimony that she does not consider an inmate's segregation history when she fills out the Mental Health Disciplinary form. [7]

## II

Sanders initiated this action *pro se* in September 2016. Shortly after he brought the case, IDOC reduced Sanders's segregation term, and he was transferred to the general population in September 2017. In an amended complaint, Sanders alleged that Wexford and the Providers violated his right to be free of cruel and unusual punishment under the Eighth Amendment. As to the former, Sanders contends that Wexford had a practice or custom of ignoring inmates' mental health needs until they were in crisis. As to the latter, he claims that the Providers were deliberately indifferent to his mental health needs and failed to advocate for his removal from segregation housing.

**\*7** This is the third appeal Sanders has filed in this case. The first time, we reversed the district court's decision to revoke his *in forma pauperis* status (IFP) and dismiss his complaint on the grounds that his allegations did not demonstrate imminent danger of serious physical harm. *Sanders v. Melvin*, 873 F.3d 957, 959–60 (7th Cir. 2017). Sanders had to make this showing because he already had three strikes under 28 U.S.C. § 1915(g). *Id.* at 959. On remand, Sanders retained counsel, paid the filing fee, and filed the operative complaint.

In the second appeal, we reversed the district court's order dismissing Sanders's case as a sanction for misrepresenting to the court that he received mental health treatment only when he had harmed himself or had credibly threatened to do so. *Sanders v. Melvin*, 25 F.4th 475, 484–85 (7th Cir. 2022).

In both instances, "Sanders ha[d] not yet been directed to substantiate his allegations." *Sanders*, 873 F.3d at 962. Since then, the parties were provided an opportunity to conduct discovery, and the defendants moved for summary judgment, which the district court granted on all counts. The latest order is the subject of this appeal.

## III

We review the district court's order granting summary judgment *de novo* after construing all factual disputes in Sanders's favor. *See Burton*, 805 F.3d at 783. We begin with Sanders's claims against the Providers before turning to his claims against Wexford.

### A. The Providers

Sanders contends that the Providers were deliberately indifferent to his mental health needs in two ways. First, they provided a course of treatment they knew to be ineffective. Second, during disciplinary proceedings, they recommended additional time in segregation (and other restrictions) rather than recommending less.

"The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). A prison official's "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285.

To prove a deliberate indifference claim, a plaintiff must first show that he suffers from an "objectively serious medical condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). Additionally, a plaintiff must establish that the prison official acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).

A prison official has a sufficiently culpable state of mind when the official "knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk." *Id.* (citation omitted). A court considers "the totality of an inmate's medical care" to assess "whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728–29 (citing *Cavalieri v. Shephard*, 321 F.3d 616, 625–26 (7th Cir. 2003)). The standard to prove deliberate difference is a difficult one: a medical professional's treatment decision "must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (internal quotation marks omitted).

One way to establish such a departure "is where a prison official persists in a course of treatment known to be ineffective." *Id.* at 729–30 (citing *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000)); *see, e.g., Greeno v. Daley*, 414 F.3d 645, 654–55 (7th Cir. 2005). That said, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) (internal quotation marks omitted). And "expert medical evidence is often required to prove" a substantial departure from accepted professional judgment, practice, or standards. *Eagan v. Dempsey*, 987 F.3d 667, 683 (7th Cir. 2021) (internal quotation marks omitted).

### 1. Sanders's Treatment

 **\*8** The parties do not dispute that Sanders's mental health needs presented an objectively serious medical condition. Rather, the parties focus on whether the Providers acted with deliberate indifference when they continued to provide, as Sanders sees it, knowingly ineffective treatment. We find that the record lacks sufficient evidence from which a reasonable jury could make this determination.

The Providers' notes documented both complaints from Sanders about his mental state and segregation as well as statements confirming that he was fine and had no mental health concerns. Sanders urges us to disregard the latter, citing the unreliability of self-reporting. But, even if we construe the record in Sanders's favor (as we must), in an area as multifaceted as mental health and its treatment, we cannot discern how a jury would be able determine the effectiveness of the course of treatment provided to Sanders without expert evidence. *See Petties*, 836 F.3d at 729 (observing "the need for specialized expertise to understand the various implications of a particular course of treatment" in cases where the risk of harm is not obvious). In this way, this case is markedly different from an obvious case of deliberate indifference such as when a prison official gives an aspirin to a patient facing a serious risk of appendicitis. *See Sherrod v. Lingle*, 223 F.3d 605, 611–12 (7th Cir. 2000).

