UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DAMONTA JENNINGS,

        Plaintiff,

  v.

CHARLES DOMBECK, et al.,                  Case No. 22-cv-01205

        Defendants.

---

**JOINT AGREED UPON FINDINGS OF FACT
IN SUPPORT OF DEFENDANT BETHANY SOUTH'S AND STATE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT[1]**

---

### I.      Overview of Claims and Parties.

Plaintiff Damonta Jennings ("Jennings") commenced the present 28 U.S.C. § 1983 civil rights action on October 12, 2022, alleging deliberate indifference to a serious medical need in violation of his rights under the Eighth Amendment to the United States Constitution against Defendants Mary Moore, Charles Dombeck, Robert Weinman, Ashley Haseleu, Daniel La Voie, Laura Sukowaty (collectively "State Defendants") and Bethany South. (*See* Dkt.1.) Jennings filed an Amended Complaint on July 28, 2023, and filed a Second Amended Complaint on February 14, 2024. (*See* Dkt. 30.)[2] In his Second Amended Complaint, Jennings also brought medical

---

[1] Certain facts have been proposed solely for purposes of summary judgment. Should this matter proceed beyond the summary judgment stage, the parties reserve the right to present evidence which may contradict or rebut certain facts presented and preserve the right to challenge the admissibility or relevance of certain evidence cited herein. "State Defendants" refers collectively to Defendants Mary Moore, Charles Dombeck, Robert Weinman, Ashley Haseleu, Daniel La Voie, Laura Sukowaty.

[2] Jennings filed his Complaint, Amended Complaint, and Second Amended Complaint pro *se*. (*See* Dkts. 1, 15, 30.) This Court granted his motion for appointment of counsel on April 10, 2024. (Dkt. 41.) Attorney Wesley E. Halsam entered a notice of appearance for Jennings on March 14, 2025. (Dkt. 62.)

negligence claims under Wisconsin law against Defendants Bethany South and Mary Moore and negligent supervision claims under Wisconsin law against Defendants Robert Weinman and Ashley Haseleu. (*See* Dkt. 30, ¶¶ 67-68.)

Jennings is a prisoner in the custody and care of the Wisconsin Department of Corrections ("DOC"). (*See id.*) He has resided at the Waupun Correctional Institution ("WCI") since approximately February 2019. (Dkt. 30, p. 4; Dkt. 75, p. 4 [9: 9-18].) Jennings' claims in this case arise from events occurring while he was a prisoner at the WCI from on or around March 1, 2021, through approximately December 11, 2023. (*See* Dkt. 30.)

Defendant Mary Moore ("APNP Moore") is an adult resident of the state of Wisconsin. (*Id.*) APNP Moore was employed by the DOC as an Advanced Practice Nurse Prescriber ("APNP") at WCI from July 8, 2019, through August 8, 2022. (Dkt. 42, ¶ 2.) APNP Moore testified that as an ANPN at WCI, she was responsible for the daily health care of an assigned panel of patients. (Dkt. 76, p. 5 [7: 4-6].) APNP Moore collaborated as needed with an on-site physician and was able to write prescriptions, give orders for treatment, and refer patients out to specialty. (*Id.*, p. 5 [7: 7-12].) As a DOC APNP, APNP Moore participated in the "planning, development, implementation, and evaluation of care and educational programs and protocols used by the health staff to meet the needs of incarcerated individuals who exhibit health problems across the continuum from prevention to complex medical and/or psychiatric conditions." (Dkt. 81 – 4.) During her employment with the DOC, APNP Moore was Jennings' primary care provider. (*Id.,* p. 42 [42: m8-10].) APNP Moore left Waupun in April 2022. (Dkt. 78, ¶ 13.)

Defendant Charles Dombeck ("APNP Dombeck") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) APNP Dombeck was, at all times relevant to this action, employed by the DOC as an APNP at the Dodge Correctional Institution. (Dk. 42, ¶ 4.) As a DOC APNP,

APNP Dombeck participated in the "planning, development, implementation, and evaluation of care and educational programs and protocols used by the health staff to meet the needs of incarcerated individuals who exhibit health problems across the continuum from prevention to complex medical and/or psychiatric conditions." ((*See* Dkt. 81 – 5.) APNP Dombeck worked with administrative direction from the Physician Supervisor. (*Id.*)

Defendant Robert Weinman ("RN Weinman") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) RN Weinman was employed by the DOC as a Nursing Supervisor at WCI from January 31, 2021, through November 19, 2022. (Dkt. 42, ¶ 5.) As the Nursing Supervisor at WCI, RN Weinman was responsible for providing administrative oversight and direction of the Health Services Unit ("HSU"). (Dkt. 73, p. 4 [6: 2-3]; *See* Dkt. 81 – 3.)

