EXHIBIT 2

Laura Sukowaty, M.D. 8/19/2025                    6

I worked for Progressive Clinic in Milwaukee in their urgent care. I worked for Froedtert in their urgent care. I was in private practice for eight years in Eagle, Wisconsin. And I worked for ProHealth Care for 15 years in practice prior to that. That goes back to when I finished my residency.

Q   And tell me about your education. Where did you go to medical school?

A   The Medical College of Wisconsin.

Q   And all those jobs you listed, is that in your capacity as a doctor?

A   It is. They are.

Q   And are you a general practitioner?

A   Family medicine.

Q   What's the difference between family medicine and a general practitioner?

A   General practitioners have a year of internship but they have not completed a residency. Family medicine have completed a residency in family medicine.

Q   Thank you. That's more for me than the record.

So did you prepare for this deposition today?

A   Yes.

Class II is something that is urgent but not emergent. My hip has bad arthritis. I need a hip replacement. That also does not require approval.

Class III is for those things that are elective, and they require approval of the committee prior to going forward with that.

Q    Does Class -- strike that.

Do you have anything to do with referrals that come in from medical providers who are outside of the prison system?

A    Yes.

Q    Tell me about your role in that.

A    If they are my patient, I put in the referral. Being in the Department of Corrections is very similar to having privileges at a hospital. I can't call up any hospital that I might have a patient at and give them orders on what I want them to do. I need privileges at that hospital. They make sure I'm vetted to make sure that I'm able to give those privileges.

The Department of Corrections works very much like that. Outside providers cannot write orders within our system because they don't know our rules from a security standpoint most of the

you've asked it, actually.  Yes, I participate in Class IIIs.

Q    Okay.  And why did he not require an approval for his -- when I say "he," I mean Mr. Jennings.  Why did Mr. Jennings not need an approval for corneal cross-linking?

A    Because it was considered to be a reasonable treatment for keratoconus.

Q    So not a Class III-type treatment then, correct?

A    Correct, but --

Q    Would it have --

A    Go ahead.

Q    That was my fault that time.

          Would it have fallen under Class II?

A    Yes.

Q    Okay.  And do you recall you or anybody else correcting Dr. South on the type of procedure it was in terms of what class it was?

          MS. HEBERLING:  Object to form and foundation.  Calls for speculation.  You can respond.

          THE WITNESS:  Dr. South is not aware of Class I, II, or III.  She doesn't generally deal with that.  She may have known that it existed, but she does not participate.

BY MR. HASLAM:

Q    Correct.  Well, I'm going to go back then.  That's a good follow-up question.

If they don't receive corneal cross-linking or a corneal transplant.

MS. HEBERLING:  Same objection.  You can respond.

THE WITNESS:  I can?  Okay.  Thank you.

Generally, I don't think they go -- their vision gets severely compromised.

BY MR. HASLAM:

Q    Okay.  Do you know if Mr. Jennings's vision was compromised?

A    I know Mr. Jennings had a corneal transplant.

Q    Do you know if having corneal cross-linking will improve vision or if it will just stop the progression of the keratoconus?

A    It doesn't necessarily stop the progression.  It can slow it down, but the hope is that it will stop or slow down significantly the progression, but it doesn't always do that.  Ultimately, the majority of patients will need corneal transplant.

Q    With the vision loss that is suffered, does that come back after a treatment such as corneal cross-linking?