DAMONTA JENNINGS,

      Plaintiff,

v.

      Case No. 22-cv-1205

CHARLES DOMBECK, ET AL.

      Defendants.

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS SOUTH'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Damonta Jennings ("Plaintiff" or "Jennings") filed an Eighth Amendment claim via a 28 U.S.C. § 1983 action, as well as state law negligence claims against several Department of Corrections ("DOC") staff and Dr. Bethany South ("Dr. South"), an independent contractor providing optometry services to inmates at various DOC facilities. The DOC staff and Dr. South filed separate motions for Summary Judgment, and this response addresses only Defendant South's motion.

Jennings was first seen by Dr. South on March 11, 2021, when he complained of deteriorating vision. Dr. South conducted an eye exam and noted that she suspected he had corneal ectasia. Dr. South would later testify that keratoconus is a form of corneal ectasia; that the standard of care for keratoconus is corneal cross-linking; and that keratoconus is a degenerative disease. Dr. South also testified that

1

she submitted an internal referral for Jennings to be seen by an outside provider. Jennins saw the outside provider on June 2, 2021, and September 22, 2021. On the second visit, the outside provider diagnosed Jennings with keratoconus and recommended corneal cross-linking.

Defendant Mary Moore admitted that she received the outside provider's report and signed for it. Through discovery, Mary Moore and other State Defendants claimed that ordering a consultation for outside providers was the responsibility of the DOC ophthalmologist. Despite receiving this recommendation, Jennings had no further optometry visits, neither within the DOC facilities or off-site, until March 28, 2022. At this visit, another optometrist, Dr. Kevin Kurt, recommended approving corneal cross-linking "ASAP" and noted that it could prevent the need for a corneal transplant. Defendant Moore also signed the Offsite Visit Report from this visit. DOC staff claims to have first attempted to contact an off-site specialist for corneal cross-linking on April 8, 2022, but the procedure was cancelled by Defendant South. DOC staff finally confirmed the corneal cross-linking was scheduled on June 2, 2022. (JSOF at 17).

On May 10, 2022, Dr. South notified Jennings that she had cancelled his corneal cross-linking and stated that it was not an approved procedure. Approximately nine days later, Drs. Sukowaty and Dombeck concluded that this procedure was urgent (Class II) and did not require approval. The procedure was ordered and was eventually performed on October 13, 2022—nineteen months after Dr. South first suspected Jennings had corneal ectasia and over a year from when the

procedure was first recommended. The procedure was effective in his right eye but not in his left. Jennings had to receive a corneal transplant in his left eye.

**LEGAL STANDARD**

**I.     Summary Judgment Standard**

"The Court considers all of the evidence in the record in the light most favorable to the non-moving party and draws all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal quotations and citations omitted)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

The moving party "must show that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see Modrowski v. Pigatto*, 712 f.3d 1166, 1168-69 (7th Cir. 2013) (movant's burden is to demonstrate the absence of a genuine issue; nonmovant is entitled to the benefit of conflicts in the record). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Burton v. Dow Chemical Co.*, 19 F.4th 636, 648 (7th Cir. 2021) (reversing summary judgment where record supported competing inferences). "Competing reasonable inferences preclude summary judgment." *Skiba*, 884 F.3d at 721 (when evidence permits different reasonable conclusions, the case goes to a jury). The nonmovant need not present evidence in a form admissible at trial so long as it could

be presented in admissible form. *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014).

**ARGUMENT**

A common theme in the Defendants' arguments (in both Dr. South's Summary Judgment Brief and the State Defendants') is the claim that the acts or omissions were not their responsibility. Administrative staff and Dr. South both claim that they lacked authority to order off-site appointments. Jennings asserts that all Defendants shared responsibility because all had knowledge of his deteriorating condition and the recommendations of off-site specialists. This awareness either came through Jennings' repeated Health Services Requests which repeat the recommended treatment and his deteriorating condition, or it came from the actual recommendations themselves. Whether serving in the role of a medical provider or in an administrative role, Defendants acted as gatekeepers to Jennings' medical care and contributed to the deleterious delay.

