DAMONTA JENNINGS,

        Plaintiff,

   v.

CHARLES DOMBECK, et al.,                     Case No. 22-cv-01205

        Defendants.

## REPLY IN SUPPORT OF DEFENDANT BETHANY SOUTH'S DISPUTED PROPOSED FINDINGS OF FACTIN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant, Bethany South ("Dr. South"), by her attorneys, Axley LLP, by Attorney Cecilia A. Heberling, and submits the following Reply in Support of Defendant Bethany South's Disputed Proposed Findings of Fact in Support of Defendant Bethany South's Motion for Summary Judgment.

1.      On or around July 18, 2023, Plaintiff, Damonta Jennings ("Jennings), submitted a Health Services Request stating that: "I would like to know why Im being told to wear glasses when offsite specialist and optometrist Bethany South know glasses DO NOT WORK. IM BLIND I CANT SEE WITH THEM!" (Dkt. 81 – 21) (emphasis in original).

     **RESPONSE: No response.**

        **REPLY:    Undisputed.**

2.      Dr. South did not order a pair of glasses for Jennings following her March 11, 2021, appointment with him because:

- She knew that he was going to be seeing an offsite provider for testing and knew that his prescription could change based on that appointment;

- Glasses are not very effective for correcting the blurred vision symptom of keratoconus and they would not have been a benefit to Jennings if he did in fact have keratoconus;

- Ordering glasses takes up to four weeks at a minimum.

(Dkt. 80, ¶ 10.)

**RESPONSE: No response.**

      **REPLY:**     **Undisputed.**

3. If Dr. South reviewed Jennings' off-site records prior to this litigation, it would have only been a brief review during Plaintiff's appointment with her on May 10, 2022. (*Id.,* ¶ 11.)

**RESPONSE: No response.**

      **REPLY:**     **Undisputed.**

4. Dr. South sees an average of 22 patients per day with the DOC and does not have time to study the patients' records in detail during each visit. (*Id.,* ¶ 21.)

**RESPONSE: No response.**

      **REPLY:**     **Undisputed.**

5. Dr. South's responses to Jennings' health services requests, to the extent that Department of Corrections ("DOC") discussed the requests with her, were addressed with a written response or a scheduled appointment based on the DOC staff's decisions and actions. (*Id.,* ¶ 14,16; (Dkt. 73., p. 12 [421-13]; *Id.,* p. 12 [43: 10-22].)

**RESPONSE: No response.**

      **REPLY:**     **Undisputed.**

6. When Dr. South saw only an order for corneal crosslinking for Jennings on or around May 10, 2022, she saw only an order waiting for a response. (*Id.,* ¶ 18.)

**RESPONSE: No response.**

**REPLY:** **Undisputed.**

7. No DOC staff members consulted with Dr. South regarding Jennings' offsite recommendations. (*Id.,* ¶ 11.)

**RESPONSE: No response.**

**REPLY:** **Undisputed.**

8. As an independent contractor with the DOC, Dr. South does not have authority to apply for Class III approval and cannot approve or deny procedures for patients. (Dkt. 74, p. 7 [15: 22-25]; (Dkt. 72, p. 23 [11-13]; Dkt. 80, ¶¶ 12, 14. )

**RESPONSE: No response.**

**REPLY:** **Undisputed.**

9. Dr. South's decision to cancel the corneal-crosslinking order on or around May 10, 2022, was made with the following contemporaneous knowledge:

- She believed that the DOC understood corneal crosslinking to be a non-covered care service that was not medically necessary because Class III Committee previously denied a patient's corneal crosslinking procedure in the past, which to her knowledge did not cause the patient to suffer any further issues.;

- Dr. South understood at that time that while corneal crosslinking, if successful, could stop the progression of the underlying keratoconus disease, keratoconus symptoms can be addressed through non-surgical means including contact lenses.;

- Dr. South did not have information regarding the specifics of Jennings' condition because she did not have the requisite equipment to map his keratoconus and did not study his off-site medical records in detail; and

- In Dr. South's experience, patients can live with keratoconus without having a corneal crosslinking procedure or a corneal transplant for years and even decades without experiencing any significant worsening of the disease. Some patients do not ever require corneal crosslinking or a corneal transplant at all. A patient with keratoconus that never receives treatment would not go blind and would not have no-light-perception vision loss. The vision loss would be blurred vision, which can be addressed with contact lens use.

(*Id.,* ¶¶ 18 – 19, 22 – 23; (Dkt. 72, p. 21 [68: 18-19].).)

**RESPONSE: No response.**

**REPLY:** **Undisputed.**

Dated this 17th day of November, 2025.

AXLEY LLP

*Electronically signed by Cecilia A. Heberling*
Cecilia A. Heberling, SBN: 1118904
Attorneys for Defendant Bethany South
Suite 200, 2 East Mifflin Street (53703)
Post Office Box 1767
Madison, WI 53701-1767
Telephone: 608.257.5661
Facsimile: 608.257.5444
Email: cheberling@axley.com