DAMONTA JENNINGS,

Plaintiff,

v.

CHARLES DOMBECK, et al.,             Case No. 22-cv-01205

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BETHANY SOUTH'S RENEWED MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this 28 U.S.C. § 1983 action, Plaintiff Damonta Jennings ("Jennings") brings claims for violation of his right to adequate medical care under the Eighth Amendment to the United States Constitution and medical negligence. His claims arise from alleged actions and inactions taken by the Defendants from March 21, 2021, through October 2022, while Jennings was in the care of the Wisconsin Department of Corrections ("DOC") as an inmate at the Waupun Correctional Institution ("WCI"). During this relevant time-period, Jennings received treatment for keratoconus, an eye disease that causes thinning of the cornea, from various DOC Health Services Unit ("HSU") staff, Defendant Dr. Bethany South ("Dr. South"), and various offsite medical providers. In support of his Eighth Amendment claim, Jennings alleges that Defendants Mary Moore, Charles Dombeck, Robert Weinmann, Ashley Haseleu, Daniel La Voie, Laura Sukowaty (collectively "State Defendants") and Dr. South were deliberately indifferent to his keratoconus condition when they ignored his offsite specialist's recommendation for him to receive a corneal crosslinking procedure and therefore delayed his corneal crosslinking procedure, which procedure

1

he did ultimately receive. Jennings also alleges that Dr. South and Mary Moore were negligent in their medical care.

There are numerous individuals who allegedly took actions or inactions during the relevant time underlying Jennings' claims. This motion focuses solely on those alleged actions or inactions taken by Defendant Bethany South ("Dr. South"), who at all times relevant, was an optometrist offering services to inmates in the care of the Wisconsin Department of Corrections ("DOC") as an independent contractor. Jennings' Eighth Amendment and medical negligence claims against Dr. South fail for a number of independent reasons.

First and foremost, pursuant to DOC policies, Dr. South did not have the authority, responsibility, or knowledge to take certain actions central to Jennings' claims against her. Specifically, Dr. South did not, and could not, review offsite specialists' recommendations for care to determine whether the DOC would adopt the specialists' recommendations. Dr. South did not, and could not, approve DOC coverage for Jennings' offsite medical care. Dr. South did not, and could not, schedule offsite medical care appointments for Jennings. As such, Jennings' claim that Dr. South is liable for ignoring the recommendations of his offsite specialists and delaying his treatment fails for these reasons alone.

Further, the minimal actions that Dr. South did take regarding Jennings' medical treatment do not, as a matter of law, amount to deliberate indifference to Jennings' medical needs nor medical negligence. Within the events underlying Jennings' claims, Dr. South provided primary optometry care appointments to Jennings on two occasions. In the meantime, she provided input for responses to his Health Services Requests ("HSRs") when DOC staff requested her input. Jennings admits that Dr. South, as an optometrist, did not and could not treat his keratoconus condition. As such, his claims that Dr. South made treatment decisions without professional judgment and that her

care fell below the standard of care are ineffective, given that he admits Dr. South did not treat his keratoconus. Moreover, and critically, Dr. South did not delay Jennings' corneal crosslinking procedure and, therefore, she did not cause Jennings to suffer any harm.

In sum, Jennings' claims that Dr. South violated his Eighth Amendment rights and acted with medical negligence have no factual support. As such, his claims against Dr. South fail as a matter of law. For these reasons, as set forth in more detail below, Jennings' Second Amended Complaint against Dr. South must be dismissed with prejudice.

## FACTUAL BACKGROUND

Pursuant to the Court's Trial Scheduling Order [Dkt. 63, p. 4] and Civil L. R. 56, filed contemporaneously with this Memorandum is a Joint Agreed Upon Statement of Facts and Disputed Proposed Findings of Fact in Support.

## SUMMARY JUDGMENT STANDARD

"Summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Indus., Inc*., 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted).

Pursuant to Fed. R. Civ. P. 56, summary judgment should be granted when there are no genuine disputes of material facts and the moving party is entitled to judgment as a matter of law. A factual dispute is "material" if the dispute could potentially affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Factual disputes over irrelevant or non-dispositive issues will not preclude an otherwise proper motion for summary judgment. *Id*. (citation omitted). A factual dispute is "genuine" if the evidence presented by the party opposing summary judgment is such that a reasonable jury could return a verdict for the non-moving party. *Id*. A genuine factual dispute cannot rest on conclusory

allegations or denials; instead, it must be supported by admissible evidence that sufficiently demonstrates a triable issue. *Id*. at 248-49 (citations omitted). A dispute of fact does not necessarily prevent the Court from granting summary judgment; if there is a genuine dispute of facts, the Court then merely views the facts "in the light most favorable to the nonmoving party. . . ." *Ricci v. DeStafano*, 557 U.S. 557, 586, 129 S. Ct. 2658, 174 L. Ed. 490 (2009) (citation omitted).

