UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DAMONTA JENNINGS,

        Plaintiff,

   v.

CHARLES DOMBECK, et al.,                  Case No. 22-cv-01205

        Defendants.

---

**JOINT AGREED UPON FINDINGS OF FACT
IN SUPPORT OF DEFENDANT BETHANY SOUTH'S AND STATE DEFENDANTS'
RENEWED MOTIONS FOR SUMMARY JUDGMENT[1]**

---

### I.      Overview of Claims and Parties.

Plaintiff Damonta Jennings ("Jennings") commenced the present 28 U.S.C. § 1983 civil rights action on October 12, 2022, alleging deliberate indifference to a serious medical need in violation of his rights under the Eighth Amendment to the United States Constitution against Defendants Mary Moore, Charles Dombeck, Robert Weinman, Ashley Haseleu, Daniel La Voie, Laura Sukowaty (collectively "State Defendants") and Bethany South. (*See* Dkt.1.) Jennings filed an Amended Complaint on July 28, 2023, and filed a Second Amended Complaint on February 14, 2024. (*See* Dkt. 30.)[2] In his Second Amended Complaint, Jennings also brought medical

---

[1] Certain facts have been proposed solely for purposes of summary judgment. Should this matter proceed beyond the summary judgment stage, the parties reserve the right to present evidence which may contradict or rebut certain facts presented and preserve the right to challenge the admissibility or relevance of certain evidence cited herein. "State Defendants" refers collectively to Defendants Mary Moore, Charles Dombeck, Robert Weinman, Ashley Haseleu, Daniel La Voie, Laura Sukowaty.

[2] Jennings filed his Complaint, Amended Complaint, and Second Amended Complaint *pro se*. (*See* Dkts. 1, 15, 30.) This Court granted his motion for appointment of counsel on April 10, 2024. (Dkt. 41.) Attorney Wesley E. Haslam entered a notice of appearance for Jennings on March 14, 2025. (Dkt. 62.)

negligence claims under Wisconsin law against Defendants Bethany South and Mary Moore and negligent supervision claims under Wisconsin law against Defendants Robert Weinman and Ashley Haseleu. (*See* Dkt. 30, ¶¶ 67-68.)

Jennings is a prisoner in the custody and care of the Wisconsin Department of Corrections ("DOC"). (*See id.*) He has resided at the Waupun Correctional Institution ("WCI") since approximately February 2019. (Dkt. 30, p. 4; Dkt. 75, p. 4 [9: 9-18].) Jennings' claims in this case arise from events occurring while he was a prisoner at the WCI from on or around March 1, 2021, through approximately December 11, 2023. (*See* Dkt. 30.)

Defendant Mary Moore ("APNP Moore") is an adult resident of the state of Wisconsin. (*Id.*) APNP Moore was employed by the DOC as an Advanced Practice Nurse Prescriber ("APNP") at WCI from July 8, 2019, through April 82022. (Dkt. 42, ¶ 2; Dkt. 78, ¶ 13) APNP Moore testified that as an APNP at WCI, she was responsible for the daily health care of an assigned panel of patients. (Dkt. 76, p. 5 [7: 4-6].) APNP Moore collaborated as needed with an on-site physician and was able to write prescriptions, give orders for treatment, and refer patients out to specialty. (*Id.*, p. 5 [7: 7-12].) As a DOC APNP, APNP Moore participated in the "planning, development, implementation, and evaluation of care and educational programs and protocols used by the health staff to meet the needs of incarcerated individuals who exhibit health problems across the continuum from prevention to complex medical and/or psychiatric conditions." (Dkt. 81 - 4, p. 2.) During her employment with the DOC, APNP Moore was Jennings' primary care provider. (Dkt. 76*.*, p. 42 [42: 8-10].) APNP Moore left Waupun in April 2022. (Dkt. 78, ¶ 13.)

Defendant Charles Dombeck ("APNP Dombeck") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) APNP Dombeck was, at all times relevant to this action, employed by the DOC as an APNP at the Dodge Correctional Institution. (Dk. 42, ¶ 4.) As a DOC APNP,

APNP Dombeck participated in the "planning, development, implementation, and evaluation of care and educational programs and protocols used by the health staff to meet the needs of incarcerated individuals who exhibit health problems across the continuum from prevention to complex medical and/or psychiatric conditions." (*See* Dkt. 81 – 5.) APNP Dombeck worked with administrative direction from the Physician Supervisor. (*Id.*)

Defendant Robert Weinman ("RN Weinman") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) RN Weinman was employed by the DOC as a Nursing Supervisor at WCI from January 31, 2021, through November 19, 2022. (Dkt. 42, ¶ 5.) As the Nursing Supervisor at WCI, RN Weinman was responsible for providing administrative oversight and direction of the Health Services Unit ("HSU"). (Dkt. 73, p. 4 [6: 2-3]; *See* Dkt. 81 – 3.)

Defendant Ashley Haseleu ("RN Haseleu") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) RN Haseleu was employed by the DOC as a Nurse Clinician 2 at WCI from April 29, 2019, through July 4, 2021. (Dkt. 42, ¶ 6.) After working as a Nurse Clinician 2, RN Haseleau became a Nursing Supervisor at WCI. (*Id.*) As a Nurse Clinician 2, RN Haseleu was responsible for "providing skilled nursing care to incarcerated adults in the state correctional facilities" including patient assessment and treating, assisting the physician in providing medical services, management of medications, and provision of emergency care and maintenance of medical records under the general supervision of the Nursing Supervisor. (Dkt. 73, p. 4 [6: 2-3]; *See* Dkt. 81 – 3.) As a Nursing Supervisor, RN Haseleu was the Assistant Manager to the HSU and her position duties included working "with the primary care physician, dentist, psychiatrist and specialists in a collaborative manner to provide quality health care at the assigned correctional facility in an efficient and effective manner." (Dkt. 81 – 3 at p. 2) RN Haseleu's duties also include providing "the overall administrative oversight and direction of the unit." (*Id.*)

In her Declaration, Defendant Laura Sukowaty (Dr. Sukowaty"), testified that the Health Services Manager ("HSM") and Assistant Health Services Manager ("AHSM") positions are administrative in nature, meaning the HSM/AHSM does not generally evaluate, diagnose, determine a course of treatment for, prescribe medications for, or have any direct patient care contact with an inmate patient. (Dkt. 78, ¶ 32.) Instead, Dr. Sukowaty claims, medical care is provided by HSU nursing staff and Advanced Care Providers (physicians and nurse practitioners), within the scope and authority of their respective positions and they do not provide direct care to patients. (*Id.*) Dr. Sukowaty further claims that as registered nurses, RN Weinman and RN Haseleu do not have the authority to prescribe medication (other than over-the-counter drugs), refer patients to offsite specialists, order imaging studies, or override the treatment decision of the dentists, physicians, nurse practitioners, and/or physician assistants. The same is true for an LPN. (*Id.,* ¶ 34.)