Here, Sanders retained psychiatrist Dr. Stuart Grassian as a mental health expert, but Dr. Grassian's opinions were limited to the psychiatric impact of Sanders's incarceration at Pontiac. He offered no opinions about the effectiveness of the specific treatment Sanders received from the Providers. For instance, when asked to evaluate whether Sanders's group therapy was beneficial, Dr. Grassian responded: "I do not know enough about the group therapy. I didn't attend it. I'm telling you what his experience was."

To be sure, Dr. Grassian does criticize the Providers for failing to spend sufficient time with Sanders to "really get[ ] to know him." But he does not suggest that the time they did spend with Sanders demonstrated a "complete abandonment of medical judgment." *See, e.g., Murphy v. Wexford Health Sources, Inc.*, 962 F.3d 911, 916–17 (7th Cir. 2020) (affirming summary judgment on the ground that expert's opinions "d[id] not go so far" to make this showing) (citing *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). And while Dr. Grassian expressed some disagreement with the treatment Sanders received (which we must credit at summary judgment), he offers no opinion as to whether the treatment the Providers gave to Sanders represented a substantial departure from accepted professional standards or suggested that such decisions were not actually based on their

professional judgment. *See Norfleet*, 439 F.3d at 396 ("[A] difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference.").

### 2. Discipline

Sanders also contends that the Providers acted with deliberate indifference to his mental health needs during the disciplinary process. Sanders insists that he is not challenging the discipline he received. Instead, he argues, a reasonable jury could find that the Providers knew of the obvious harms from segregation and, despite this, failed to exercise their clinical judgment when recommending segregation and similarly restrictive sanctions. But, even if we were to assume that the Providers were aware of the risk as Sanders describes and take Sanders's factual assertions to be true, the record is devoid of any evidence from which a reasonable jury could conclude that no minimally competent mental health professional would have made the recommendations they did.

**\*9** Furthermore, Moss, Nelson, and Haag each recommended that Sanders be docked yard time. And, because access to exercise is an essential human need, we have recognized that failure to provide exercise time can violate the Eighth Amendment. *See Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001); *Anderson v. Romero*, 72 F.3d 518, 528 (7th Cir. 1995). Still, for the reasons explained, the record before us lacks a basis upon which a jury could conclude that Nelson's recommendation under these circumstances substantially departed from professional norms.

Sanders also criticizes the Providers for "fail[ing] to undertake a meaningful review of [his] medical history before recommending solitary confinement." He cites the testimony from Nelson, Lanterman, and Duckworth discussed earlier. But of these three Providers, only Nelson completed a form for Sanders. And Nelson stated that, although he did not review Sanders's mental health records prior to completing the form, he relied on information from colleagues who treated Sanders on a regular basis. Nothing in the record indicates that this was such a stark departure from professional standards as to constitute deliberate indifference.

Lastly, even if no minimally competent mental healthcare provider would have made the recommendations the Providers did here, Sanders has not demonstrated a genuine dispute of fact as to whether the recommendations caused him harm. By the time the Providers began participating in Sanders's disciplinary proceedings—the earliest being Moss in May 2015—he was already serving a term of segregation set to expire in January 2022 and was released from segregation in September 2017. Thus, no reasonable jury could conclude that the recommendations of the Providers caused him to serve more time in segregation than he otherwise would have.

For these reasons, the district court did not err when granting summary judgment in favor of the Providers.

### B. Wexford

Sanders asserts two grounds for his *Monell* claim against Wexford. First, he contends that Wexford has a widespread practice or custom of ignoring the mental health problems of inmates until they are in crisis. Second, he faults Wexford for failing to give direction to its mental health professionals on how to complete a Mental Health Disciplinary Review form.

We have recognized three types of entity action that can support *Monell* liability under § 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* at 986 (internal quotation marks omitted). Moreover, inaction can give rise to liability under *Monell* if it reflects "a conscious decision not to take action" where necessary to "remedy a potentially dangerous practice." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc) (internal quotation marks omitted); *see also J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377–78 (7th Cir. 2020) (en banc).