Defendant Ashley Haseleu ("RN Haseleu") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) RN Haseleu was employed by the DOC as a Nurse Clinician 2 at WCI from April 29, 2019, through July 4, 2021. (Dkt. 42, ¶ 6.) After working as a Nurse Clinician 2, RN Haseleau became a Nursing Supervisor at WCI. (*Id.*) As a Nurse Clinician 2, RN Haseleu was responsible for "providing skilled nursing care to incarcerated adults in the state correctional facilities" including patient assessment and treating, assisting the physician in providing medical services, management of medications, and provision of emergency care and maintenance of medical records under they general supervision of the Nursing Supervisor. (Dkt. 81 – 8.) As a Nursing Supervisor, RN Haseleu was the Assistant Manager to the HSU and worked with the primary care physician, dentist, psychiatrist and specialists to provide health care at the assigned correctional facility. (*Id.*)

Defendant Laura Sukowaty (Dr. Sukowaty") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) Dr. Sukwoty was, at all times relevant to this action, employed by the DOC as

a Physician Supervisor at the Dodge Correctional Facility. (Dkt. 42, ¶ 7.) As a Physician Supervisor, Dr. Sukowaty supervised certain nurse practitioners and physicians at the DOC and saw patients. (Dkt. 74, p. 5 [8: 7-13].)

Defendant Daniel LaVoie ("Dr. LaVoie") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) Dr. LaVoie was, at all times relevant to this action, the Medical Director of the Wisconsin Division of Adult Institutions, Bureau of Health Services. (Dkt. 42, ¶ 8.) As the Medical Director, Dr. LaVoie worked under the administrative direction of the Director of the Bureau of Health Services to direct the medical, mental health, dental, pharmaceutical and optometric programs for offenders in the Division of Adult Institutions and the Wisconsin Correctional Center System. (Dkt. 81 - 7.)

Defendant Bethany South ("Dr. South") is an adult resident of the state of Wisconsin. (Dkt 80, ¶ 1.) Dr. South is an optometrist licensed by the state of Wisconsin. (Dtk. 74 p. 5 [9: 2-3]; Dkt. 72, p. 5 [5: 17], Dkt. 80, ¶3.) Dr. South has never been employed by the DOC. (Dkt. 72, p. 20 [66: 7-9]; Dkt. 74 p. 5 [9: 2-3].) Dr. South is not a surgeon. (Dkt. 71, p. 12 [35: 19].) At all times relevant to this action, Dr. South was an independent contractor working within the State of Wisconsin Correctional Facilities on behalf of Richter Professional Services, with whom the DOC had a contract, pursuant to a March 22, 2016, Independent Contractor Agreement between Dr. South and Richter Professional Services (hereinafter the "Independent Contractor Agreement"). (Dkt. 80, ¶ 4 ; Dkt 74, p. 5 [9: 13].) Dr. South's obligations under the Independent Contractor Agreement include contacting the State facility and the clients therein for which she is providing service hereunder and shall schedule and provide such services as she determines in accord with professional services. (Dkt. 80, ¶ 4.) Jennings does not have any personal knowledge regarding Dr. South's Independent Contractor Agreement beyond his understanding of eye care as stated

within the WCI Inmate Handbook and Dr. South's written discovery responses in this case. (Dkt. 75, p. 6 [15: 7-14].) Dr. South provided Jennings with medical care on March 10, 2021, and May 10, 2022. (*Id.,* p. 19 [69: 14 – 17]; Dkt. 80, ¶ 9.) Jennings claims that Dr. South was negligent and/or deliberately indifferent by: (1) not ordering him glasses after his March 11, 2021, basic eye exam appointment with her until August 3, 2021, (2) cancelling his corneal crosslinking procedure order on May 10, 2022; (3) not providing him with care from March 12, 2021, through May 10, 2022; (4) failing to acknowledge his Health Services Requests; and (5) by failing to speak with DOC employees about the severity of Jennings' condition and advocating for him to be seen earlier for a crosslinking procedure. (Dkt. 75, p. 7 [19:10-13], *Id.,* p. 14 [8-10], *Id.,* p. 15 [50: 15-25], [51: 1-2];  Dkt. 75 -1, p. 13;  Dkt. 30, ¶¶ 52 -54.)

**II.     General Background Regarding DOC's Policies and Procedures for Health Services Requests, and Off-Site Visits, and Class III Medical Procedures.**

The State Defendants follow DOC's Division of Adult Institutions' ('DAI") policies along with state laws and practice guidelines in the performance of their job duties. (*See* Dkt. 81 -3, p. 1; Dkt. 81-4, p.1 ; Dkt. 81-5, p. 1; Dkt. 81- 6, p. 1; Dkt. 81 – 7, p. 1; Dkt. 81 – 8, p. 1; Dkt. 74, p. 12 [38: 18 – 20].)