**I.     The Available Facts Support A Finding That Dr. South Acted With Deliberate Indifference.**

An Eighth Amendment claim for inadequate medical care requires a showing that (1) a serious medical condition exists; and (2) that the defendant acted with deliberate indifference—knowledge of and disregard for the substantial risk. *Farmer v. Brennan*, 511 U.S. 825, 832-38 (1994). Dr. South concedes that keratoconus is a serious medical condition. ECF no. 83 at 5-6. Dr. South claims that she did not act with deliberate indifference because: (1) she had no knowledge of Jennings' offsite care; (2) Dr. South could not approve or deny procedures; (3) she did not have

authority to initiate Class III approval process; (4) she did not have a roll in reviewing Health Services Requests ("HSR"); (5) she did not schedule her own visits with Jennings; and (6) she was not responsible for scheduling off-site visits. These arguments must fail because there is sufficient evidence—even from Dr. South's own testimony—to show that genuine issues of material fact exist as to Dr. South's ability to ensure her patients receive care. Further, her testimony shows that she did have knowledge of Jennings' serious medical condition as well as the standard of care for that condition.

Dr. South was the first medical professional to suspect Jennings had keratoconus.[1] (JSOF at 11.) Dr. South knew that keratoconus was a form of corneal ectasia, that keratoconus was typically a degenerative condition, and that the standard of care for a patient with keratoconus is corneal cross-linking. (Jennings PFOF ¶¶ 1-3.) Dr. South further testified that if a person does not treat keratoconus, they would be permanently unable to see. (Jennings PFOF ¶ 4.) Finally, Dr. South testified that a corneal transplant would be the "very worst-case scenario" for a person with keratoconus. (Jennings PFOF ¶ 5.) This testimony demonstrates Dr. South had knowledge of Jennings' condition, that corneal cross-linking was the appropriate care was for that condition, and that failure to obtain that care would lead to a worsening of Jennings' condition and may require a corneal transplant.

---

1 Dr. South wrote that she suspected Jennings had corneal ectasia and later testifies that keratoconus is a form of corneal ectasia. A reasonable juror could determine that she was aware Jennings likely had keratoconus.

Further, Dr. South admits that she "submitted an internal referral for Jennings to be seen by an outside provider." (JSOF at 11.) This indicates not only that Dr. South was aware of Jennings' need for care, but also that she has the ability to initiate appointments with specialists. While Dr. South claims that she "did not schedule Jennings' off-site visits," she certainly played a role in whether or not these visits were initiated.

Jennings was able to see an outside provider after his first visit with Dr. South. (JSOF at 12.) On September 22, 2021, that off-site provider diagnosed him with keratoconus (as Dr. South suspected), and recommended corneal cross-linking—the standard of care for keratoconus. (JSOF at 12-13.) Despite filing multiple HSRs, Jennings was not seen by Dr. South, or any eye care specialists, until March 28, 2022—more than six months after receiving the recommendation for corneal cross-linking and being diagnosed with a serious medical condition. (JSOF at 14.) During the March 28, 2022, visit, Dr. Kurt wrote that corneal cross-linking should be approved "ASAP," and stated that it could prevent the need for a corneal transplant. (JFOF at 14.) The DOC claims to have made an appointment for corneal cross-linking on or around April 28, 2022, after receiving an HSR from Jennings. (*Id.* at 16.) On May 10, 2022, Dr. South admits that she told Jennings that she cancelled the corneal cross-linking procedure because it was not an approved procedure—more evidence that Dr. South could exercise control over a patient's off-site medical care. (*Id.*) The procedure was reinstated by other DOC staff approximately seven days after Dr. South cancelled it. (Jennings DPFOF ¶ 9.)

Dr. South claims that she had no control to start the process for Class III review. (ECF no. 083 at 9.) This is certainly a disputed fact, as it appears she has the ability to cancel a procedure as well as to submit an internal recommendation for treatment. (JSOF at 11, 16.) Regardless, this argument has no merit, as other DOC staff has testified that Jennings' corneal cross-linking would not have required Class III approval because it was not an elective procedure, but rather an urgent Class II procedure. (Jennings DPFOF ¶ 10.)

### A. Dr. South's claim that she did not have substantial knowledge that Jennings was at substantial risk of harm is rebutted by available evidence.

Dr. South claims that she did not have "substantial knowledge that Jennings was in substantial risk of serious harm." (ECF no. 83 at 6.) She relies on *Farmer*, which states that deliberate indifference requires "a showing that the officer was subjectively aware of the risk." *Farmer,* 511 U.S. at 828. Dr, South also cites *Obrien v. Indiana Dept. of Corr.*, 495 F.3d 505, 508 (7th Cir. 2007) for her assertion that "evaluating whether a defendant was deliberately indifferent . . . depends on 'what information was available to the defendant at the time that a decision was made." ECF no. 83 at 6. Under these legal standards, it is apparent that Dr. South had substantial knowledge Jennings was in substantial risk of harm because (1) she was aware that Jennings likely had a serious medical condition; (2) was aware that this condition was degenerative; (3) was aware that the proper treatment for this condition was corneal cross-linking; and (4) that she took no steps to ensure Jennings received the care he needed. In fact, Dr. South actually stymied Jennings' ability to

7

receive the standard of care in this case by cancelling the procedure after it had finally been approved. (JSOF at 16.)