## **ARGUMENT**

In his Second Amended Complaint, Jennings alleges that Dr. South acted with deliberate indifference to his serious medical need in violation of his rights under the Eighth Amendment to the United States Constitution and acted with professional negligence under Wisconsin state law. (*See* Dkt. 30, ¶¶ 67-38.) Specifically, Jennings claims that Dr. South's alleged actions or inactions regarding his treatment and in response to a specialist's recommendation for him to receive a corneal crosslinking procedure caused a delay in his receipt of the procedure, resulting in harm. (*See* Dkt. 30.) As set forth below, Jennings' claims against Dr. South lack factual support and are ripe for dismissal on summary judgment.

There are two independent grounds for this Court to dismiss Jennings' Eighth Amendment deliberate indifference claim against Dr. South. First, the undisputed facts demonstrate that Dr. South did not ignore any specialists' recommendations nor make any treatment decision with substantial knowledge that Jennings was in substantial risk of serious harm. Simply put, when analyzed based on her knowledge at the time, Dr. South's minimal actions in the events underlying do not evince deliberate indifference. Further and independently, Dr. South's actions did not delay Jennings' medical treatment, and she did not cause Jennings harm.

Likewise, there are multiple, independent grounds for this Court to dismiss Jennings' medical negligence claim against Dr. South. First, Jennings cannot demonstrate that Dr. South

4

breached her duty of care. Additionally, and independently, Jennings cannot demonstrate that Dr. South's care caused him to suffer any injury.

I.     **Summary Judgment Dismissing Jennings' Eighth Amendment Claim Against Dr. South Is Appropriate Because the Undisputed Facts Do Not Support Jennings' Claim That She Acted with Deliberate Indifference Towards His Serious Medical Condition, Resulting in Treatment Delays And Harm.**

The Eighth Amendment to the United States Constitution, in its prohibition of "cruel and unusual punishments," subjects prison officials to scrutiny for the conditions of inmates' confinement and imposes a duty on those officials to ensure "that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L.Ed. 2d 811 (1994) (internal citations omitted). At issue in this case is Jennings' Eighth Amendment right to receive adequate medical care during his confinement. Eighth Amendment liability for inadequate prison medical care requires "more than ordinary lack of due care for the prisoner's interests or safety." *Id.,* at 835 (citation omitted). Rather, an Eighth Amendment claim for inadequate medical care requires a showing that a defendant was deliberately indifferent by demonstrating (1) an objective component that the plaintiff had an objectively serious medical condition, and (2) a subjective component that the defendant(s) "actually knew of, but disregarded, a substantial risk to the inmate's health." *See Cesal v. Moats,* 851 F. 3d 714, 721 (7th Cir. 2017) (citations omitted).

Here, for purposes of her summary judgment motion only, Dr. South concedes that Jennings' keratoconus was a serious medical condition and that such claim can be brought against her as a government actor.[1] However, as set forth below, the undisputed record does not and cannot

---

[1] Dr. South expressly reserves the right to present additional evidence and dispute these issues should the claims against her survive summary judgment.

support Jennings' claim that Dr. South actually knew of, but disregarded, a substantial risk to his health in violation of his Eighth Amendment right to adequate medical care.

A. *Dr. South did not act with substantial knowledge that Jennings was in substantial risk of serious harm.*

In its decision in *Farmer*, the United States Supreme Court defined "deliberate indifference" in the context of Eighth Amendment violations by prison officials as "requiring a showing that the officer was subjectively aware of the risk." *Farmer*, 511 U.S. at 828. As such, liability for Eighth Amendment claims exists "only if [the defendant] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *O'Brien v. Indiana Dept. of Corr.*, 495 F.3d 505, 508 (7th Cir. 2007) (citing *Farmer*, 511 U.S. at 847). When evaluating whether a defendant was deliberately indifferent, the question depends on "what information was available to the defendant at the time that a decision was made." *Id.* (finding that prison officials were not deliberately indifferent when they placed plaintiff, a former correctional officer, into housing where other at-risk inmates were placed based on knowledge that this course of action had been followed in the past and based on no knowledge that plaintiff was in any more danger than similar at-risk inmates).