Dr. Sukowaty is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) Dr. Sukowaty was, at all times relevant to this action, employed by the DOC as a Physician Supervisor at the Dodge Correctional Facility. (Dkt. 42, ¶ 7.) Dr. Sukowaty is a family medicine doctor. (Dkt. 74, p. 4 [6: 15].) As a Physician Supervisor, Dr. Sukowaty supervised certain nurse practitioners and physicians at the DOC and saw patients. (Dkt. 74, p. 5 [8: 7-13].)

Defendant Daniel LaVoie ("Dr. LaVoie") is an adult resident of the state of Wisconsin. (*See* Dkts. 30, 42.) Dr. LaVoie was, at all times relevant to this action, the Medical Director of the Wisconsin Division of Adult Institutions, Bureau of Health Services. (Dkt. 42, ¶ 8.) As the Medical Director, Dr. LaVoie worked under the administrative direction of the Director of the Bureau of Health Services to direct the medical, mental health, dental, pharmaceutical and optometric programs for offenders in the Division of Adult Institutions and the Wisconsin Correctional Center

4

System. (Dkt. 81 - 7.)  According to Dr. Sukowaty, Dr. LaVoie was not involved in the treatment of nor decision-making regarding Jennings' keratoconus. (Dkt. 78, ¶ 36.)

Defendant Bethany South ("Dr. South") is an adult resident of the state of Wisconsin. (Dkt 80, ¶ 1.) Dr. South is an optometrist licensed by the state of Wisconsin. (Dtk. 74 p. 5 [9: 2-3]; Dkt. 72, p. 5 [5: 17]; Dkt. 80, ¶3.) Dr. South has never been employed by the DOC. (Dkt. 72, p. 20 [66: 7-9]. Dr. South is not a medical provider and is not supervised by Dr. Sukowaty. (Dkt. 74 p. 5 [9: 2-4].) Dr. South is not an ophthalmologist nor a surgeon. (Dkt. 71, p. 12 [35: 19]; Dkt 80, ¶ 7.) Rather, at all times relevant to this action, Dr. South was an independent contractor working within the State of Wisconsin Correctional Facilities on behalf of Richter Professional Services, with whom the DOC had a contract, pursuant to a March 22, 2016, Independent Contractor Agreement between Dr. South and Richter Professional Services (hereinafter the "Independent Contractor Agreement"). (Dkt. 80, ¶¶ 3] ; Dkt 74, p. 5 [9: 13].) Dr. South testified that at all times relevant to this action, she was not the only optometrist working as an independent contractor with the DOC to provide optometry services to inmates. (Dkt. 80, ¶ 5.) Additionally at all times relevant, as an independent contractor with the DOC, Dr. South worked within numerous correctional facilities throughout the state. (*Id.,* ¶ 6.)

Dr. South's obligations under the Independent Contractor Agreement included contacting the State facility and the clients therein for which she provides service and scheduling and providing such services as she determines in accord with professional services. (*Id.*, ¶ 4.) As an optometrist working as an independent contractor with the DOC, Dr. South performed primary eye care including basic eye exams using the equipment available to her at the correctional institutions. (*Id.,* ¶ 7.) Dr. South claims that the extent of Dr. South's impact on patient scheduling for care with

her was providing her availability to the various correctional facilities that she worked in within the state. (*Id.,* ¶ 8, 6.)

Jennings does not have any personal knowledge regarding Dr. South's Independent Contractor Agreement beyond his understanding of eye care as stated within the WCI Inmate Handbook and Dr. South's written discovery responses in this case. (Dkt. 75, p. 6 [15: 7-14].) Dr. South provided Jennings with medical care on March 11, 2021, and May 10, 2022. (*Id.,* p. 19 [69: 14 – 17]; Dkt. 80, ¶ 9.) Jennings claims that Dr. South was negligent and/or deliberately indifferent by: (1) not ordering him glasses after his March 11, 2021, basic eye exam appointment with her until August 3, 2021, (2) cancelling his corneal crosslinking procedure order on May 10, 2022; (3) Jennings was on a waiting list and was not seen by Dr. South from March 12, 2021, through May 10, 2022; (4) failing to acknowledge his Health Services Requests; and (5) by failing to speak with DOC employees about the severity of Jennings' condition and advocating for him to be seen earlier for a crosslinking procedure. (Dkt. 75, p. 7 [19:10-13], *Id.,* p. 14 [49: 22-24], *Id.,* p. 15 [50: 15-25], *Id.,* p. 15 [51: 1-2]; *Id.,* p. 15 [19-25]; Dkt. 75 -1, p. 13; Dkt. 30, ¶¶ 52 -54.)

**II.      General Background Regarding DOC's Policies and Procedures for Health Services Requests, Off-Site Visits, and Class III Medical Procedures.**

The State Defendants follow DOC's Division of Adult Institutions' ('DAI") policies along with state laws and practice guidelines in the performance of their job duties. (*See* Dkt. 81 -3, p. 1; Dkt. 81-4, p.1 ; Dkt. 81-5, p. 1; Dkt. 81- 6, p. 1; Dkt. 81 – 7, p. 1; Dkt. 81 – 8, p. 1; Dkt. 74, p. 12 [38: 18 – 20].)

        i.      *Health Services Requests and Scheduling Patient Care Appointments with Dr. South.*

The WCI issues a Rules & Information Handbook ("WCI Handbook") setting forth rules and policies for inmates to follow during their time at the WCI. (Dkt. 81 -10, p. 6.) The WCI Handbook provides the following procedure for inmates to obtain medical services:

1. Obtain a Health Services Request form DOC-3035 from the officer in your housing unit.
2. Completely fill out your name, DOC number, housing unit, cell number, and date at the top of the form.
3. Provide a brief, but specific, description of your problem (i.e., sore back, toothache, request to review medical file, etc.) in area provided; do not write in lower area.
4. Attach a completed Disbursement Request to the Health Services Request. If you do not have a Disbursement Request to attach to your Health Services Request, a Disbursement Request will be provided to you upon arriving at Health Services.
5. Place the completed form in the Health Services Request box located in each cell hall. The only exceptions are for those inmates housed in the Segregation Unit. Due to the nature of this area, the Officers are responsible for placing the Health Services Requests in the box. The Health Services Unit (HSU) is not responsible for Health Services Requests handled any other way.
6. Health Services Requests are picked up at 7:30 a.m. by HSU staff, 7 days a week. A nurse reviews the requests and either schedules an appointment, sends a written response, or forwards the request to other staff (i.e., dental, optical, medical record reviews, medication reviews, etc).
7. You will be charged $7.50 for each inmate-initiated Health Service Request that results in a face-to-face assessment by a health care provider. This includes medical, dental, psychiatric and optical visits. You will not be charged a co-payment for appointments initiated by a health care provider or for referrals from one health care provider to another.