### 1. Refusing Treatment

Sanders contends that Wexford has a practice or custom of refusing mental health treatment until an inmate harms himself or threatens to do so.[8] But, assuming such a practice existed, Sanders has not created a genuine issue of fact as to whether such a practice was widespread. Sanders points to only one occasion when Moss told him that she did not want to see him unless he was suicidal.[9] And, while a plaintiff may be able to "demonstrate the existence of an official policy or custom by presenting evidence limited to his own experience," *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008), one incident cannot "plausibly be described as 'so persistent and widespread as to practically have the force of law.' " *Bridges v. Dart*, 950 F.3d 476, 480 (7th Cir. 2020) (quoting *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)).

**\*10** Sanders also points to purported gaps in treatment by the Providers as evidence of a widespread practice of refusing mental health care until a crisis arises, but the record clearly shows that many other mental healthcare providers, including multiple psychiatrists and psychologists, were regularly treating him during the times that he was not seeing the Providers. In fact, on this record, there can be no genuine dispute that Sanders was receiving continuous treatment for his mental health conditions, including before and after each suicide attempt.

### 2. Lack of Policy

Lastly, Sanders argues that Wexford had an obligation to promulgate a policy describing what a mental health professional should do when participating in a disciplinary proceeding, but failed to issue one. It is not clear from the briefing what Sanders thinks such a policy should contain. For example, does he believe that Wexford should require mental health professionals to review an inmate's mental health records in all cases, consider an inmate's overall segregation time, meet with the inmate in person before making a recommendation, or always recommend a reduced segregation time (or, perhaps, all the above)?

What is clear is that IDOC already had a procedure in place to ensure the involvement of mental health professionals in the disciplinary process for seriously mentally ill inmates. And his own proceedings before the Adjustment Committee demonstrates the significant impact that their recommendations could have on the outcome.

Furthermore, given the existing policy, there is no evidence in the record from which a reasonable jury could find that the failure to promulgate a more detailed policy created a risk so obvious as to constitute deliberate indifference. And Sanders has presented no evidence to show that the absence of such a policy caused the Providers to treat him in a way that violated the Eighth Amendment.

Dr. Grassian does vaguely suggest that Wexford failed to adequately train its mental health providers regarding the risks posed by solitary confinement to inmates suffering from mental illness, but he says nothing about whether the detailed policy Sanders proposes was necessary or, if so, whether the need would have been obvious to Wexford. Thus, the district court did not err in granting summary judgment to Wexford on Sanders's *Monell* claims.

### IV

For these reasons, the district court's grant of summary judgment is AFFIRMED.

Rovner, Circuit Judge, concurring.
Although I agree that there can be no liability for these defendants under our deliberate indifference standard, I write separately to emphasize what I have said more extensively in my dissent in *Johnson v. Prentice*, 29 F.4th 895, 906 (7th Cir. 2022), and what my brother, Judge Hamilton, has written recently in his concurrence in *Jackson v. Anastasio*, No. 23-1703, —— F.4th ——,

——, 2025 WL 2437947, at \*10 (7th Cir. Aug. 25, 2025) (Hamilton, J., joined by Rovner, J., concurring), about our evolving understanding of solitary confinement and its deleterious effects.

It is undisputed that Cordell Sanders was living with serious mental illness. Because of repeated rules infractions, Sanders spent eight continuous years in solitary confinement. This isolation was all-encompassing. Sanders was held in his cell for 22 to 24 hours a day. Occasionally, he was let out to shower, for visits, to use the solitary confinement law library, or to attend "yard" in slightly larger cells that look like very narrow, chain-link-fenced dog runs, which Wexford's own expert described as "isolated cubicles." He did not have access to out-of-cell religious, educational, or vocational programming. When he did leave his cell, Sanders was shackled, even during medical appointments. His cell had no outside windows and little air flow, subjecting him to extreme temperatures and stifling conditions. He had little to no ability to interact with other prisoners. For at least five of the eight years of his solitary confinement, he was on "yard restriction," meaning that he was only allowed to leave his cell for exercise in the isolated cubicle once a month, for a single hour, and often he did not get even that miniscule relief.

 \*11  Despite (or perhaps because of) spending eight years in continuous solitary confinement, he was unable to conform his behavior to prison expectations or to act in a manner that benefited his own interest. During his time in solitary confinement, Sanders expressed suicidal thoughts, harmed himself, and attempted to take his life multiple times. He overdosed on pain medication in 2010. He sliced his stomach in 2012. He overdosed on 69 pills on October 27, 2015, and overdosed again on pills on July 24, 2016—his fourth suicide attempt in six years. Two days later, in continued distress, he began to bite his wrist.