> i.     *Health Services Requests and Scheduling Patient Care Appointments with Dr. South.*

The WCI issues a Rules & Information Handbook ("WCI Handbook") setting forth rules and policies for inmates to follow during their time at the WCI. (Dkt. 81 -10, p. 6.) The WCI Handbook provides the following procedure for inmates to obtain medical services:

1. Obtain a Health Services Request form DOC-3035 from the officer in your housing unit.
2. Completely fill out your name, DOC number, housing unit, cell number, and date at the top of the form.

3. Provide a brief, but specific, description of your problem (i.e., sore back, toothache, request to review medical file, etc.) in area provided; do not write in lower area.
4. Attach a completed Disbursement Request to the Health Services Request. If you do not have a Disbursement Request to attach to your Health Services Request, a Disbursement Request will be provided to you upon arriving at Health Services.
5. Place the completed form in the Health Services Request box located in each cell hall. The only exceptions are for those inmates housed in the Segregation Unit. Due to the nature of this area, the Officers are responsible for placing the Health Services Requests in the box. The Health Services Unit (HSU) is not responsible for Health Services Requests handled any other way.
6. Health Services Requests are picked up at 7:30 a.m. by HSU staff, 7 days a week. A nurse reviews the requests and either schedules an appointment, sends a written response, or forwards the request to other staff (i.e., dental, optical, medical record reviews, medication reviews, etc).
7. You will be charged $7.50 for each inmate-initiated Health Service Request that results in a face-to-face assessment by a health care provider. This includes medical, dental, psychiatric and optical visits. You will not be charged a co-payment for appointments initiated by a health care provider or for referrals from one health care provider to another.

B. Appointments

1. You will initially be seen by the registered nurse. If the nurse determines it is necessary, an appointment will be scheduled with the physician. Referrals to outside specialists are made only if the physician deems it necessary.
2. Normal HSU business hours are 7:30 a.m. – 3:00 p.m., Monday through Friday, excluding holidays.
3. Unless your medical need is determined to be an emergency, an appointment is scheduled approximately 3-5 days after the Health Services Request is received.
4. Medical emergencies will be handled as they arise. A medical emergency is defined as an unexpected, serious happening demanding immediate medical action. If you have a genuine medical emergency, notify your Housing Unit Officer or Shop Officer who will then contact the Health Service Unit. The on-duty nurse will determine whether or not a medical emergency actually exists. If you are unable to report to the Health Services Unit, medical personnel will come to your aid.

(Dkt. 81 – 10, pp. 30- 31.)

At all times relevant, the DAI issued policy no. 500.30.11 entitled "Daily Handling of Non-Emergency Requests for Health Care" (hereinafter "DAI Non-Emergency Requests Policy".) (*See* Dkt. 81 – 9.) The DAI Non-Emergency Requests Policy states that "HSRs [Health Services Requests] are picked up daily by health staff" and "are reviewed and prioritized daily by qualified health care professionals, or the health care liaison if applicable." (*Id.*) The same policy further states that "n[]ot every written request is a health care request requiring a face-to-face evaluation;" however, "[r]equests for care identifying symptoms requiring a face-to-face encounter shall be conducted by a registered nurse, or the health care liaison, within 24 hours of receipt." (*Id.*)

In sum, DOC nursing staff review Health Services Requests ("HSRs") submitted by inmates and determine whether to send a written response or schedule an appointment for the nurse to evaluate the inmate in a clinical setting. (Dkt. 73, p. 13 [43: 1-3].) Dr. South testified that she does not review HSRs unless a DOC staff member contacts her about am HSR. (Dkt. 80, ¶ 16.) If an inmate was seen by an optometrist for regular routine care, the DOC's staff would put the inmate on the optometrist's schedule for that care. (*Id.*, p. 12 [41: 12-19].) Dr. South testified that she would provide the DOC institutions with her availability, and the DOC medical staff would create the schedule for which inmates she would see while she was at a particular correctional institution. (*Id.*, p. 6 [11: 9-14].)[3] As an optometrist, Dr. South performed primary eye care including basic eye exams using the equipment available to her at the correctional institutions. (Dkt. 80, ¶ 7.)

    ii.    *Off-Site Specialist Visits*.

At all times relevant, the DAI issued policy no. 500.30.02, "Specialty Consultations," to "develop procedures to ensure the continuity of care when off-site providers, such as specialty

---

[3] During the relevant time, Dr. South did not work exclusively at the WCI and worked within numerous correctional institutions across the state of Wisconsin. (Dkt. 80,¶ 5.)

consultation, emergency services and inpatient services make recommendations" ("Specialty Consultations Policy"). (Dkt. 81- 11, p. 1.) Pursuant to the DAI Specialty Consultation policy, the "DOC ACP [Advanced Care Provider] shall consider outside recommendations and initiate orders as medically necessary." (*Id.*) The DAI Specialty Consultation provides the following procedure for ordering specialty consultations:

> A. Specialty Consultations require an order and prior authorization if indicated.
>
>> 1. The ACP shall determine the need for off-site/specialty care and discuss this with the patient.
>> 2. All appointments shall be ordered in the HCR [Health Care Record].
>> 3. Processes shall be in place to assure timely scheduling of off-site visits.
>> 4. Timeframe delays or changes to scheduled appointments shall be communicated with an ACP and RHA [Responsible Health Authority].
>> 5. All communication between facility and off-site provider regarding scheduling of an appointment shall be documented in HCR.