The *Petties* court identified a number of "clues" that can be evidence of deliberate indifference. These clues include: "inexplicable delays or departures from common medical standards, or of course, the doctor's own testimony that indicates knowledge of necessary treatment he failed to provide" and "evidence that the patient repeatedly complained of enduring pain with no modifications in care." *Petties v. Carter,* 836 F.3d 722, 731 (7th Cir. 2016), as amended (Aug. 25, 2016).

In the present case, Dr. South suspected Jennings had a degenerative eye disease and admitted she knew the standard of care for his condition was corneal cross-linking. (Jennings DFOF ¶¶ 1-3.) While Jennings did not complain of the same type of pain as cited in *Petties*, he did complain of disabling vision loss and severe headaches. (Jennings DFOF ¶ 6.) Despite his complaints, and despite the ease with which Dr. South could have prescribed him corrective lenses to help in the interim, Dr. South neither provided Jennings with glasses nor did she follow up with the care he received from off-site providers. Meanwhile, Jennings submitted HSR after HSR pleading with anyone in the prison to take action. (*Id.*)

Dr. South claims she had no knowledge of the recommendations off-site providers made and had no participation in Jennings' offsite care. Setting aside the fact that she admitted to cancelling his offsite treatment because she thought it was not an approved procedure, a clear sign that she did play a role in his off-site care, there is other evidence in the record that a reasonable juror could use to show that

Dr. South had knowledge of the seriousness of Jennings' condition and failed to act. For example, Defendant Moore, Jennings' Primary Care Provider ("PCP"), stated that all HSRs that discuss eye issues go "right to the optometrist's mailbox and then they handle that." (Jennings DFOF ¶ 11.) Jennings submitted numerous HSRs during the period between when Dr. South initially suspected he had corneal ectasia and when he received treatment. (*Id.* ¶ 6.) A reasonable juror could find that Defendant Moore is more credible than Defendant South; therefore, dismissal in Summary Judgment based on lack of knowledge is inappropriate.

Defendants have not accounted for several months of this delay,[2] and a reasonable jury could find that Dr. South received Jennings' multiple complaints, that she knew the seriousness of Jennings' condition, and that she acted with deliberate indifference by failing to ensure Jennings was provided with the proper treatment.

### B. Dr. South understates her authority and misstates the Class of procedure Jennings' corneal cross-linking is.

Dr. South claims that she "did not participate in the events underlying this litigation because she was an independent contractor and such actions were outside of her scope, authority, and subjective knowledge at the time." (ECF no. 83 at 8.) This claim is rife with disputed material facts. Dr. South basis this claim on her assertions that (1) she could not order treatment for Jennings; (2) she did not receive

---

2 Both State Defendants and Dr. South point to specific explanations for portions of the delay, but even if accepted as true, these explanations only account for a small portion of time between when Defendants had knowledge of his condition and when he received treatment.

Jennings' off-site visit reports; (3) she did not have authority to approve or deny patient treatment; (4) she did not have authority to initiate Class III prior-approval for Jennings' treatment; (5) she did not collect, review, and respond to Jennings' HSRs unless a DOC staff member consulted with her; and (6) she did not schedule Jennings for care appointments with herself. (ECF no. 083 at 9.) These arguments fail because they rely on disputed material facts.

Dr. South's first assertion, that she could not order treatment for Jennings, is rebutted by her own admission that "she submitted an internal referral for Jennings to be seen by an outside provider." (JSOF at 11.) Even if Dr. South could not order specific treatment for Jennings, a reasonable juror could find that she could make an internal request for such treatment. Rather than submitting such a request, Dr. South did the opposite—she cancelled Jennings' corneal cross-linking procedure. (JSOF at 16.) She did not do this because she thought it was the best medical course of action, but rather because she thought it was not an approved procedure—an approval she now claims she has nothing to do with. (*Id.*)