In other words, whether a defendant was deliberately indifferent is a subjective inquiry, based on the information available to that defendant at the time a decision was made. *Id.*; *Cesal*, 851 F. 3d at 721. This subjective inquiry relies on evidence "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 772, 728 (7th Cir. 2016) (citing *Farmer*, 511 U.S. at 837) (emphasis in original). A showing of objective recklessness, or "failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known – is insufficient to make a claim." *Id.* (citing *Farmer*, 511 U.S. at 844) (emphasis in original). In other words, a plaintiff must show that a defendant "knew of facts from which he could infer that a

6

substantial risk of serious harm existed, and that he did, in fact, draw that inference." *Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954, 964 (7th Cir. 2019) (citations omitted). To determine the subjective component of deliberate indifference, the court considers the "totality of an inmate's medical care." *Petties,* 836 F. 3d at 728 (citation omitted).

Here, Jennings alleges that Dr. South was deliberately indifferent to his serious medical need by: (1) not ordering him glasses after his March 11, 2021, basic eye exam appointment with her until August 3, 2021, (2) cancelling his corneal crosslinking procedure order on May 10, 2022; (3) Jennings was on a waiting list and was not seen by Dr. South from March 12, 2021, through May 10, 2022; (4) failing to acknowledge his Health Services Requests; and (5) by failing to speak with DOC employees about the severity of Jennings' condition and advocating for him to be seen earlier for a crosslinking procedure. Again, to demonstrate deliberate indifference, Jennings must demonstrate, under the totality of his medical care, that Dr. South actually knew of and disregarded a substantial risk of harm to him in taking each of the above actions, to the extent that he can demonstrate that she took each alleged action at all. *Petties,* 836 F. 3d at 728. As such, the questions at issue in this motion are, at the outset, whether (1) there is any factual support that Dr. South had any knowledge of the above alleged actions or inactions related to Jennings' care and, if yes, (2) whether Dr. South actually knew of and disregarded a substantial risk of harm while taking these actions. *Id.* (citation omitted).

The undisputed facts do not support any reasonable inference that Dr. South acted with deliberate indifference. As set forth below, Dr. South did not knowingly ignore any specialists' recommendations regarding Jennings' medical care. Indeed, she had no knowledge regarding the details of Jennings' offsite care and had no knowledge of the DOC actions in response to Jennings' offsite care. Simply put, she had no participation in Jennings' offsite care. Further, the actions that

Dr. South did take were not taken with actual knowledge of and disregard to a substantial risk of harm to Jennings.

> i. Dr. South did not act with deliberate indifference by failing to take certain actions because, as an independent contractor, she did not have the requisite subjective knowledge regarding Jennings' offsite specialist's recommended care, the details of his HSRs, or the details of scheduling him for care with herself in order for liability to attach.

At the outset, it is critical to define which alleged actions Dr. South did not take within the events underlying this litigation because she was an independent contractor and such actions were outside of her scope, authority, and subjective knowledge at the time. Specifically, Jennings alleges that Dr. South was deliberately indifferent to his serious medical need when she did not see Jennings from March 12, 2021, through May 10, 2022, when she failed to acknowledge his health service requests ("HSRs"), and when she ignored his specialist's recommendations and failed to speak with DOC employees about the severity of his condition and failed to advocate for him to be seen earlier for a crosslinking procedure. Jennings' claims against Dr. South based on these alleged inactions fail because she did not participate in the actions and no subjective knowledge regarding her alleged duty to take certain actions.

Here, as set forth below, Dr. South's alleged inactions regarding scheduling Jennings for care, responding to his HSRs, and following his specialist's recommendations were not deliberate or knowing inactions taken with disregard to Jennings' serious medical need. Rather, Dr. South's alleged failures to act were the product of her ability and authority to take certain actions regarding Jennings' care based on her status as independent contractor with the DOC, which led to Dr. South having no subjective knowledge of her alleged duty to take certain actions. Indeed, her lack of subjective knowledge is a complete defense. *Petties*, 836 F.3d at 728 (citing *Farmer*, 511 U.S. at 844) ("Officials can avoid liability by proving they were unaware even of an obvious risk of inmate

health or safety."); *O'Brien*, 495 F.3d at 509 ("[T]he question of whether a defendant was deliberately indifferent must logically depend on what information was available to the defendant at the time that a decision was made.") Here, Jennings cannot point to any specific decision made by Dr. South regarding his specialist's recommendations, his HSRs, and his status on a waitlist for an optometry appointment.

At all times relevant, the DOC followed its Department of Adult Institutions policies regarding Specialty Consultations, Prior Authorizations for Non-Urgent medical care, and Health Services Requests. At all times relevant, Dr. South was an independent contractor, not a DOC provider. Only DOC providers can make referrals for treatment. If a patient is referred for offsite treatment by a DOC provider, the DOC provider who ordered the off-site care receives and reviews the Off-Site Report completed by the offsite specialist and determines whether the recommended care should be implemented and seeks prior authorization for that care if necessary. Pursuant to the same policy, if a DOC Advanced Care Professional ("ACP") determines the need for off-site specialty care and DOC approves the care as covered, then the Health Care Services ("HSU") Manager shall designate an appropriate HSU staff member to schedule consultations.