B. Appointments

1. You will initially be seen by the registered nurse. If the nurse determines it is necessary, an appointment will be scheduled with the physician. Referrals to outside specialists are made only if the physician deems it necessary.
2. Normal HSU business hours are 7:30 a.m. – 3:00 p.m., Monday through Friday, excluding holidays.
3. Unless your medical need is determined to be an emergency, an appointment is scheduled approximately 3-5 days after the Health Services Request is received.

4. Medical emergencies will be handled as they arise. A medical emergency is defined as an unexpected, serious happening demanding immediate medical action. If you have a genuine medical emergency, notify your Housing Unit Officer or Shop Officer who will then contact the Health Service Unit. The on-duty nurse will determine whether or not a medical emergency actually exists. If you are unable to report to the Health Services Unit, medical personnel will come to your aid.

(Dkt. 81 – 10, pp. 30- 31.)

At all times relevant, the DAI issued policy no. 500.30.11 entitled "Daily Handling of Non-Emergency Requests for Health Care" (hereinafter "DAI Non-Emergency Requests Policy".) (*See* Dkt. 81 – 9.) The DAI Non-Emergency Requests Policy states that "HSRs [Health Services Requests] are picked up daily by health staff" and "are reviewed and prioritized daily by qualified health care professionals, or the health care liaison if applicable." (*Id.*) The same policy further states that "[n]ot every written request is a health care request requiring a face-to-face evaluation;" however, "[r]equests for care identifying symptoms requiring a face-to-face encounter shall be conducted by a registered nurse, or the health care liaison, within 24 hours of receipt." (*Id.*)

According to the testimony of Robert Weimnan, DOC nursing staff review Health Services Requests ("HSRs") submitted by inmates and determine whether to send a written response or schedule an appointment for the nurse to evaluate the inmate in a clinical setting. (Dkt. 73, p. 13 [43: 1-3].) In her declaration, Dr. South testified that she does not review HSRs unless a DOC staff member contacts her about an HSR. (Dkt. 80, ¶ 16.) Dr. South further testified that if a DOC staff member contacts Dr. South about an HSR, Dr. South will either discuss with DOC staff that the HSR can be responded to with a written response or by scheduling an appointment. (*Id.,*¶¶ 14, 16.) According to the testimony of Dr. South and Robert Weinman and DAI Policy 500.30.11, the DOC Health Services Unit staff members would complete written responses, or responses otherwise, to HSRs. (Dkt. 80, ¶ 16.; Dkt. 73, p. 13 [43: 1-3]; Dkt. 81 – 9, p. 3.) ANPN Moore

8

testified that "when nurses do the review of HSR slips, if its an eye concern, it goes right to the optometrists' mailbox and then they handle that." (Dkt. 72, p. 14 [11-15].) DOC Nurses review HSRs and either schedule an appointment, send a written response, or forward the request to other staff. (Dkt. 81 – 10, pp. 30- 31.) APNP Moore is not a DOC nurse and she did not personally handle Jennings' HSRs. (Dkt. 42, ¶ 2; Dkt. 72, p. 7 [13: 19-23].) If an inmate submits an HSR regarding a vision issue, the inmate could be scheduled for an appointment with Dr. South under the following circumstances[3]:

1. The nurse could schedule the patient with Dr. South without Dr. South ordering an assessment.
2. The nurse could first meet with the inmate and then refer the patient to optical as either an urgent referral if the nurse determines that there is urgency, and if non-urgent, then the nurse places the inmate on a list for an optical appointment. Once an inmate is placed on a list for an optical appointment, a DOC medical program assistant scheduled those inmates generally based on the time of the inmate's request.

(Dkt. 73., p. 12 [421-13]; *Id.,* p. 12 [43: 10-22].) If an inmate was seen by an optometrist for regular routine care, the DOC's staff would put the inmate on the optometrist's schedule for that care. (*Id.*, p. 12 [41: 12-19].) Dr. South testified that at all times relevant, Dr. South did not schedule inmates for optometry appointments. (Dkt. 72, p. 6 [9: 11].) Rather, according to her testimony, Dr. South would provide the DOC institutions with her availability, and the DOC medical staff would create the schedule for which inmates she would see while she was at a particular correctional institution. (*Id.*, p. 6 [11: 9-14]; Dkt. 80, ¶ 8.)[4]

        ii.      *Off-Site Specialist Visits*.

---

[3] According to Dr. South, she was not the only optometrist providing services as an independent contractor to the DOC during the relevant time. (Dkt. 80, ¶ 5.) For purposes of this motion, the proposed facts will discuss only those processes for scheduling inmates' care with Dr. South.

[4] During the relevant time, Dr. South did not work exclusively at the WCI and worked within numerous correctional institutions across the state of Wisconsin. (Dkt. 80, ¶6.)

At all times relevant, the DAI issued policy no. 500.30.02, "Specialty Consultations," to "develop procedures to ensure the continuity of care when off-site providers, such as specialty consultation, emergency services and inpatient services make recommendations" ("Specialty Consultations Policy"). (Dkt. 81- 11, p. 1.) Pursuant to the DAI Specialty Consultation policy, the "DOC ACP [Advanced Care Provider] shall consider outside recommendations and initiate orders as medically necessary." (*Id.*) The DAI Specialty Consultation provides the following procedure for ordering specialty consultations:

A. Specialty Consultations require an order and prior authorization if indicated.

   1. The ACP shall determine the need for off-site/specialty care and discuss this with the patient.
   2. All appointments shall be ordered in the HCR [Health Care Record].
   3. Processes shall be in place to assure timely scheduling of off-site visits.
   4. Timeframe delays or changes to scheduled appointments shall be communicated with an ACP and RHA [Responsible Health Authority].
   5. All communication between facility and off-site provider regarding scheduling of an appointment shall be documented in HCR.