Sanders' experience with solitary confinement is not unique. The amicus briefs of former correctional officials, as well as that of mental health professionals with extensive experience studying the psychological and physiological effects of solitary confinement detail the abundant research describing the destructive and devastating mental health effects of even the most minimal time spent in solitary confinement. *See* R. 53 and 54. The effects are universal. According to one researcher's survey, "[t]here is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement last[ing] for longer than 10 days ... failed to result in negative psychological effects." [1]

Of course prison staff must have measures to enforce rules violations and to keep inmates and staff safe. But the amicus brief from former correctional officials claims that the increased use of solitary confinement is "not associated with reductions in facility or systemwide misconduct and violence." [2] In fact, "data reveal[ ] a clear relationship between the use of restrictive housing in facilities and [ ] indicators of facility disorder." [3] Studies have also demonstrated that reducing solitary confinement decreases prison violence dramatically. [4] In light of the uncontroverted harm to prisoners, forty-five states have introduced bills to regulate, limit, or ban solitary confinement. [5] As of 2023, twenty states had introduced bills to limit solitary confinement to fifteen days or less, three of which have passed, and only Iowa, Idaho, Utah, North Dakota and Wyoming had not yet introduced a single bill on the topic. [6]

 \*12  And so, in the end, Sanders suffered terribly for, at most, a minimal positive effect on prison security, and possibly even a negative effect. Although we once looked at outdoor exercise time in prison as recreational, our "evolving standards of decency" allow us to understand that "conditions which may have been acceptable long ago may be considered unnecessarily cruel in light of our growing understanding of human needs and the changing norms of our society." *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001) (internal quotation marks omitted). For several decades, we have recognized that exercise is one of the basic human necessities and an essential component of health. *Anderson v. Romero*, 72 F.3d 518, 527–28 (7th Cir. 1995). It "is no longer considered an optional form of recreation but is instead a necessary requirement for physical and mental well-being." *Delaney*, 256 F.3d at 683. Consequently, "long stretches of [solitary] confinement can have serious adverse effects on prisoners' psychological well-being" and can be described as cruel under the Eighth Amendment if "unrelieved by opportunities for out-of-cell exercise." *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001); *see also Davenport v. DeRobertis*, 844 F.2d 1310, 1313 (7th Cir. 1988) ("[I]solating a human being from other human beings year after year or even month after month can cause substantial psychological damage."). Of course, that basic human need must be balanced against security and penological interests of the prison, but " '[t]o deny a prisoner *all* opportunity for exercise outside his cell would, the cases suggest, violate

the Eighth Amendment unless the prisoner posed an acute security risk if allowed outside of his cell for even a short time.' " *Delaney*, 256 F.3d at 687 (quoting *Anderson*, 72 F.3d at 527).

This case addresses the level of care mental health care providers owe to a prisoner in solitary confinement. In *Jackson*, Judge Hamilton addressed the question of when disciplinary solitary confinement implicates a prisoner's liberty interest. Both cases at their core, however, ask courts to consider when solitary confinement breaches norms of humane and ethical treatment of prisoners. As Judge Hamilton points out, the United States sponsored rules in the United Nations entitled "Standard Minimum Rules for the Treatment of Prisoners" which prohibit as a form of torture solitary confinement of more than fifteen consecutive days. *Jackson*, 2025 WL 2437947, at *10 (Hamilton, J., concurring). Sanders endured solitary confinement for more than eight years. And as Judge Hamilton further notes, "recent case law ... reflects a judicial intuition that prolonged punitive solitary confinement should be a thing of the past, " as it is not consistent with " 'evolving standards of decency that mark the progress of a maturing society.' " *Id.* at *16 (quoting *Walton v. Nehls*, 135 F.4th 1070, 1072 (7th Cir. 2025)).

Although we find no liability for these defendants given their limited role in the assignment of Sanders' solitary confinement, it is my hope that our evolving understanding of the psychological effects of solitary confinement on the one hand, and lack of penological benefit, on the other, will inform our understanding of deliberate indifference, liberty interests, and Eighth Amendment standards in cases where defendants were, in fact, responsible for imposing the condition. With our growing understanding of human needs, mental illness, and the devastating effects of solitary confinement, our standards of decency and humaneness must evolve to reflect the changing norms of a civilized society.