(*Id.*) Pursuant to the same policy, if an ACP determines the need for off-site specialty care, then the Health Care Services ("HSU") Manager shall designate an appropriate HSU staff member to schedule consultations. (*Id.*, p. 2.) The ACP shall then provide medical necessary information for health staff to complete the top portion of DOC-3001 – Offsite Service Request and Report ("Offsite Visit Report"). (*Id.*, p. 3.) The WCI follows the practice of sending an Offsite Visit Report along with every inmate who is taken offsite to a hospital. (Dkt. 81 -2, pp. 7-8; Dkt. 74, p. 8 [20: 7-11].) During the off-site visit, the off-site provider then fills out the report to include their assessment and recommendations to the DOC. (Dkt. 74, p. 8 [20:11-14].) A security team member then brings back the Off-Site Visit Report and then gives it to a DOC nurse. (Dkt. 73, p. 16 [54: 3-7], *Id.,* p. 17 [57: 6-13], *Id.,* p. 17 [58: 4-5].) However, sometimes the off-site provider will not fill out the report. (Dkt. 74, p. 8 [20: 16]; Dkt. 73, p. 16 [54: 7-8].) In that instance, the RN would then need to access the electronic record and download the AVS. (Dkt. 74, p. 8 [20: 17-21]; Dkt. 73, p. 16[54: 4-7].) It is the DOC's policy that the provider who receives and reviews an Off-Site

Visit Report affixes their own initials on the report. (Dkt. 74, p. 12 [37: 19-22], *Id.,* p. 12 [38:23-25], *Id.,* p. 13 [39: 1-2].) Providers outside of the DOC cannot write orders for medical treatment within the DOC's system. (Dkt. 74, p. 5 [10: 22-25].)

Pursuant to the DAI Specialty Consultations Policy, any patient returning from an off-site visit shall be seen by a Registered Nurse. (Dkt. 81 - 11, p. 3.) The recommendations from off-site providers "shall be reviewed and ordered by a DOC ACP before implementation" and "[s]ome recommendations require prior authorization before implementation according to DAI Policy 500.10.12." (*Id.*, pp. 4-5.) As such, the DOC provider who ordered the off-site care should receive and review the Off-Site Report and determines whether the recommended care should be implemented and seeks prior authorization for that care if necessary. (Dkt. 73, p. 6 [13: 4-11]; Dkt. 74, p. 12 [37: 19-22]; Dkt. 72, p. 9 [22: 9-6].) Assuming that the care recommended by an off-site provider is approved by the DOC, the DOC provider then puts in an order, or referral, for the care and a DOC scheduler schedules the care. (Dkt. 74, p. 21 [14; 22-24]; *Id.,* p. 6 [11: 16-18]; Dkt. 73, p. 6 [13:12-16].) Only DOC providers can make referrals for treatment. *(*Dkt. 74*,* p. 6 [11: 16-18]. Outside providers can only make recommendations for treatment. (*Id.*)

Offsite Advanced Care Providers do not have prescription authority within any Corrections' institution. (Dkt. 78, ¶ 34.) Therefore, when an inmate patient returns from an offsite visit with a prescription, it is the Corrections ACP who is responsible for reviewing the offsite ACP's recommendations and deciding whether or not to follow them based on whether or not they are appropriate for use in an institution setting. (*Id.*, ¶ 35.)

iii.     *Prior Authorization for Medical Procedures.*

At all times relevant, the DAI issued policy no. 500.10.12, "Prior Authorization Guidelines for Non-Urgent Care (Class III)," to "utilize Prior Authorization Guidelines for non-urgent

treatment" and arrange for hospital and specialty care for patients "in need of these services" ("Class III Policy"). (Dkt. 81 – 12, p. 1.) The Class III board is a process for prior approvals because the State is self-insured. (Dkt. 74, p. 5 [9: 20-23].) Pursuant to the Class III Policy, there are three classifications of "Medical and Surgical Conditions," including:

1. Class 1: Emergency Care
   a. An emergency is a potentially life-threatening condition requiring immediate care.
   b. A delay in treatment may result in death or permanent serious impairment of the patient's health.
2. Class II: Urgent Care
   a. Presently necessary urgent health care problem.
   b. An urgent medical health care problem, while not an emergency, is one in which prolonged delay of treatment could present a risk for serious bodily harm, disability, or further deterioration in the patient's condition resulting in worsening health.
3. Class III: Non-Urgent Medically Acceptable
   a. A non-urgent condition is one that does not represent a significant threat to the patient's general medical health and which is not likely to pose such a threat in the foreseeable future.
   b. Surgical procedures can be performed at the convenience of physicians, persons and institutions involved. Non-urgent cases are of two types and in both types, prior authorization is required.
4. Class III-A
   a. Cases involving persistent pain or dysfunction where pain or dysfunction have been progressive but do not pose an urgent threat to the health of the patient.
   b. The condition must be subject to medical correction or arrest.
   c. While no medical deferment is expected to result from a delay of several weeks to months, adequate care dictates the performance of medical or surgical procedure as soon as scheduling reasonably permits.
5. Class III-B – No procedure or referral should be scheduled at the present.
   a. Cases not involving persistent pain, progressive disease, or impairment and not solely for the convenience of the patient.
   b. No medical effects are expected to result from the surgical delay of months to years.
6. Class IV: Elective Non-Covered Care Services.
   a. Services that are considered not medically necessary or required in accordance with acceptable medical standards for medical and surgical practice. No procedure or referral should be scheduled at the present.

(Dkt. 81 – 12, pp. 2-3.) Class I and Class II requests do not require prior approval. (*Id.,* at p. 3.) A Class II request is submitted by "the facility ACP [advanced care provider" in the electronic health record. (*Id.,* at p. 3.) A Class III request is approved by the DOC's medical director, designee, or by the Class III committee. (*Id.,* at p. 3.)

**III.     Jennings' Medical Care At Issue.**

*i.     Jennings' March 11, 2021, appointment with Dr. South.*

Prior to March 11, 2021, the extent of Mr. Jennings' eye care included fewer than ten basic eye exams. (Dkt. 75, p. 5 [12: 18-21], *Id.,* p. 5 [13: 2-4].) None of these prior eye exams resulted in a prescription for glasses or contacts. (*Id.,* p. 5 [13: 4-7].) Upon his incarceration at the Dodge Correctional Facility, Jennings had a required eye exam and did not need any glasses or contacts as a result, as such, he assumes that his vision was "good" at that time. (*Id.,* p. 5 [13: 12-15].) Jennings submitted a request for a visit for his vision on or around March 11, 2021, because he realized it was becoming "a little more difficult and blurry to read from a distance than usual." (*Id.,* p. 5 [13: 23-25]; p. 6 [14: 1-5].)

Dr. South performed a basic eye exam on Jennings on March 11, 2021. (South Declaration; Dkt. 72, p. 9 [21: 19-20]; Dkt. 75, p. 11 [35: 1-5].) As a result of her March 11, 2021, basic eye exam, Dr. South suspected that Jennings had corneal ectasica. (Dkt. 72, p. 9 [21: 8-10], *Id,* p. 9 [23: 15-17].) Dr. South did not have the equipment to diagnose Jennings with corneal ectasia because the WCI did not have the equipment needed to conduct topography testing that gives more detailed information about the thinning. (*Id.,* p. 9 [21:8-9, 19-25], *Id.,* p. 8 [16: 22-25.) Dr. South testified that she submitted an internal referral for Jennings to be seen by an outside provider while he sat in her chair on March 11, 2021. (*Id.,* p. 9 [21: 11-13]; Dkt. 75, p. 7 [18: 8, 12-2-].) Dr. South did not prescribe Jennings with a pair of glasses on March 11, 2021. (Dkt. 80, ¶ 10.)

Pursuant to Dr. South's internal referral, Jennings had an appointment with Dr. Shipla Reddy ("Dr. Reddy") at UWHealth Ophthalmology on June 2, 2021. (Dkt. 76, Exhibit 2 at p. 3.) In her After Visit Summary ("AVS"), Dr. Reddy stated: "Corneal ectasia – Suspect keratoconus based on exam … Recommend glasses wear … Follow up with pentacam 1-2 months, repeat pentacam 4-5 months, then 6 mo security clinic with DFE to discuss management options," (Dkt. 76, Exhibit 2 at p. 3.) In the Offsite Visit Report regarding the June 2, 2021, offsite visit, Dr. Reddy stated "see AVS" in the recommendations section. (*Id.,* p. 1.) Dr. Reddy suspected keratoconus and recommended glasses and topography, an imaging study which maps the surface curvature of the cornea. Crosslinking was not recommended at that time. (Dkt. 78, ¶ 9.)

APNP Moore received the Offsite Visit Report regarding Jennings' June 2, 2021, visit with Dr. Reddy and initialed the same report on the same date. (*Id.,* p. 1; Dkt. 76, p. 14 [42: 22-25], *Id.,* p. 14 [43: 1-4].)  As Jennings' primary care provider, APNP Moore was responsible for reviewing Jennings' offsite record reports and ordering follow up appointments as necessary. (Dkt. 81 -1, p 10.)