Dr. South's assertion that she did not receive Jennings' offsite visit reports is not evidence that she was unaware of his ongoing treatment. This is a rebuttable assertion. First, as mentioned above, Defendant Moore testified that HSR requests go directly to the DOC optometrist's inbox. (Jennings DFOF ¶ 11.) Second, Jennings submitted multiple HSRs describing both his deteriorating condition and citing the recommendations of the off-site providers. (*Id.* ¶ 6.) As such, a reasonable jury could find that Dr. South was in receipt of ample information regarding the

recommended treatment and Jennings' deteriorating condition and failed to act. Additionally, a reasonable jury could find that Dr. South suspected Jennings had corneal ectasia, she knew keratoconus was a form of corneal ectasia, she knew the standard of care for keratoconus is corneal-cross linking, and she knew that untreated keratoconus could lead to permanent vision loss (all facts obtained through Dr. South's own testimony). (Jennings DFOF ¶¶ 1-3.) As such, her continued inaction, and her action of cancelling Jennings' corneal cross-linking, could reasonably be found to have been done with deliberate indifference.

Dr. South also asserts that she did not have authority to initiate Class III approval. Class III procedures are elective procedures, Class II procedures are urgent, and Class I are emergency. Dr. Sukowaty testified that approval is only needed for Class III procedures, not Class I or II procedures. (Jennings DFOF ¶ 10.) She further testified that Jennings' corneal cross-linking was a Class II procedure and did not require Class III approval. (*Id.*) If Dr. South intends to use the classification of Jennings' procedure as evidence to show she did not act with deliberate indifference, then it is most certainly a contested material fact that is not appropriate for Summary Judgment dismissal.

Dr. South's contention that she did not schedule appointments with herself is certainly one that does not absolve her of her responsibility to provide adequate medical care. It may be understandable if she had never seen Jennings to begin with, but once she conducted a basic eye exam and determined that Jennings likely had a degenerative eye disease that required treatment, a reasonable jury could

find that any minimally competent physician would have followed up on this patient. Further, Jennings' multiple HSRs provide evidence that Dr. South was aware Jennings' condition was worsening and that many months had gone by without him receiving the required treatment.

### C. Dr. South cannot claim she only made treatment decisions based on her professional judgment when she admits her decisions were based on a misunderstanding of DOC policy.

Dr. South claims that she did not make any treatment decisions with the knowledge that her actions would place Jennings at substantial risk. To support this claim, she states that she did not order glasses for Jennings because they would not help his blurry vision and that glasses would take more than four weeks to arrive. (ECF no. 083 at 12.) Dr. South also states that cancelling Jennings' corneal cross-linking was not a treatment decision, but rather because she thought the procedure was not approved. (*Id*. at 12.)

Dr. South's characterization of her treatment is flawed. It was not that Dr. South specifically failed to order Jennings glasses, but rather that she failed to take any steps to alleviate his deteriorating vision. Jennings submitted numerous HSRs after his March 11, 2021, visit with Dr. South where he complains of deteriorating vision, the inability to read, severe migraine headaches, and seeing white dots. (Jennings DFOF ¶ 6.) In one HSR he states that the off-site provider at UW Madison prescribed him with glasses, but that he never received them. (*Id*.) Despite the barrage of HSRs informing prison staff and, arguably, Dr. South, nothing was done to alleviate Jennings' suffering for months. Dr. South argues that corrective

lenses do not treat keratoconus, but she does agree that they provide clearer vision. (JFOF at 14.) A reasonable juror may still determine that Dr. South should have done something, such as prescribing the scleral contacts, that would offer Jennings clearer vision while waiting for the corneal cross-linking procedure.

Dr. South cancelled Jennings' corneal cross-linking treatment and now attempts to describe this action as "not a treatment decision." Dr. South claims this was a decision regarding "what procedures the DOC constituted as covered." (ECF no. 83 at 13.) As noted above, other Defendants have testified that this procedure was covered because it was a Class II, urgent procedure, and not a Class III, elective procedure. Dr. South also stated that she "does not approve or deny procedures for patients in the prison system." *Id*. at 9. This begs the question: If Dr. South does not approve or deny procedures, then why did she cancel what she knew to be the standard of care for Jennings' condition? Dr. South knew Jennings had a serious degenerative condition. (Jennings DFOF ¶¶ 1-3.) She knew if it went untreated it could cause permanent vision loss. (*Id*.) She knew corneal cross-linking was the standard of care. (*Id*.) Instead of taking steps to get him the appropriate care, she stood in the way of that care and perpetuated the delay.

### D. A reasonable jury could find that the delay in Jennings' treatment caused his condition to deteriorate and require a corneal transplant.