Additionally, pursuant to DAI policy, Dr. South, as an independent contractor, did not approve or deny procedures for patients in the prison system. The DOC utilizes a Class III board for prior approvals of non-urgent care because the DOC is self-insured. As an independent contractor, Dr. South could not initiate a Class III review application and did not participate in Class III reviews.

Finally, pursuant to DAI policy, DOC staff collect, review, and respond to patients' Health Services Requests ("HSRs"). Dr. South knows about submitted HSRs only if DOC staff consult with her regarding an HSR. In that event, the DOC staff would still determine how to respond to

the patients' HSR. If a DOC staff member determined that Jennings should be seen by Dr. South in response to an HSR, the DOC staff member would schedule that care. Dr. South did not schedule inmates for optometry appointments. Rather, Dr. South would provide the DOC institutions with her availability, and the DOC medical staff would create the schedule for which inmates she would see while she was at a particular correctional institution. DOC staff would then schedule the inmates for optometry care after placing an inmate on a list for an optical appointment, generally based on the time of the inmate's request.

In sum, pursuant to DAI policy, Dr. South: (1) could not order treatment for Jennings; (2) did not receive Jennings' offsite visit reports to determine whether specialists' recommendations should be followed; (3) did not have authority to approve or deny patient treatment; (4) did not have authority to initiate Class III prior-approval for Jennings' treatment, (5) did not schedule Jennings' offsite visits; (5) did not collect, review, and respond to Jennings' HSRs unless a DOC staff member consulted with her, and even in that event, she did not determine the response; and (6) did not schedule Jennings for care appointments with herself. None of the DOC providers consulted with Dr. South regarding Jennings' offsite visit reports at issue in this case. In sum, DAI policy is the reason that Dr. South did not take certain actions in the events underlying Jennings' claims, including scheduling him for visits with herself, responding to his HSRs, and following his specialist's recommendations. No reasonable juror could infer that, by following DAI policy, Dr. South actually knew of and disregarded a substantial risk of harm to Jennings.

Further, and critically, Jennings' claim that Dr. South should have reviewed his records and advocated for him to receive the crosslinking procedure sooner is not a cognizable deliberate indifference claim. Jennings' claim inherently concedes that Dr. South did not have knowledge of his specialists' recommendations and the status of scheduling his corneal crosslinking procedure.

The defendants' *actual* knowledge and response to *known* risks is the litmus for a deliberate indifference claim. *See Petties,* 836 F. 3d at 728 (emphasis in original); *O'Brien*, 495 F.3d at 509. During the relevant time, Dr. South's *actual* knowledge regarding Jennings' offsite medical care included that, pursuant to DAI policy, DOC staff reviewed offsite visit reports and recommendations, that DOC staff determined whether the recommendations would be pursued, and that DOC staff scheduled approved offsite visits. Based on this knowledge, Dr. South did not act with knowledge of and disregard a substantial risk of harm to Jennings' by not reviewing Jennings' offsite medical records and advocating for his corneal crosslinking procedure. Rather, Dr. South understood that the DOC staff would proceed with reviewing Jennings' offsite recommendations, determining whether they were approved, and scheduling them if they were approved pursuant to DOC policy. She also knew that DOC staff would schedule Jennings for optometry appointments and would collect, review, and respond to his HSRs. Like the defendants in *O'Brien,* Dr. South acted with knowledge of a system and without any facts that the system would not work in Jennings' situation, not with actual knowledge of a substantial risk of serious harm. *See O'Brien,* 495 F.3d at 508-09 ("The evidence indicates that this course of action had been followed repeatedly in the past, and there is nothing in the record to show that the prison should have had any reason to think it would not be successful in this case.")

Indeed, the system did work. DOC staff undertook all the above actions regarding Jennings' offsite visits. They reviewed his offsite visit reports and recommendations, approved the recommendation for Jennings to undergo a corneal crosslinking procedure, and scheduled his corneal crosslinking procedure for as soon as the offsite provider could accommodate.

In sum, Jennings cannot demonstrate that Dr. South's alleged inactions including not following his outside specialists' recommendations, not scheduling his offsite care, not scheduling

11

him for an appointment with her, not seeking prior approval for his corneal crosslinking, and not responding to his HSRs were taken with actual knowledge of and disregard of a risk of substantial harm to him. Rather, Dr. South's alleged inactions were taken pursuant to her knowledge of DAI policy and DOC staff procedures and without actual knowledge of Jennings' specific situation. Simply, Dr. South cannot be held liable for deliberate indifference by following DAI policies and acting within her authorized scope as an independent contractor.