(*Id.*) Pursuant to the same policy, if an ACP determines the need for off-site specialty care, then the Health Care Services ("HSU") Manager shall designate an appropriate HSU staff member to schedule consultations. (*Id.*, p. 2.) The ACP shall then provide medical necessary information for health staff to complete the top portion of DOC-3001 – Offsite Service Request and Report ("Offsite Visit Report"). (*Id.*, p. 3.) The WCI follows the practice of sending an Offsite Visit Report along with every inmate who is taken offsite to a hospital. (Dkt. 81 -2, pp. 7-8; Dkt. 74, p. 8 [20: 7-11].) During the off-site visit, the off-site provider then fills out the report to include their assessment and recommendations to the DOC. (Dkt. 74, p. 8 [20:11-14].) A security team member then brings back the Off-Site Visit Report and then gives it to a DOC nurse. (Dkt. 73, p. 16 [54: 3-7], *Id.,* p. 17 [57: 6-13], *Id.,* p. 17 [58: 4-5].)  However, sometimes the off-site provider will not fill out the report. (Dkt. 74, p. 8 [20: 16]; Dkt. 73, p. 16 [54: 7-8].) In that instance, the RN would

then need to access the electronic record and download the AVS. (Dkt. 74, p. 8 [20: 17-21]; Dkt. 73, p. 16[54: 4-7].) When a DOC patient is seen by an offsite provider, it can take a few days to receive and process the medical records from that offsite visit into HSU's electronic medical record system. (Dkt. 78, ¶ 16.)  It is the DOC's policy that the provider who receives and reviews an Off-Site Visit Report affixes their own initials on the report. (Dkt. 74, p. 12 [37: 19-22], *Id.,* p. 12 [38:23-25], *Id.,* p. 13 [39: 1-2].) Providers outside of the DOC cannot write orders for medical treatment within the DOC's system. (Dkt. 74, p. 5 [10: 22-25].)

Pursuant to the DAI Specialty Consultations Policy, any patient returning from an off-site visit shall be seen by a Registered Nurse. (Dkt. 81 - 11, p. 3.) The recommendations from off-site providers "shall be reviewed and ordered by a DOC ACP before implementation" and "[s]ome recommendations require prior authorization before implementation according to DAI Policy 500.10.12."[5] (*Id.*, pp. 4-5.) As such, the DOC provider who ordered the off-site care should receive and review the Off-Site Report and determine whether the recommended care should be implemented and seeks prior authorization for that care if necessary. (Dkt. 73, p. 6 [13: 4-11]; Dkt. 74, p. 12 [37: 19-22]; Dkt. 72, p. 9 [22: 9-6].) Assuming that the care recommended by an off-site provider is approved by the DOC, the DOC provider then puts in an order, or referral, for the care and a DOC scheduler schedules the care. (Dkt. 74, p. 21 [14; 22-24]; *Id.,* p. 6 [11: 16-18]; Dkt. 73, p. 6 [13:12-16].)  According to the testimony of Dr. Sukowaty, only DOC providers can make referrals for treatment. (*Dkt. 74,* p. 6 [11: 16-18]. Outside providers can only make recommendations for treatment. (*Id.*)

Offsite Advanced Care Providers do not have prescription authority within any Corrections' institution. Therefore, according to Dr. Sukowaty, when an inmate patient returns

---

[5] Dr. Sukowaty claims that when a DOC patient is seen by an offsite provider, it can take a few days to receive and process the medical records from that offsite visit into HSU's electronic medical record system. (Dkt. 78, ¶ 7.)

from an offsite visit with a prescription, it is the Corrections ACP who is responsible for reviewing the offsite ACP's recommendations and deciding whether or not to follow them based on whether or not they are appropriate for use in an institution setting. (Dkt. 78, ¶ 35.) As an independent contractor with the DOC, Dr. South is not authorized to determine whether recommendations by off-site providers will be ordered. (Dkt. 80, ¶ 12; (Dkt. 74, p. 21 [14; 22-24]; *Id.,* p. 6 [11: 16-18]; Dkt. 73, p. 6 [13:12-16]; Dkt. 81 - 11, pp. 4-5.) According to DAI policy, "deviation from off-site recommendations/orders require rationale and shall be documented in the HCR. If the ACP orders differ from recommendations, the patient shall be informed." (Dkt. 81-11, p. 4.)

### iii. *Prior Authorization for Medical Procedures*.

At all times relevant, the DAI issued policy no. 500.10.12, "Prior Authorization Guidelines for Non-Urgent Care (Class III)," to "utilize Prior Authorization Guidelines for non-urgent treatment" and arrange for hospital and specialty care for patients "in need of these services" ("Class III Policy"). (Dkt. 81 – 12, p. 1.) The Class III board is a process for prior approvals because the State is self-insured. (Dkt. 74, p. 5 [9: 20-23].) Pursuant to the Class III Policy, there are three classifications of "Medical and Surgical Conditions," including:

1. Class 1: Emergency Care
   a. An emergency is a potentially life-threatening condition requiring immediate care.
   b. A delay in treatment may result in death or permanent serious impairment of the patient's health.
2. Class II: Urgent Care
   a. Presently necessary urgent health care problem.
   b. An urgent medical health care problem, while not an emergency, is one in which prolonged delay of treatment could present a risk for serious bodily harm, disability, or further deterioration in the patient's condition resulting in worsening health.
3. Class III: Non-Urgent Medically Acceptable
   a. A non-urgent condition is one that does not represent a significant threat to the patient's general medical health and which is not likely to pose such a threat in the foreseeable future.

     b. Surgical procedures can be performed at the convenience of physicians, persons and institutions involved. Non-urgent cases are of two types and in both types, prior authorization is required.

4. Class III-A
     a. Cases involving persistent pain or dysfunction where pain or dysfunction have been progressive but do not pose an urgent threat to the health of the patient.
     b. The condition must be subject to medical correction or arrest.
     c. While no medical deferment is expected to result from a delay of several weeks to months, adequate care dictates the performance of medical or surgical procedure as soon as scheduling reasonably permits.