**All Citations**

--- F.4th ----, 2025 WL 2476653

---

**Footnotes**

1    In addition, Sanders sued the Illinois Department of Corrections and certain of its correctional officials in this action, and the district court granted them summary judgment which Sanders also appealed. Sanders eventually settled with the Department and its officials and dismissed his appeal.

2    Defendants formally refer to his placement as "segregation housing," while Sanders applies the label "solitary confinement." We use the term "segregation" as reflected in the record. While the parties also dispute how to characterize the conditions Sanders faced during his placement, they agree that the privileges and freedoms of inmates in segregation housing were severely limited compared to those in the general prison population. For example, inmates assigned to segregation housing at Pontiac are held in their cells for at least 22 hours a day. And for most of Sanders's time at Pontiac, segregation inmates were allowed out of their cells only for showers, yard, visits, and use of the law library.

3    According to Sanders's medical file, mental status examinations generally measured the propriety of his appearance, behavior, mood, affect, concentration, memory, speech, and thoughts.

4    Prior to his treatment by the Providers, Sanders attempted to commit suicide at least once when he overdosed on his pain medication in 2010. Sanders also claimed he attempted suicide in 2012, when he suffered an episode of psychosis and cut himself around his stomach area. Defendants dispute this 2012 attempt, pointing out that Sanders cites no corroborating medical records and concedes he never told anyone about this incident. However, we accept self-serving testimony on summary judgment so long as it based on personal knowledge. *See Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010).

5    C Grade indicated a further restriction in institutional privileges.

It is not clear from the record which mental health provider completed the Mental Health Disciplinary Review forms for these violations.

Sanders also cites testimony from Haag, but she did not, as Sanders claims, admit that she disregarded his segregation term during disciplinary proceedings. Rather, she stated that she did not calculate the term when completing an assessment after segregation rounds.

It does not appear that Sanders raised this precise *Monell* theory when responding to defendants' summary judgment motion below. Rather than asserting a widespread refusal of treatment until a crisis occurs, Sanders submitted that Wexford lacked a policy that ensured consistent and effective mental health treatment. Defendants do not complain, so we will take Sanders's theory as he has articulated it here.

The other incident was relayed by a guard to Sanders and constitutes at least one level of inadmissible hearsay. *See Washington Cnty. Water Co., Inc. v. City of Sparta*, 77 F.4th 519, 529 (7th Cir. 2023) ("[I]nadmissible hearsay evidence does not create a factual dispute at summary judgment.") (citation omitted).

Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 132 (2003).

Benjamin Steiner & Calli M. Cain, U.S. Dept. of Justice Programs, Bureau of Justice Statistics, *The Relationship Between Inmate Misconduct, Institutional Violence, and Administrative Segregation: A Systematic Review of the Evidence in Restrictive Housing in the U.S.: Issues, Challenges, and Future Directions*, at 179 (Nov. 2016), http://www.nationaljailacademy.org/_documents/resources/administrative-segregation/doj-restrictive-housing.pdf. [https://perma.cc/5PS9-TG3E]

Allen J. Beck, U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics Use of Restrictive Housing in U.S. Prisons and Jails, 2011–12, at 10 (Oct. 2015), https://bjs.ojp.gov/content/pub/pdf/urhuspj1112.pdf. [https://perma.cc/4SVJ-6GYQ]

*See, e.g.*, Marc A. Levin, Texas Public Policy Foundation, *Testimony of Marc A. Levin, Esq., Director of the Center for Effective Justice at the Texas Public Policy Foundation Before the U.S Senate Judiciary Subcommittee on The Constitution, Civil Rights and Human Rights*, at 3 (Feb. 2014) (noting decreases in violence associated with reducing solitary confinement across multiple states), https://www.judiciary.senate.gov/imo/media/doc/02-25-14Levin-Testimony.pdf. [https://perma.cc/L3UU-QFY5]

Jean Casella, *New Report and Public Database Track Legislation to Limit or End Solitary Confinement*, Solitary Watch (January 2023), https://solitary-watch.org/2023/01/25/new-report-and-public-database-track-legislation-to-limit-or-end-solitary-confinement. [https://perma.cc/65XX-RSDP]

*Id.*

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.