*iii.  Jennings' Care with Dr. Shilpa Reddy at UW Health on September 22, 2021.*

Jennings' next off-site appointment with Dr. Reddy occurred on September 22, 2021. (Dkt. 76, Exhibit 1at p. 2.) APNP Moore made the referral for Jennings' September 22, 2021, appointment with Dr. Reddy. (Dkt. 76, p. 15 [45: 7-9].) After Jennings' September 22, 2021, offsite visit, APNP Moore signed off on the September 22, 2021, Offsite Visit Report prepared by Dr. Shipla G. Reddy. (Dkt. 81 -1, p. 10; Dkt. 76, p. 15 [45: 10-12].) In the September 22, 2021, Offsite Visit Report, Dr. Shipla wrote "see AVS" in the recommendations section. (Dkt. 76,

Exhibit 1 at p. 1.) The AVS from Dr. Reddy's September 22, 2021, offsite visit with Jennings states:

> **Keratoconus both eyes**
> -Discussed etiology and management of these issues; due to severity, will send to Cornea
>     -Of note, there is not corneal cross-linking available in a secure facility at UW, and it is likely that this procedure would help the patient. It would be preferable for the patient to see a non-UW cornea physician with cross-linking facilities available. I will set him up with our Cornea specialist, but if he can be sent to a non-UW provider with cross-linking instead, this would be optimal recommend this plan of action.

(*Id.,* (at p. 2.) (emphasis in original) Dr. Reddy diagnosed Jennings with keratoconus in both eyes and noted that it was "likely" that corneal cross-linking would help Jennings. However, she also noted there was no secure facility for corneal cross-linking at UW, recommended to be done by non-UW provider. (Dkt. 78, ¶ 10.) Per the September 22, 2021, off-site record, APNP Moore ordered Jennings a referral to UW Optometry for a "CTL visit," which visit was conducted on March 28, 2022. (Dkt. 81 – 1, p. 10.)

*iv.*      <u>*Overview of Keratoconus Condition and Treatment.*</u>

Keratoconus is a thinning disease of the cornea that causes it to bulge in certain ways. (Dkt. 72, p. 7 [15: 12-13].) Keratoconus is a type of corneal ectasia. (*Id.,* p. 9 [23: 18-20].) All forms of corneal ectasia are degenerative. (*Id.,* p. 9 [23: 21-23].) One of the symptom of keratoconus is blurred vision. (*Id.,* p. 8 [16: 9-10].) Keratoconus can be treated with corneal crosslinking or corneal transplants. (*Id.,* p. 8 [18: 19-20].) Corneal cross-linking is an outpatient procedure that involves painting Vitamin A over tissue and then curing it with UV light to strengthen the cornea to prevent bulging. (Dkt. 72, p. 12 [35: 2-8].) In Wisconsin, corneal crosslinking is performed only by surgeons. (Dkt. 72, p. 12 [35: 24-25], *Id.,* p. 13 [1]; *Id.,* p 15 [18-19].) At his deposition, Jennings testified that Dr. South could not and did not treat his

13

keratoconus condition because she did not have the equipment to provide any treatment. (Dkt. 75, p. 19 [69: 1-2, 10-11].)

Dr. South testified that corneal crosslinking is not guaranteed to reverse the progression of keratoconus. (*Id.,* p. 17 [58: 10-12]; Dr. Sukowaty testified that purpose of corneal cross linking is to "stop or slow down significantly the progression [of keratoconus]. (Dkt. 74, 24:15-20. A corneal transplant is an outpatient procedure removing the cornea and replacing it with a donor tissue from a cadaver. (Dkt. 76, p. 17 [53 [1-3]; Dkt. 72, p. 13 [37: 1-9.) Dr. South testified that if someone with keratoconus does not have a corneal transplant, they would have "very blurry vision." (Dkt. 72*,* p. 8 [17: 21-25].) Wearing contact lenses does not treat keratoconus, but it does offer clearer vision. (*Id.,* p. 14 [40: 5-7].) If someone with keratoconus was completely untreated, they would have permanently impaired vision. (*Id.,* p. 21 [68: 11- 14].)

v. *Jennings' Care with Dr. Kevin Kurt at UW Health on March 28, 2022.*

Jennings' next off-site visit was with Dr. Kevin Kurt ("Dr. Kurt") at UWHealth Ophthalmology on March 28, 2022. (Dkt. 76, Exhibit 3 at p. 2.) In the recommendations section of the Offsite Visit Report, Dr. Kurt wrote: "Corneal x-linking would be very beneficial to patient. Keratoconus is progressing. Will need to return to office for scleral / [*sic.*] lens fitting. Corneal cross-linking may be able to prevent need for corneal transplant. Please approve ASAP." (*Id.*) APNP Moore received and initialed the Offsite Visit Report from Jennings' March 28, 2022, visit with Dr. Kurt. (Dkt. 76, p. 15 [15: 24-25], *Id.,* p. 16 [48: 1-2].) At her deposition, APNP Moore testified that she had no recollection of providing the March 28, 2021, September 21, 2021, nor June 2, 2022, Offsite Visit Reports to Dr. South. (*Id.,* p. 16 [48: 15-20].)