Dr. South, like the State Defendants in their Summary Judgment Brief, claims that Jennings cannot show he suffered harm due to the delay in care. This claim can be rebutted through the testimony of the treating physicians, some of whom

13

are Defendants. Jennings was diagnosed with a degenerative eye disease, keratoconus, on September 22, 2021. (JFOF at 12-13.) Dr. South suspected he had such a condition as early as March 11, 2021. (*Id.* at 11.) "Degenerative" means the condition gets worse over time. (Jennings DFOF ¶ 3.) While Jenning's condition was deteriorating, he submitted numerous HSRs informing prison staff that his vision loss was disabling—he could not read, see at a distance, and he was suffering from debilitating headaches. (*Id.* ¶ 6.) Despite these complaints, Dr. South did not see him, or order him corrective lenses for several months. This is the first injury Jennings suffered due to the delay in treatment. Further, it can be inferred from the record that corneal cross-linking could obviate the need for a corneal transplant. Dr. Kurt wrote, "corneal cross-linking may be able to prevent need for corneal transplant. Please approve ASAP." (JFOF at 14.)

It can also be inferred that the delay caused the need for a transplant by the outcome of the procedure. Jennings had corneal cross-linking performed on both eyes. (JFOF at 17.) After the corneal cross-linking, it was determined that Jennings only needed a transplant of his left eye, not his right eye. (*Id.* at 18.) At a trial, Jennings can have the treating physicians analyze the corneal topography that is part of his medical record and discuss how the disease progressed over time. Armed with this information, a reasonable jury could find that had he received the corneal cross-linking in a timely manner, he would not have needed the transplant.

## II. Medical Malpractice Claims

Jennings claims that Dr. South was negligent by not providing the care she owed as a physician. Wisconsin law requires the following elements for medical malpractice claims: (1) a breach (2) of a duty owed (3) that results (4) in an injury or damages. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Jennings has adequately pled medical malpractice and can offer proof of each element through the available evidence.

### A. Dr. South owed Jennings a duty of care and she breached that duty.

Under Wisconsin law, "a 'duty' exists when it is established that it was foreseeable that an act or omission to act may cause harm to someone." *Schuster v. Altenberg*, 144 Wis. 2d 223, 238, 424 N.W.2d 159, 165 (1988). "In determining whether harm was foreseeable [one] is not held to a standard of omniscience, but merely to 'that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in similar circumstances." *Id.* While Dr. South does not appear to dispute that she owed Jennings a duty of care in her brief, it must be stated that such a duty existed.

First, Dr. South testified that corneal cross-linking is the standard of care for keratoconus, as other treating physicians have. (Jennings DFOF ¶¶ 1-3.) She also was aware that Jennings likely had keratoconus, as evidenced by her note after her March 11, 2021, visit with Jennings where she wrote that she suspected Jennings had corneal ectasia and submitted an internal referral to be seen at an outside provider. Dr. South also testified that a patient with keratoconus could suffer

permanent vision loss if the keratoconus is not treated and that a corneal transplant is a "wort case scenario." (*Id.* ¶¶ 4-5.) This testimony from Dr. South, and that of the other treating physicians, is sufficient for a reasonable juror to find that Jennings' injuries were foreseeable.

Further, Dr. South knew Jennings' vision was deteriorating. Not only did she suspect he had a degenerative eye disease that caused blurry vision, but Jennings also submitted numerous HSRs stating the degree to which his vision was deteriorating and detailing his need for corrective lenses. (Jennings DFOF ¶ 6.) The fact that no action was taken to alleviate Jennings' suffering for several months after his visit with her on March 11, 2021, demonstrates another example of Dr. South's failure to provide adequate medical care.

Dr. South, like the State Defendants, points to the fact that Jennings has not named an expert as a reason to dismiss this case in Summary Judgment. This argument fails to take into account case law that demonstrates a plaintiff may rely on the testimony of treating physicians, even a defendant's own testimony, "to supply evidence regarding the appropriate standard of care." *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004).

In *Gil v. Reed,* 381 F.3d 649, 659 (7th Cir. 2004), the Seventh Circuit addressed whether the lack of an expert witness was dispositive of a plaintiff's ability to prove the standard of care and causation. The *Gil* court held that the testimony of treating physicians can be sufficient to determine the standard of care. *Id.* at 559-60. The court also reasoned that it "is within a layperson's purview to know that when a

serious infection at the site of a surgical wound is diagnosed and an antibiotic is prescribed, failure to supply or delay in supplying the antibiotic can result in unnecessary pain, discomfort and a spreading of the infection." *Id.* at 661.