> ii. <u>Dr. South did not make any treatment decisions regarding Jennings' care without professional judgment and with substantial knowledge that Jennings was in a substantial risk of harm when she did not order glasses after his March 11, 2021, visit nor when she cancelled the order for his corneal crosslinking on May 10, 2022.</u>

There are minimal actions that Dr. South did in fact take in the events underlying Jennings' claims, which actions Jennings claims support his Eighth Amendment claim against her. These actions include not ordering glasses after his March 11, 2021, visit with her and cancelling the order for his corneal crosslinking procedure on May 10, 2022. As described below, these actions are analyzed under the second inquiry at issue in this motion, whether Dr. South actually knew of *and* disregarded a substantial risk of harm while taking these actions. *Petties,* 836 F. 3d at 728. The undisputed facts demonstrate that she did not because Dr. South did not make any treatment decisions with the knowledge that her action would place Jennings in substantial risk of serious harm.

A treatment decision is central to an Eighth Amendment deliberate indifference to a medical need claim against a medical professional. *See Petties,* 836 F.3d at 732 ("… [W]here evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to the risk of harm that they caused."); *See also Sanders v. Moss*, --- F.4th ----, ----, 2025 WL 2476653, slip. op. at ___

(7th Cir. Aug. 28, 2025) ("The standard to prove deliberate indifference is a difficult one: a medical professional's treatment decision 'must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such professional judgment.'") (citations omitted)[2]. Specifically, a plaintiff must demonstrate that a defendant made a treatment decision without exercising professional judgment by either departing "radically from 'accepted professional practice'" or without the defendant honestly believing his own proffered medical explanation. *See Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (citing *Petties*, 836 F.3d at 732; *Pyles v. Fahim,* 771 F. 3d 703, 409 (7th Cir. 2014)).

Here, there are two actions alleged by Jennings that Dr. South did, in fact, take. Neither support Jennings' deliberate indifference claim against her. The first was not ordering him glasses after his March 11, 2021, eye exam. As set forth below, Dr. South made this treatment decision pursuant to her reasonable professional judgment and without knowledge of a substantial risk of harm to Jennings. The second was cancelling the order for a corneal crosslinking procedure on or around May 10, 2022. As forth below, this action was not a treatment decision and, even so, Dr. South did not take this action with the requisite knowledge of substantial risk of harm.

First, Dr. South's decision not to order glasses for Jennings after her March 11, 2021, examination of his eyes was not a treatment decision made without professional judgment. Rather, her decision was based on her professional knowledge and experience that she suspected Jennings had corneal ectasia but could not diagnose him at the WCI and had requested that he be seen by an outside specialist. Dr. South knew that if diagnosed with keratoconus, glasses would not be an effective treatment for him. She also knew that based on his follow up care with an offsite specialist, Jennings' prescription may change, and that it took approximately four weeks or more

<hr>

[2] A copy of the slip opinion in the Seventh Circuit's August 28, 2025, decision in *Sanders v. Moss* is enclosed to Dkt. 81 as Exhibit 20.

13

for an ordered pair of glasses to arrive, such that it would be futile for her to order a pair of glasses that could be rendered obsolete by the time they arrived. Jennings cannot dispute this professional judgment, as he would later state in a July 18, 2023, HSR that his specialists and Dr. South advised him that glasses would not help his blurry vision.

Next, Dr. South's decision on or around May 10, 2022, to cancel the order for a corneal crosslinking procedure in Jennings' electronic health record was not a treatment decision at all and no Eighth Amendment liability can attach to this decision. On May 10, 2022, Dr. South did not decide to cancel a scheduled procedure because she determined that Jennings did not need the procedure. In other words, Dr. South did not act pursuant to her decision regarding what treatment was appropriate for Jennings and/or what treatment he could receive, as such decisions were not within her authority as an independent contractor. Nor could she make this decision because decisions regarding what treatments Jennings should receive for his keratoconus fell beyond Dr. South's professional scope as a primary care optometrist. Jennings admitted at his deposition that Dr. South, as an optometrist, did not and could not treat his keratoconus. Instead of making a treatment decision by cancelling an order for Jennings to have corneal crosslinking, Dr. South made a decision regarding what procedures the DOC constituted as covered based on her previous experiences regarding what the DOC constituted as covered. This was not an exercise of professional judgment because it was not a treatment decision, and it cannot serve as a basis for Jennings' deliberate indifference claim.