5. Class III-B – No procedure or referral should be scheduled at the present.
     a. Cases not involving persistent pain, progressive disease, or impairment and not solely for the convenience of the patient.
     b. No medical effects are expected to result from the surgical delay of months to years.

6. Class IV: Elective Non-Covered Care Services.
     a. Services that are considered not medically necessary or required in accordance with acceptable medical standards for medical and surgical practice. No procedure or referral should be scheduled at the present.

(Dkt. 81 – 12, pp. 2-3.) Class I and Class II requests do not require prior approval. (*Id.,* at p. 3.) A Class II request is submitted by "the facility ACP [advanced care provider" in the electronic health record. (*Id.*, at p. 3.) A Class III request is approved by the DOC's medical director, designee, or by the Class III committee. (*Id.,* at p. 3.) According to Dr. South's and Dr. Sukowaty's testimony, as an independent contractor, Dr. South does not have authority to initiate applications for Class III committee reviews and does not participate in Class III committee reviews. (Dkt. 80, ¶ 14;.) As an independent contractor, Dr. South did not approve or deny procedures for patients in the prison system. (Dkt. 72, p. 13 [11-13].)

**III.    Jennings' Medical Care At Issue.**

    *i.    <u>Overview of Keratoconus Condition and Treatment</u>.*

Keratoconus is a thinning disease of the cornea that causes it to bulge in certain ways. (Dkt. 72, p. 7 [15: 12-13].) Dr. South testified that keratoconus is a type of corneal ectasia. (*Id.,* p. 9 [23:

18-20].) Dr. South testified all forms of corneal ectasia are degenerative, meaning that typically, the corneal ectasia gets worse. (*Id.,* p. 9 [23: 21-23]; p. 8 [16:5-7].) The symptom of keratoconus is blurred vision. (*Id.*, p. 8 [16: 9-10].) Keratoconus can be treated with corneal crosslinking or corneal transplants. (*Id.,* p. 8 [18: 19-20].) Dr. South testified that corneal crosslinking is the standard of care for keratoconus. (*Id.*, p. 14 [41: 23-25].) Corneal cross-linking is an outpatient procedure that involves painting Vitamin A over tissue and then curing it with UV light to strengthen the cornea to prevent bulging. (Dkt. 72, p. 12 [35: 2-8].) Corneal-crosslinking often only delays further worsening of corneal ectasia rather than fully preventing it. (Dkt. 78, ¶ 38.) If keratoconus progresses, corneal cross-linking becomes less effective. (Dkt. 72, p. 13 [36: 12-15].) Dr. South testified that in Wisconsin, corneal crosslinking is performed only by surgeons and surgeons make the recommendation for corneal crosslinking. (Dkt. 72, p. 12 [35: 24-25], *Id.,* p. 13 [1]; *Id.,* p 15 [18-19].) At his deposition, Jennings testified that Dr. South could not and did not treat his keratoconus condition because she did not have the equipment to provide any treatment. (Dkt. 75, p. 19 [69: 1-2, 10-11].)

According to the testimony of Dr. Sukowaty, corneal crosslinking is not guaranteed to reverse, stop, or slow down the progression of keratoconus. (*Id.,* p. 17 [58: 10-12]; Dkt. 74, p. 6 [12: 11-14].)  Dr. Sukowaty testified that the hope for corneal cross-linking is that it will stop or slow down significantly the progression of keratoconus. (Ex. 74 24: 15-21.) A corneal transplant is an outpatient procedure removing the cornea and replacing it with a donor tissue from a cadaver. (Dkt. 76, p. 17 [53 [1-3]; Dkt. 72, p. 13 [37: 1-9.)  Dr. South testified that if someone with keratoconus does not have a corneal transplant they would be "permanently unable to see" in the form of "very blurry vision." (Dkt. 72*,* p. 8 [17: 21-25]; p. 8 [4-7].) Wearing contact lenses does not treat keratoconus, but it does offer clearer vision. (*Id.,* p. 14 [40: 5-7].)  If someone with

keratoconus was completely untreated, they would have permanently blurred vision, which could be improved with contact lenses. (*Id.,* p. 21 [68: 11- 14]; Dkt. 80, ¶ 22) Untreated keratoconus does not lead to blindness or no-light-perception vision loss. (Dkt. 72*,* p. 21 [68: 18-19]; Dkt. 80, ¶ 22.)

ii. <u>*Jennings' March 11, 2021, appointment with Dr. South*</u>.

Prior to March 11, 2021, the extent of Mr. Jennings' eye care included fewer than ten basic eye exams. (Dkt. 75, p. 5 [12: 18-21], *Id.,* p. 5 [13: 2-4].) None of these prior eye exams resulted in a prescription for glasses or contacts. (*Id.,* p. 5 [13: 4-7].) Upon his incarceration at the Dodge Correctional Facility, Jennings had a required eye exam and did not need any glasses or contacts as a result, as such, he assumes that his vision was "good" at that time. (*Id.,* p. 5 [13: 12-15].) Jennings submitted a request for a visit for his vision on or around March 11, 2021, because he realized it was becoming "a little more difficult and blurry to read from a distance than usual." (*Id.,* p. 5 [13: 23-25]; p. 6 [14: 1-5].)

Dr. South performed a basic eye exam on Jennings on March 11, 2021. (Dkt. 72, p. 9 [21: 19-20]; Dkt. 75, p. 11 [35: 1-5].) As a result of her March 11, 2021, basic eye exam, Dr. South suspected that Jennings had corneal ectasia. (Dkt. 72, p. 9 [21: 8-10], *Id.,* p. 9 [23: 15-17].) When asked at her deposition "what happens next after blurry vision if keratoconus goes untreated," Dr. South stated "[p]otentially a corneal transplant at the very worst-case scenario…. I think a corneal transplant would be the end of that." (Dkt. 72, p. 8 [17:13-17.)  Dr. South did not have the equipment to diagnose Jennings with corneal ectasia because the WCI did not have the equipment needed to conduct topography testing that gives more detailed information about the thinning. (*Id.,* p. 9 [21:8-9, 19-25], *Id.,* p. 8 [16: 22-25.) Dr. South submitted an internal referral for Jennings to be seen by an outside provider while he sat in her chair on March 11, 2021. (*Id.,* p. 9 [21: 11-13];