*vi.      Approval and Scheduling of Jennings' Corneal Cross-Linking.*

On or around April 3, 2022, Jennings submitted an HSR stating that: "On my visit to UW Health on 3.28.22 they recommended I get cross link surgery to stop the keratoconus from damaging my corneal causing a full replacement of the corneal. Prior recommendations where not followed up on." (Dkt. 81 – 13.) DOC employee Ann York received Jennings' April 3, 2022, HSR on April 5, 2022. (*Id.*) On or around April 6, 2022, APNP Dombeck emailed Dr. Sukowaty and asked whether, in her judgment, UW Ophthalmology's request for a "patient [Jennings] be sent to a local non-secure site for corneal cross-linking procedure ASAP which they believe may prevent the need for a corneal transplant."[4] (Dkt. 81 – 14.) Dr. Sukowaty claims she had already discussed the need for Class III approval for corneal cross-linking with Dr. LaVoie and determined that pre-approval was not needed. (Dkt. 78, ¶ 18.) Dr. Sukowaty determined that Class III was unnecessary for Jennings to receive corneal cross-linking (Dkt. 74, p. 7 [16: 14-20].) Dr. Sukowaty testified that corneal cross linking for Jennings would have been a Class II, urgent care, procedure. (*Id.* [15: 7-15]. As such, prior authorization by the Class III Committee was not necessary in order to proceed with Mr. Jennings' corneal crosslinking treatment. (Dkt. 81 -1, pp. 10, 12.) Dr. Sukowaty responded to APNP Dombeck's email on April 7, 2022, and stated that the patient "can be approved for this." ." (Dkt. 81 - 14.) APNP Dombeck responded on April 8, 2022, that he would order the consult. (*Id.*)

On April 8, 2022, Haley Bassuener, LPN, left a message with UW to have triage nurses call her back to discuss Jennings' scleral lens and corneal cross-linking procedure. (Dkt. 78, ¶ 21.) On April 20, 2022, Bassuener followed up and called to get an update from UW regarding Jennings' corneal cross-linking procedure. (*Id., .*" (Dkt. 81 - 14.) ¶ 21.) Bassuener called on two

---

[4] ANPN Moore left her employment with the DOC on or around April 2022. (Dkt. 76, p. 5 [6: 2-4].) APNP Dombeck began his employment with the DOC on or around April 2022. (Dkt. 81 – 1, 11.)

separate occasions before UW returned her call. On April 28, 2022, UW informed Bassuener that UW was referring Jennings to Valley Eye Associates for the cross-linking. (Dkt. 78, ¶ 23.)

On or around April 28, 2022, Ms. Bassuenuer emailed Dr. Sukowaty and APNP Dombeck and stated that she had been trying to coordinate with UW where to have Jennings go for a corneal crosslinking, and as UW recommended, she made contact with Valley Eye in Appleton. (Dkt. 81 - 15.) She further stated that Valley Eye could not get Jennings in until November, and that she asked to be put on a call back list in the event a sooner date was to open up. (*Id.*) Sometime in April 2022, Jennings learned through HSR correspondence with the DOC that a crosslinking procedure had been approved and would be scheduled and ordered. (Dkt. 75, p. 15 [53: 19-24].)

vii.    *Jennings' May 10, 2022, Visit with Dr. South.*

Jennings had an appointment with Dr. South on May 10, 2022, for Jennings to pick out the frame for his glasses. (*Id.,* p. 15 [52:8-10, 14-15].) During this visit, Dr. South notified Mr. Jennings that his corneal crosslinking was not a covered procedure and had been cancelled. (*Id.,* p. 15 [52:24-25].) Jennings then wrote an inmate complaint to the WCI regarding his denied treatment and an HSR to the HSU to "confirm that the treatment was not covered," (*Id.,* p. 54 [9-11, 13-15].) Dr. South had cancelled the order for corneal crosslinking, and she testified she cancelled the order because "there was confusion about whether the cross-linking was an approved procedure through the DOC. (Dkt. 72, [33: 15-6]. Dr. South testified that she then received an email shortly thereafter stating that the crosslinking procedure was approved and she reinstated the order for the crosslinking procedure. (Dkt. 72, p. 12 [33: 17-19].)

Jennings' crosslinking procedure was rescheduled after Dr. South reinstated the order. (Dkt**.** 75, p 16 [56: 5-9].) On or around June 2, 2022, the WCI HSU responded to a May 31, 2022, HSR from Jennings to confirm that his corneal crosslinking surgery was scheduled. (Dkt. 81 -17.)