The present case is analogous to *Gil*. Jennings can show through the testimony of treating physicians that: (1) corneal cross-linking is the standard of care for keratoconus; (2) keratoconus is a degenerative disease; and (3) the longer keratoconus goes untreated the less effective corneal cross-linking will be. This is more than enough to establish that a reasonable jury can find that a nineteen-month difference between when keratoconus was first suspected and when it was treated led to corneal cross-linking being ineffective and requiring a corneal transplant in Jennings' left eye. Further, Jennings' medical records state that corneal cross-linking only prevents the progression of keratoconus but does not reverse vision loss. (Jennings DFOF ¶ 12.) A reasonable juror could find that Jennings' permanent vision loss was exacerbated by the delay.

In *Gil*, the court further explains that "nothing in Wisconsin law prevents a plaintiff from relying on the defendant . . . or the defendant's agents . . . to supply evidence regarding the appropriate standard of care." *Id.* at 659. The *Gil* court points to two Wisconsin cases for this assertion. *See Froh v. Milwaukee Medical Clinic*, S.C., 85 Wis. 2d 308, 270 N.W.2d 83, 87 (Ct. App. 1978) (opining that the testimony of the surgeon accused of malpractice was 'sufficient to place this matter in the field of negligence and malpractice by a physician'); *see also Richards v. Mendivil*, 200 Wis. 2d 665, 548 N.W. 85, 89 (Ct. App. 1996) (relying on a physician

17

defendant to establish one of the elements of *res ipsa loquitur*).

Finally, the scheduling order from this Court does not contain a deadline for expert witness disclosures. (ECF no. 063.) Further, Fed. R. Civ. P. 26 (a)(2)(D) states that expert witnesses must be disclosed at least 90 days before the date set for trial. No trial has been set in this case. As such, Jennings still has the power to name an expert witness. While this is unnecessary because of the testimony of the Defendants themselves, it should foreclose the argument that having not named an expert at this stage of litigation is fatal to his claims.

### B. A reasonable jury could find that Dr. South's breach of duty constitutes a cause-in-fact of Jennings' injuries.

"To establish causation in Wisconsin, the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm." *Ehlinger by Ehlinger v. Sipes*, 155 Wis. 2d 1, 12, 454 N.W.2d 754, 758 (1990). "One who creates a dangerous condition may be held liable even though another cause is also a substantial factor in contributing to the result." *Id.* (internal quotations and citations omitted). "The defendant's negligent conduct need not be the sole or primary factor in causing the plaintiff's harm." *Id.*

> Where the causal relationship between the defendant's alleged negligence and the plaintiff's harm can only be inferred by surmising as to what the plaintiff's condition would have been had the defendant exercised ordinary care, to satisfy his or her burden of production on causation, ***the plaintiff need only show that the omitted treatment was intended to prevent the very type of harm which resulted, that the plaintiff would have submitted to the treatment, and that it is more probably than not the treatment could have lessened or avoided the plaintiff's injury had it been rendered***. It then is for the trier of fact to determine whether the defendant's negligence was a substantial factor in causing the plaintiff's harm.

*Id.* at 20 (emphasis added)

18

In the present case, the available deposition testimony demonstrates that the aim of corneal cross-linking is to prevent the need for a corneal transplant. Sufficient testimony exists to infer that delaying corneal cross-linking reduces the likelihood it will be effective. This is sufficient for Jennings to show that any delays caused by Dr. South's failure to follow the standard of care for keratoconus, including but not limited to her cancelling the procedure, were the cause-in-fact of Jennings' injuries.

Furthermore, the corneal transplant and permanent vision loss are not the only injury Jennings has claimed. He also claims that as a result of Dr. South not responding to his HSR complaints of deteriorating vision, he spent months with severely compromised vision that resulted in his inability to read, see distant objects, and caused severe headaches. A reasonable jury could find that Dr. South's failure to prescribe corrective lenses for a protracted period was the cause-in-fact of these injuries.

## CONCLUSION

For the aforementioned reasons, this Court must deny Dr. South's Motion for Summary Judgment.

KRAVIT, HOVEL & KRAWCZYK s.c.

*s/ Wesley E. Haslam*
Wesley H. Haslam
  State Bar No. 1121993
*Attorneys for Plaintiff*

Kravit, Hovel & Krawczyk s.c.
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (telephone)
(414) 271-8135 (facsimile)
weh@kravitlaw.com

Dated: November 3, 2025