Even if Dr. South's action of canceling the corneal crosslinking procedure in Jennings' electronic health record on or around May 10, 2022, was a treatment decision, it was not made without professional judgment and was not made with actual knowledge and disregard of a substantial risk of harm. *Petties,* 836 F. 3d at 728. Rather, Dr. South acted without actual

14

knowledge regarding the recommendations in Jennings' offsite visit reports and without knowledge regarding the details of his offsite medical care because she sees on average twenty-two patients per day and does not have time to study each patient's medical record in detail. She acted without knowledge that Dr. Sukowaty had previously approved Jennings' corneal crosslinking procedure. She acted without knowledge that the corneal crosslinking procedure was anything more than an order waiting for DOC approval. She acted with the knowledge that the DOC had denied a prior keratoconus patient's Class III board application for corneal crosslinking as a non-urgent, elective, and non-covered procedure that was not medically necessary, and with the knowledge that this patient did not suffer any further issues. She acted with knowledge that patients can live with keratoconus without having a corneal crosslinking procedure or a corneal transplant for years and even decades without experiencing any significant worsening of the disease. She acted with the knowledge that some patients do not ever require corneal crosslinking or a corneal transplant at all. She acted with the knowledge that a patient with keratoconus that never receives treatment through either corneal crosslinking or a corneal transplant would not go blind and would not have no-light-perception vision loss. Finally, Dr. South acted with knowledge that vision loss would be in the form of blurred vision, which can be addressed with contact lens use.

In sum, the few actions that Dr. South did take in the mosaic of Jennings' care at issue do not evince deliberate indifference. She did not act with actual knowledge to ignore specialists' recommendations and delay his care, nor did she make treatment decisions without professional judgment. For this reason, Jennings' deliberate indifference claim against Dr. South must be dismissed.

B. *Dr. South's actions did not delay Jennings' treatment and Jennings cannot demonstrate that Dr. South caused a delay in his care, nor that any alleged delay caused him harm.*

Regardless of Dr. South's subjective knowledge and decisions resulting therefrom, which as set forth above do not support Jennings' deliberate indifference claim against her, Dr. South did not cause any delay in Jennings' treatment and Jennings cannot demonstrate that he suffered harm due to any alleged delay in treatment. This is a separate, independent ground for this Court to dismiss Jennings' Eighth Amendment claim against Dr. South. In Eighth Amendment claims regarding delays in medical care, as here, a plaintiff must present verifying medical evidence that the delay, and not the underlying conditions, caused some harm. *Walker,* F.3d at 964; *See also Sheik-Abdi v. McCellan*, 37 F.3d 1240, 1248 (7th Cir. 1994) ("Section 1983 creates a cause of action based upon personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (citation omitted).

Here, Dr. South did not cause any delay in Jennings' corneal crosslinking procedure. Rather, his corneal crosslinking procedure was scheduled by DOC staff pursuant to DOC policy. First, because UW was recommending the procedure be completed by a non-UW provider, the responsibility fell on UW to find another specialist to refer Jennings to. On April 28, 2022, UW informed Haley Bassuener, LPN ("Ms. Bassuener"), that UW was referring Jennings to Valley Eye Associates for the cross-linking. Valley Eye could not get Jennings in until November, and Ms. Bassuener asked to be put on a call back list in the event a sooner date was to open up. Sometime in April 2022, Jennings learned through HSR correspondence with the DOC that a crosslinking procedure had been approved and would be scheduled and ordered. During a visit on May 10, 2022, Dr. South notified Mr. Jennings that his corneal crosslinking was not a covered procedure and had been cancelled. Jennings then wrote an inmate complaint to the WCI regarding

16

his denied treatment and an HSR to the HSU to "confirm that the treatment was not covered." Dr. South then received an email shortly thereafter stating that the crosslinking procedure was approved and she reinstated the order for the crosslinking procedure. Jennings' crosslinking procedure was rescheduled after Dr. South reinstated the order. On or around June 2, 2022, the WCI HSU responded to a May 31, 2022, HSR from Jennings to confirm that his corneal crosslinking surgery was scheduled.

Jennings had a consult appointment with Valley Eye Associates to evaluate his eyes and determine if he needed corneal crosslinking in July 2022. Valley Eye Associates had initially indicated to the DOC that November was the earliest that Jennings could be scheduled for a crosslinking procedure, however, they ended up moving the visit date up to August 25, 2022. However, Jennings then submitted two HSRs dated August 19, 2022, where he made reference to his upcoming surgical procedure being "in less than 1 week from today's date," which was accurate. HSU informed Jennings on August 26, 2022, that his crosslinking procedure was "rescheduled due to security breach of app[ointment] date." It is DOC policy that an inmate is not informed in advance of the time and date of offsite visits and procedures. The inmate possessing this information poses security risks to the institution and correctional staff. For example, an inmate could coordinate with individuals outside the prison to attempt escape or to meet and receive contraband. Jennings' crosslinking procedure was rescheduled, and Valley Eye Associates performed a corneal crosslinking procedure on both of Jennings' eyes on or around October 13, 2022.