15

Dkt. 75, p. 7 [18: 8, 12-20].) Dr. South testified that she did not prescribe Jennings with a pair of glasses on March 11, 2021, because she knew that he was going to be seeing an offsite provider for testing and knew that his prescription could change based on that appointment. (Dkt. 80, ¶ 10.) Further, according to her testimony, she knew that ordering glasses would take up to four weeks at a minimum and that glasses are not effective for correcting the blurred vision symptoms of keratoconus and glasses would not have been a benefit to Jennings if he did in fact have keratoconus. (*Id.*)

### iii. *Jennings' Care with Dr. Shilpa Reddy at UW Health on June 2, 2021*.

Pursuant to Dr. South's internal referral, Jennings had an appointment with Dr. Shipla Reddy ("Dr. Reddy") at UWHealth Ophthalmology on June 2, 2021. (Dkt. 76, Exhibit 2 at p. 3.) In her After Visit Summary ("AVS"), Dr. Reddy stated: "Corneal ectasia – Suspect keratoconus based on exam … Recommend glasses wear … Follow up with pentacam 1-2 months, repeat pentacam 4-5 months, then 6 mo security clinic with DFE to discuss management options," (Dkt. 76, Exhibit 2 at p. 3.) In the Offsite Visit Report regarding the June 2, 2021, offsite visit, Dr. Reddy stated "see AVS" in the recommendations section. (*Id.,* p. 1.) Dr. Reddy suspected keratoconus and recommended glasses and topography, an imaging study which maps the surface curvature of the cornea. Crosslinking was not recommended at that time. (Dkt. 78, ¶ 9.)

APNP Moore received the Offsite Visit Report regarding Jennings' June 2, 2021, visit with Dr. Reddy and initialed the same report on the same date. (*Id.,* p. 1; Dkt. 76, p. 14 [42: 22-25], *Id.,* p. 14 [43: 1-4].) As Jennings' primary care provider, APNP Moore was responsible for reviewing Jennings' offsite record reports and ordering follow up appointments as necessary. (Dkt. 81 -1, p 10.) At all times relevant, DOC employees Shelly Bloch and/or Haley Bassuener ("Ms. Bassuener") were the staff members responsible for scheduling medical appointments for the

inmates at WCI. (Dkt. 81 – 1, p. 8.) After receiving the June 2, 2021, Offsite Visit Report, APNP Moore "would have given that [recommendation to wear glasses, follow up with Pentacam] to the scheduling person to return from Pentacam one to two months and then it would have gotten scheduled." (Dkt. 76, p. 14 [43: 19-25].)

*iv. Jennings' Care with Dr. Shilpa Reddy at UW Health on September 22, 2021.*

Jennings' next off-site appointment with Dr. Reddy occurred on September 22, 2021. (Dkt. 76, Exhibit 1at p. 2.) APNP Moore made the referral for Jennings' September 22, 2021, appointment with Dr. Reddy. (Dkt. 76, p. 15 [45: 7-9].) After Jennings' September 22, 2021, offsite visit, APNP Moore signed off on the September 22, 2021, Offsite Visit Report prepared by Dr. Shipla G. Reddy. (Dkt. 81 – 1, p. 11; Dkt. 76, p. 15 [45: 10-12].) In the September 22, 2021, Offsite Visit Report, Dr. Shipla wrote "see AVS" in the recommendations section. (Dkt. 76, Exhibit 1 at p. 1.) The AVS from Dr. Reddy's September 22, 2021, offsite visit with Jennings states:

> **Keratoconus both eyes**
> -Discussed etiology and management of these issues; due to severity, will send to Cornea
> -Of note, there is not corneal cross-linking available in a secure facility at UW, and it is likely that this procedure would help the patient. It would be preferable for the patient to see a non-UW cornea physician with cross-linking facilities available. I will set him up with our Cornea specialist, but if he can be sent to a non-UW provider with cross-linking instead, this would be optimal recommend this plan of action.

(*Id.,* (at p. 2.) (emphasis in original) Dr. Reddy diagnosed Jennings with keratoconus in both eyes and noted that it was "likely" that corneal cross-linking would help Jennings. (*Id.*) However, she also noted there was no secure facility for corneal cross-linking at UW, recommended to be done by non-UW provider. (Dkt. 78, ¶ 10.) In her declaration, Dr. Sukowaty testified that Dr. Reddy did not request approval for the cross-linking procedure from DOC or state that the procedure was

urgent. (*Id.,* ¶ 11.) Per the September 22, 2021, off-site record, APNP Moore ordered Jennings a referral to UW Optometry for a "CTL visit," which visit was conducted on March 28, 2022. (Dkt. 81 – 1, p. 10.)

> v. *Jennings' Care with Dr. Kevin Kurt at UW Health on March 28, 2022.*

Jennings' next off-site visit was with Dr. Kevin Kurt ("Dr. Kurt") at UWHealth Ophthalmology on March 28, 2022. (Dkt. 76, Exhibit 3 at p. 2.) In the recommendations section of the Offsite Visit Report, Dr. Kurt wrote: "Corneal x-linking would be very beneficial to patient. Keratoconus is progressing. Will need to return to office for scleral / [*sic.*] lens fitting. Corneal cross-linking may be able to prevent need for corneal transplant. Please approve ASAP." (*Id.*) APNP Moore received and initialed the Offsite Visit Report from Jennings' March 28, 2022, visit with Dr. Kurt. (Dkt. 76, p. 15 [15: 24-25], *Id.,* p. 16 [48: 1-2].) At her deposition, APNP Moore testified that she had no recollection of providing the March 28, 2022, September 21, 2021, nor June 2, 2022, Offsite Visit Reports to Dr. South. (*Id.,* p. 16 [48: 15-20].) Dr. South did not review the March 28, 2022, September 21, 2021, nor June 2, 2022, Offsite Visit Reports when Jennings returned from the offsite visits and no DOC employees provided the Offsite Visit Reports to her for review. (Dkt. 78, ¶ 11.)