Jennings had a consult appointment with Valley Eye Associates to evaluate his eyes and determine if he needed corneal crosslinking in July 2022. (*Id.,* p. 15 [50: 5-10].) Valley Eye Associates had initially indicated to the DOC that November was the earliest that Jennings could be scheduled for a crosslinking procedure, however, they ended up moving the visit date up to August 25, 2022. (Dkt. 81 -15.) Jennings submitted two HSRs dated August 19, 2022, where he "makes reference to his upcoming surgical procedure being 'in less than 1 week from today's date' which was accurate.'" (Dkt. 81 – 18; Dkt. 78, ¶ 28.) In an August 22, 2025, email to APNP Dombeck, Ms. Bassuener stated that she "was instructed to contact the admin captain about the security breach and was told the surgical procedure needs to be rescheduled. Please review the new surgical date as it was the soonest the clinic had available." (Dkt. 81 - 15; Dkt. 81 – 18; Dkt. 78, ¶ 29.) The HSU informed Jennings on August 26, 2022, that his crosslinking procedure was "rescheduled due to security breach of app[ointment] date." (Dkt. 81 – 18.) It is DOC policy that an inmate is not informed in advance of the time and date of offsite visits and procedures. (Dkt. 78, ¶ 30.)

Valley Eye Associates performed a corneal crosslinking procedure on both of Jennings' eyes on or around October 13 or 14, 2022. (Dkt. 75, p. 16 [55: 13-24].) After his corneal crosslinking procedure, Dr. Sarah Nehls ("Nehls") at UWHealth decided that Jennings needed a corneal transplant in his left eye. (Dkt. 75, p. 57: 5-8].) At his deposition, Jennings testified that it was his belief that he needed a corneal transplant procedure because he did not have the corneal

crosslinking procedure until October 2022. (*Id.,* p. 16 [57: 9-12, 18- 22].) At his deposition, Jennings testified that Dr. Nehls did not tell him that he needed a corneal transplant due to when he had the corneal crosslinking procedure. (*Id.*) Jennings does not have any medical training. (*Id.,* p. 5 [12: 1-3].) Jennings' counsel produced a July 21, 2021, declaration by Dr. Kurt in this case. (Dkt. 81 - 19.) In his July 21, 2021, declaration, Dr. Kurt stated that it is his "professional opinion that corneal cross-linking became the standard of care for keratoconus after the Food and Drug Administration ("FDA") approved corneal cross-linking to treat keratoconus."[5] (*Id.)*

Jennings underwent a corneal transplant procedure in his left eye on or around April 2024. (Dkt. 75*,* p. 17 [58: 25], *Id.,* p. 17 [59: 1-5].) Jennings' providers have indicated that his left eye corneal transplant was successful. (*Id.,* p. 17 [60: 2-5].) Jennings continues to treat with UWHealth annually for new contacts and review of the stitches in his eye. (*Id.,* p. 17 [60: 15-19].) At his deposition, Jennings testified that he experiences light sensitivity that causes eye pain and headaches and less than 20/20 vision in his left eye because of the care at issue and events alleged in his Second Amended Complaint. (*Id.,* p. 18 [65: 19-25], *Id.,* p. 19 [66: 8, 12-13], *Id.,* p. 19 [67: 18-20].) Jennings takes over-the-counter medication and wears approved tinted glasses to treat his headaches. (*Id.,* p. 19 [66: 15-20].)

Dated this 3rd day of October, 2025.

JOSHUA L. KAUL                      KRAVIT, HOVEL & KRAWCZYK, S.C.
Attorney General of Wisconsin

*s/Jonathon Davies*                           *s/ Wesley E. Haslam*
Jonathon Davies                             Wesley E. Haslam
Assistant Attorney General             State Bar #1121993

---

[5] Dr. Kurt's July 21, 2025, declaration also states that he diagnosed Jennings for keratoconus on September 22, 2021, and recommended corneal cross-linking as a treatment for Jennings' keratoconus on September 22, 2021. (*Id.*) The undersigned counsel stipulate that the September 22, 2021, date referenced therein is an error. As provided above, Jennings had an appointment with Dr. Reddy on September 22, 2021. Jennings' first appointment with Dr. Kurt was on March 28, 2022.

State Bar # 1102663

*Attorneys for State Defendants*

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-2070
(608) 294-2907 (Fax)
Jonathon.davies@wisdoj.gov


AXLEY LLP

**s/ Cecilia A. Heberling**
Cecilia A. Heberling
State Bar #1118904

*Attorneys for Defendant Bethany South*

Suite 200, 2 East Mifflin Street (53703)
Post Office Box 1767
Madison, WI  53701-1767
(608) 257-5661
(608) 257-5444 (Fax)
cheberling@axley.com

*Attorney for Plaintiff Damonta Jennings*

Kravit, Hovel & Krawczyk, s.c.
825 N. Jefferson St., 5th Floor
Milwaukee, WI 53202
(414) 271-7100

(414) 871-8135 (Fax)
weh@kravitlaw.com