Again, as above, in the events underlying Jennings' claims, Dr. South had no involvement in the alleged delay of his care. Dr. South's only involvement in his off-site care was cancelling the order for his crosslinking procedure in May 10, 2022, based on her understanding of the DOC's

17

stance on covering the same procedure. However, she reinstated the order within days and his crosslinking procedure was then re-scheduled for August 2022, when it had originally been scheduled for November 2022.

Further, to demonstrate a deliberate indifference claim for a delay "in treating non-life-threatening but painful conditions", Jennings must show that "the delay exacerbated the injury or unnecessarily prolonged [his] pain." *Arnett v. Webster,* 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010)). Here, Jennings has not offered any evidence that the alleged delay in his receipt of the corneal crosslinking procedure caused him to suffer harm. Corneal crosslinking is a procedure that can stop the progression of keratoconus, but its success is not guaranteed. After his corneal crosslinking procedure, Dr. Sarah Nehls ("Nehls") at UW Health decided that Jennings needed a corneal transplant in his left eye. Jennings underwent a corneal transplant to his left eye on or around April 2024. Jennings' providers have indicated that his left eye corneal transplant was successful.

At his deposition, Jennings testified that it was his belief that he needed a corneal transplant procedure because he did not have the corneal crosslinking procedure until October 2022. Jennings further testified that Dr. Nehls did not tell him that he needed a corneal transplant due to when he had the corneal crosslinking procedure. Jennings does not have any medical training. Jennings' unfounded belief that the alleged delay in his corneal crosslinking procedure caused the need for a corneal transplant in his left eye is insufficient to demonstrate that the alleged delay caused him harm. *Walker,* F.3d at 964.

A declaration produced by Jennings' counsel from Dr. Kevin Kurt ("Dr. Kurt") is likewise ineffective. In his July 21, 2021, declaration, Dr. Kurt stated that it is his "professional opinion that corneal cross-linking became the standard of care for keratoconus after the Food and Drug

18

Administration ("FDA") approved corneal cross-linking to treat keratoconus." This opinion does not address or support Jennings' assertion that the alleged delay in his corneal crosslinking procedure caused the need for a corneal transplant in his left eye is insufficient to demonstrate that the alleged delay caused him harm. *Id.* Indeed, Defendant Laura Sukowaty ("Dr. Sukowaty"), opines that to a reasonable degree of medical certainty, it is not likely that the brief delays in Jennings undergoing the cross-linking procedure led to a need for corneal transplant. Dr. Sukowaty further opines that is more likely than not that Jennings would have needed corneal transplant regardless of the cross-linking procedure

As such, Jennings' deliberate indifference claim against Dr. South fails on the additional, independent grounds that Dr. South did not cause or participate in the alleged delay in his care, and further, Jennings cannot demonstrate that he suffered harm due to the alleged delay in his care. For this reason and the above reason, Jennings' Eighth Amendment claim against Dr. South must be dismissed.

> **II.  Summary Judgment Dismissing Jennings' Medical Negligence Claim Against Dr. South Is Appropriate Because Jennings Cannot Demonstrate A *Prima Facie* Case of Medical Negligence.**

Under Wisconsin law, a claim for medical malpractice requires the following elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages. *Paul v. Skemp,* 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860 (citation omitted). In sum, a medical malpractice claim "requires a negligent act or omission that causes an injury." *Id.* Negligent acts or omissions that can constitute medical malpractice include: "omissions, failure to provide health care services, and professional services that should have been rendered when these deficiencies violate the standard of care required from a health care provider." *Burks v. St. Joseph's Hosp.,* 227 Wis. 2d 811, 826, 596 N.W. 2d 391.

A.  *Dr. South Did Not Breach Any Duty of Care That She Owed As An Optometrist.*

Jennings' medical negligence claim against Dr. South fails because he cannot identify any act or omission that breached the standard of care absent expert testimony. Expert testimony is required to establish "the degree and care and skill required of a physician" unless the "situation is one where the common knowledge of laymen affords a basis for finding negligence." *Christianson v. Downs*, 90 Wis. 2d 332, 339, 279 N.W.2d 918 (1979) (citations omitted). At the outset, this is not a case where the alleged malpractice is "one where the common knowledge of laymen affords a basis for finding negligence." (*Id.*). Wisconsin courts have found that such cases exist when a surgeon leaves a sponge or other foreign object inside a patient during surgery or removes the wrong organ or body part. *Id.* (citations omitted). Here, Jennings underwent his corneal crosslinking surgery within, under the facts in the light most favorable to Jennings, approximately thirteen months after his September 21, 2021, visit with Dr. Reddy.  An alleged delay of a patients' receipt of a corneal crosslinking procedure within approximately thirteen months of a recommendation is not a situation where a layman can determine the "degree and care and skill required of a physician." *Id.* As such, Jennings needs expert testimony to establish a breach in Dr. South's duty of care. Jennings has offered only the opinion of Dr. Kurt that "corneal crosslinking is the standard of care." Dr. Kurt made no opinions regarding what Dr. South's standard of care was in this situation, nor how she allegedly breached her duty of care.