> vi. *Approval and Scheduling of Jennings' Corneal Cross-Linking.*

On or around April 3, 2022, Jennings submitted an HSR stating that: "On my visit to UW Health on 3.28.22 they recommended I get cross link surgery to stop the keratoconus from damaging my corneal causing a full replacement of the corneal. Prior recommendations where not followed up on." (Dkt. 81 – 13.) DOC employee Ann York received Jennings' April 3, 2022, HSR on April 5, 2022. (*Id.*) On or around April 6, 2022, APNP Dombeck emailed Dr. Sukowaty and asked whether, in her judgment, UW Ophthalmology's request for a "patient [Jennings] be sent to

a local non-secure site for corneal cross-linking procedure ASAP which they believe may prevent the need for a corneal transplant."[6] (Dkt. 81 – 14.) Dr. Sukowaty had already discussed the need for Class III approval for corneal cross-linking with Dr. LaVoie and determined that pre-approval was not needed. (Sukowaty Decl. ¶ 18.) Dr. Sukowaty determined that Class III was unnecessary for Jennings to receive corneal cross-linking (Dkt. 74, p. 7 [16: 14-20].) Dr. Sukowaty testified that corneal cross linking would have been a Class II, urgent care, procedure. (*Id.*, p. 7 [15: 7-15].) As such, prior authorization by the Class III Committee was not necessary in order to proceed with Mr. Jennings' corneal crosslinking treatment. (Dkt. 81 -1, pp. 10, 12.) Dr. Sukowaty responded to APNP Dombeck's email on April 7, 2022, and stated that the patient "can be approved for this." (Dkt. 81 – 14.) APNP Dombeck responded on April 8, 2022, that he would order the consult. (*Id.*)

Dr. Sukowaty claims that because UW was recommending the procedure be completed by a non-UW provider, the responsibility fell on UW to find another specialist to refer Jennings to. (Dkt. 78, ¶ 20.) Dr. Sukowaty also claims that only DOC providers can make referrals for treatment. *(*Dkt. 74*, p. 6 [11: 16-18].)* Outside providers can only make recommendations for treatment. (*Id.*) On April 8, 2022, Haley Bassuener, LPN, left a message with UW to have triage nurses call her back to discuss Jennings' scleral lens and corneal cross-linking procedure. (*Id.*, ¶ 21.) On April 20, 2022, Bassuener followed up and called to get an update from UW regarding Jennings' corneal cross-linking procedure. (*Id.*, ¶ 21.) Bassuener called on two separate occasions before UW returned her call. (Dkt. 81 – 14.) On April 28, 2022, UW informed Bassuener that UW was referring Jennings to Valley Eye Associates for the cross-linking. (Dkt. 78, ¶ 23.)

On or around April 28, 2022, Ms. Bassuenuer emailed Dr. Sukowaty and APNP Dombeck and stated that she had been trying to coordinate with UW where to have Jennings go for a corneal

---

[6] ANPN Moore left her employment with the DOC on or around April 2022. (Dkt. 76, p. 5 [6: 2-4].) APNP Dombeck began his employment with the DOC on or around April 2022. (Dkt. 81 – 1, 11.)

crosslinking, and as UW recommended, she made contact with Valley Eye in Appleton. (Dkt. 81 – 15.) She further stated that Valley Eye could not get Jennings in until November, and that she asked to be put on a call back list in the event a sooner date was to open up. (*Id.*) Sometime in April 2022, Jennings learned through HSR correspondence with the DOC that a crosslinking procedure had been approved and would be scheduled and ordered. (Dkt. 75, p. 15 [53: 19-24].)

### vii.   *Jennings' May 10, 2022, Visit with Dr. South*.

Jennings had an appointment with Dr. South on May 10, 2022, for Jennings to pick out the frame for his glasses. (Dkt. 72*., p. 15 [52:8-10, 14-15].) During this visit, Dr. South saw only an order awaiting a response, as such, she believed that the DOC had not yet determined whether the procedure was covered. (Dkt. 84, ¶ 6; Dkt. 80, ¶ 18.) During this visit, Dr. South notified Mr. Jennings that his corneal crosslinking was not a covered procedure and had been cancelled. (Dkt. 75*, p. 15 [52:24-25].) Dr. South had cancelled the order for corneal crosslinking, and she testified she cancelled the order because "there was confusion about whether the cross-linking was an approved procedure through the DOC." (Dkt. 72, [33: 15-6].

Specifically, at the time when she cancelled the order for Jennings' corneal crosslinking, she believed that the DOC understood corneal crosslinking to be a non-covered care service that was not medically necessary (Dkt. 80, ¶ 17.) This belief was based on her prior experience when the Class III Committee denied a patient's corneal crosslinking procedure in the past because the Class III Committee determined that the corneal crosslinking was an elective, non-covered service that was not medically necessary. (*Id.*) To her knowledge, this denial did not cause the patient to suffer any further issues or progressive issues. (*Id.*) Also, Dr. South understood at that time that while corneal crosslinking, if successful, could stop the progression of the underlying keratoconus disease, keratoconus symptoms can be addressed through non-surgical means including contact

lenses. (*Id,* ¶ 18.) Dr. South further understood at that time, based on her experience, that patients can live with keratoconus without having a corneal crosslinking procedure or a corneal transplant for years and even decades without experiencing any significant worsening of the disease. (*Id.,* ¶ 22.) In her experience, some patients do not ever require corneal crosslinking or a corneal transplant at all. (*Id.*)

When she cancelled Jennings' corneal crosslinking procedure, Dr. South testified that she had, at most, briefly reviewed Jennings' off-site records during his May 10, 2022, appointment with her. (Dkt. 80, ¶ 11.) Dr. South testified that she sees an average of 22 patients per day with the DOC and does not have time to study the patients' records in detail during each visit. (*Id.,* ¶ 21.) Dr. South further testified that no DOC staff members consulted with Dr. South regarding Jennings' offsite recommendations. (*Id.,* ¶ 11.) Dr. South did not review the March 28, 2022, September 21, 2021, nor June 2, 2022, Offsite Visit Reports when Jennings returned from the offsite visits and no DOC employees provided the Offsite Visit Reports to her for review. (Dkt. 80, ¶ 11.) Further, at the same time, Dr. Southy testified that she did not have information regarding the specifics of Jennings' condition because she did not have the requisite equipment to map his keratoconus and did not study his off-site medical records in detail. (*Id.,* ¶ 21.)

Jennings then wrote an inmate complaint to the WCI regarding his denied treatment and an HSR to the HSU to "confirm that the treatment was not covered," (Dkt. 75, p. 54 [9-11, 13-15].) Dr. South testified that she then received an email shortly thereafter stating that the crosslinking procedure was approved and she reinstated the order for the crosslinking procedure. (Dkt. 72, p. 12 [33: 17-19].)

viii.    *Jennings' Treatment with Valley Eye Associates.*

Jennings' crosslinking procedure was rescheduled after Dr. South reinstated the order. (Dkt. 75, p 16 [56: 5-9].) On or around June 2, 2022, the WCI HSU responded to a May 31, 2022, HSR from Jennings to confirm that his corneal crosslinking surgery was scheduled. (Dkt. 81 -17.)