Nonetheless, this Court can dismiss Jennings' medical negligence claims against Dr. South even without deciding that such claims fail because they lack expert opinion. Even absent expert testimony, the undisputed facts in this case cannot support any breach of duty by Dr. South. Dr. South is an optometrist. In this case, Jennings claims that Dr. South's negligent actions or omissions caused a delay in his corneal-crosslinking procedure.

However, from not ordering a pair of glasses on March 11, 2021, Jennings cannot point to any services that Dr. South failed to provide. *See Burks*, 227 Wis. 2d at 827 ("The failure to provide health care services can, in appropriate circumstances, be negligence.") As an optometrist, Dr. South does not schedule, assess, or perform corneal crosslinking. An ophthalmologist performs these services. Further, as set forth above, Dr. South did not have any role in the scheduling of, assessing of, or performance of Jennings' corneal crosslinking procedure. This is not due to Dr. South failing to provide such services, but rather due to the scope of the care that she provides as an optometrist. For these reasons, Jennings admits that Dr. South did not and could not treat his keratoconus.

Moreover, as set forth above, Dr. South did not participate in reviewing Jennings' offsite visit recommendations, deciding whether to schedule the recommended care, deciding whether the recommended care could be approved, submitting the recommended care to the Class III board for approval, scheduling Jennings' care, nor deciding how to respond to his HSRs. These omissions were not due to a breach in Dr. South's duty of care, but rather due to the constraints on Dr. South's authority to take such actions pursuant to DAI policy.

The only care at issue that fell within Dr. South's scope included the March 11, 2021, and May 10, 2022, examination appointments with Jennings. Jennings alleges that Dr. South failed to order glasses for him after the March 11, 2021, examination. However, Dr. South did not order glasses because she suspected that Jennings had corneal ectasia and requested that he be seen by an offsite specialist. Jennings admits that glasses do not treat keratoconus nor help with the blurred vision symptoms. As such, Jennings cannot dispute that Dr. South's action of waiting to order glasses for a suspected corneal ectasia patient until the results of a visit with a specialists for further diagnosis is not a breach in the appliable duty of care.

For these reasons, Jennings cannot demonstrate that Dr. South breached a duty of care and his medical negligence claim fails.

### B. *Dr. South Did Not Cause Jennings To Suffer Any Injury.*

Even further, Jennings' medical negligence claims fail against Dr. South because regardless of whether he has expert testimony, he cannot point to any act or omission that caused him to suffer an injury. First, as set forth above, Dr. South did not participate in any alleged delay in the scheduling of Jennings' corneal crosslinking procedure. Next, as set forth above, Jennings has no support for his belief that the alleged delay in his corneal crosslinking procedure caused him to need a corneal transplant. Finally, Jennings alleges that Dr. South did not and could not treat his keratoconus because she is an optometrist, not an ophthalmologist. The only care that Dr. South provided to Jennings in the events underlying his claims were two basic eye exam appointments. Jennings cannot point to any harm caused by Dr. South's care during these appointments. Jennings admits that glasses do not treat keratoconus nor help with the blurred vision symptoms. As such, Jennings cannot argue that Dr. South's alleged negligent failure to order glasses in March 2021 caused him to suffer harm.

In sum, Jennings cannot demonstrate that Dr. South breached a duty of care, nor that she caused him to suffer any injury. As such, Jennings' medical negligence claim against Dr. South must be dismissed.

### **CONCLUSION**

In sum, Jennings' Eighth Amendment and medical negligence claims against Dr. South are devoid of any factual basis. On the basis of the argument and authority set forth above and the pleadings of record in this matter, including the declarations in support of Defendant Bethany South's Renewed Motion for Summary Judgment, the Court should grant Defendant Bethany

South's Renewed Motion for Summary judgment and dismiss Plaintiff's Second Amended Complaint against Bethany South on the merits, with prejudice and with costs.

Dated this 20th day of January, 2025.

AXLEY LLP

*Electronically signed by Cecilia A. Heberling*
Cecilia A. Heberling, SBN:  1118904
Attorneys for Defendant Bethany South
Suite 200, 2 East Mifflin Street (53703)
Post Office Box 1767
Madison, WI  53701-1767
Telephone:  608.257.5661
Facsimile:  608.257.5444
Email: cheberling@axley.com