Jennings had a consult appointment with Valley Eye Associates to evaluate his eyes and determine if he needed corneal crosslinking in July 2022. (*Id.,* p. 15 [50: 5-10].) Valley Eye Associates had initially indicated to the DOC that November was the earliest that Jennings could be scheduled for a crosslinking procedure, however, they ended up moving the visit date up to August 25, 2022. (Dkt. 81 -15.) Jennings submitted two HSRs dated August 19, 2022, where he "makes reference to his upcoming surgical procedure being 'in less than 1 week from today's date' which was accurate.'" (Dkt. 81 – 18; Dkt. 78, ¶ 28.) In an August 22, 2025, email to APNP Dombeck, Ms. Bassuener stated that she "was instructed to contact the admin captain about the security breach and was told the surgical procedure needs to be rescheduled. Please review the new surgical date as it was the soonest the clinic had available." (Dkt. 81 - 15; Dkt. 81 – 18; Dkt. 78, ¶ 29.) The HSU informed Jennings on August 26, 2022, that his crosslinking procedure was "rescheduled due to security breach of app[ointment] date." (Dkt. 81 – 18.) It is DOC policy that an inmate is not informed in advance of the time and date of offsite visits and procedures. (Dkt. 78, ¶ 30.) The inmate possessing this information poses security risks to the institution and correctional staff. For example, an inmate could coordinate with individuals outside the prison to attempt escape or to meet and receive contraband. (*Id*., ¶ 30.)

Valley Eye Associates performed a corneal crosslinking procedure on both of Jennings' eyes on or around October 13 or 14, 2022. (Dkt. 75, p. 16 [55: 13-24].) After his corneal crosslinking procedure, Dr. Sarah Nehls ("Nehls") at UWHealth decided that Jennings needed a corneal transplant in his left eye. (Dkt. 75, p. 57: 5-8].) At his deposition, Jennings testified that it

was his belief that he needed a corneal transplant procedure because he did not have the corneal crosslinking procedure until October 2022. (*Id.,* p. 16 [57: 9-12, 18- 22].) At his deposition, Jennings testified that Dr. Nehls did not tell him that he needed a corneal transplant due to when he had the corneal crosslinking procedure. (*Id.*) Jennings does not have any medical training. (*Id.,* p. 5 [12: 1-3].) Defendant Dr. Sukowaty claims that to a reasonable degree of medical certainty, it is not likely that the brief delays in Jennings undergoing the cross-linking procedure led to a need for corneal transplant. (Dkt. 78, ¶ 37.) Dr. Sukowaty further claims that is more likely than not that Jennings would have needed corneal transplant regardless of the cross-linking procedure. (*Id.*, ¶ 38.)

Jennings' counsel produced a July 21, 2021, declaration by Dr. Kurt in this case. (Dkt. 81 - 19.) In his July 21, 2021, declaration, Dr. Kurt stated that it is his "professional opinion that corneal cross-linking became the standard of care for keratoconus after the Food and Drug Administration ("FDA") approved corneal cross-linking to treat keratoconus."[7] (*Id.*)

On or around July 18, 2023, Jennings submitted a Health Services Request stating that: "I would like to know why Im being told to wear glasses when offsite specialist and optometrist Bethany South know glasses DO NOT WORK. IM BLIND I CANT SEE WITH THEM!" (Dkt. 81 – 21) (emphasis in original). Jennings underwent a corneal transplant procedure in his left eye on or around April 2024. (Dkt. 75, p. 17 [58: 25], *Id.,* p. 17 [59: 1-5].) Jennings' providers have indicated that his left eye corneal transplant was successful. (*Id.,* p. 17 [60: 2-5].) Jennings continues to treat with UWHealth annually for new contacts and review of the stitches in his eye.

---

[7] Dr. Kurt's July 21, 2025, declaration also states that he diagnosed Jennings for keratoconus on September 22, 2021, and recommended corneal cross-linking as a treatment for Jennings' keratoconus on September 22, 2021. (*Id.*) The undersigned counsel stipulate that the September 22, 2021, date referenced therein is an error. As provided above, Jennings had an appointment with Dr. Reddy on September 22, 2021. Jennings' first appointment with Dr. Kurt was on March 28, 2022.

(*Id.,* p. 17 [60: 15-19].) At his deposition, Jennings testified that he experiences light sensitivity that causes eye pain and headaches and less than 20/20 vision in his left eye because of the care at issue and events alleged in his Second Amended Complaint. (*Id.,* p. 18 [65: 19-25], *Id.,* p. 19 [66: 8, 12-13], *Id.,* p. 19 [67: 18-20].) Jennings takes over-the-counter medication and wears approved tinted glasses to treat his headaches. (*Id.,* p. 19 [66: 15-20].)

Plaintiff did not submit any Notice of Claim regarding any of his claims in this case. ( Dkt. 82, ¶ 4.)

Dated this 20th day of January 2025.

JOSHUA L. KAUL  
Attorney General of Wisconsin

KRAVIT, HOVEL & KRAWCZYK, S.C.

**s/Jonathon Davies**  
Jonathon Davies  
Assistant Attorney General  
State Bar # 1102663  
*Attorneys for State Defendants*  
Wisconsin Department of Justice  
Post Office Box 7857  
Madison, Wisconsin 53707-7857  
(608) 267-2070  
(608) 294-2907 (Fax)  
Jonathon.davies@wisdoj.gov

**s/ Wesley E. Haslam**  
Wesley E. Haslam  
State Bar #1121993

*Attorney for Plaintiff Damonta Jennings*  
Kravit, Hovel & Krawczyk, s.c.  
825 N. Jefferson St., 5th Floor  
Milwaukee, WI 53202  
(414) 271-7100  
(414) 871-8135 (Fax)  
weh@kravitlaw.com

AXLEY LLP

**s/ Cecilia A. Heberling**  
Cecilia A. Heberling  
State Bar #1118904  
*Attorneys for Defendant Bethany South*  
Suite 200, 2 East Mifflin Street (53703)  
Post Office Box 1767  
Madison, WI  53701-1767  
(608) 257-5661  
(608) 257-5444 (Fax)  
cheberling@axley.com