DAMONTA JENNINGS,

        Plaintiff,

v.                                Case No. 22-cv-1205

CHARLES DOMBECK, ET AL.

        Defendants.

## PLAINTIFF'S BRIEF IN OPPOSITION TO STATE DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Damonta Jennings ("Plaintiff" or "Jennings") filed an Eighth Amendment claim via a 28 U.S.C. § 1983 action and state law negligence claims against Advanced Practice Nurse ("ANPN") Mary Moore, ANPN Charles Dombeck, Health Services Manager ("HSM") Robert Weinman, Assistant Health Services Manager ("AHSM") Ashley Haseleau, Dr. Laura Sukowaty, and Dr. Daniel LaVoie (collectively "State Defendants") and Dr. Bethany South ("Dr. South"), an independent contractor providing optometry services to inmates at various DOC facilities. The DOC staff and Dr. South filed separate motions for Summary Judgment, and this response addresses only State Defendants' motion.

This case is about a prisoner not receiving timely care for a serious medical condition. Defendants attempt to claim that they provided adequate medical

care and point to specific actions they took during this nineteen-month period, as well as a reason for why his treatment was delayed for an additional one and a half months. However, Defendants fail to address why no Department of Corrections ("DOC") staff ordered the treatment outside medical providers recommended for Jennings until after several months and several requests from the prisoner to follow up on the recommended treatment. In fact, an internal DOC investigation revealed that Defendant Moore received two separate recommendations from outside providers and did not order the procedure. (Dkt. No. 100 at 2.)

Jennings' medical condition is keratoconus, a form of corneal ectasia where the cornea becomes thin and distorted, severely compromising one's vision. (Dkt. No 101 at 13-4.) Keratoconus is a degenerative condition, meaning that it worsens over time. (*Id.*) The treatment recommended by the outside medical providers was corneal cross-linking, a procedure that can obviate the need for a corneal transplant if caught early enough.[1](*Id.* at 14-5.) Jennings first received a recommendation for corneal cross-linking on September 22, 2021. (*Id.* at 17.) Defendant Moore signed the Offsite Visit Report where corneal cross-linking was recommended, but no DOC staff attempted to schedule the procedure until April of 2022 at the earliest. (*Id.* 18-9.) Jennings went to another off-site medical appointment on March 28, 2022. (*Id.* at 18.) The provider recommended approving corneal cross-

---

1 State Defendants dispute whether corneal cross-linking would have prevented a corneal transplant; however, they agree in depositions that it is the standard of care for keratoconus.

linking "ASAP" and noted that it could prevent the need for a corneal transplant. (*Id.*) Defendant Moore also signed the Offsite Visit Report from this visit. (*Id.* at 17.)

No DOC staff attempted to schedule the recommended treatment until at least April of 2022. (*Id.* at 18-9.) During this period, Jennings complained of deteriorating vision that was disabling and caused him to have severe headaches. (Dkt. No. 100 at 1-2.) After Jennings received the corneal cross-linking procedure, the deterioration in his right eye was mitigated, but he still required a corneal transplant in his left eye. (Dkt. No. 101 at 23-4.) Jennings asserts that the unnecessary delay caused him to require a corneal transplant, caused suffering throughout the period of the delay, and that his vision is now permanently impaired. (*Id.*)

**LEGAL STANDARDS**

### I.    Summary Judgment Standard

"The Court considers all of the evidence in the record in the light most favorable to the non-moving party and draws all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal quotations and citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

The moving party "must show that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see Modrowski v. Pigatto*, 712 f.3d 1166, 1168-69 (7th Cir. 2013) (movant's burden is to demonstrate the absence of a genuine issue;

nonmovant is entitled to the benefit of conflicts in the record). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Burton v. Dow Chemical Co.*, 19 F.4th 636, 648 (7th Cir. 2021) (reversing summary judgment where record supported competing inferences). "Competing reasonable inferences preclude summary judgment." *Skiba*, 884 F.3d at 721 (when evidence permits different reasonable conclusions, the case goes to a jury). The nonmovant need not present evidence in a form admissible at trial so long as it could be presented in admissible form. *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014).

## II.    Eighth Amendment Standard

The Eighth Amendment imposes an affirmative duty on prison officials to provide humane conditions of confinement, ensuring that inmates receive adequate food, clothing, shelter, medical care, and reasonable safety. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994); *see also Budd v. Motley*, 711 F.3d 840, 842-43 (7th Cir. 2013). An Eighth Amendment claim has two components: (1) the deprivation must by objectively serious; and (2) the defendant must act with deliberate indifference— actual knowledge of and disregard for that substantial risk. *Farmer*, 511 U.S. at 834– 38; *Board v. Farnham*, 394 F.3d 469, 478–80 (7th Cir. 2005). Actual knowledge may be proven by circumstantial evidence, including the obviousness of the risk. *Farmer*, 511 U.S. at 842; *Perez v. Fenoglio*, 792 F.3d 768, 781-84 (7th Cir. 2015) (holding that officials informed through grievances and correspondence may not ignore serious risks).

Officials violate the Eighth Amendment when they persist with a course of treatment or conditions they know to be ineffective or dangerous, or when they delay necessary care without justification and thereby exacerbate harm. *Petties v. Carter*, 836 F.3d 722, 728-31 (7th Cir. 2016) (*en banc*) (non-medical reasons for delay and failure to follow specialist recommendations can prove deliberate indifference); *Gonzalez v. Feinerman*, 663 F.3d 311, 314-15 (7th Cir. 2011) (unjustified delay in surgery states claim). Nonmedical officials may be liable when they know of a serious risk and refuse or fail to act, including by turning a blind eye to grievances. *Vance v. Peters*, 97 F.3d 987, 993-95 (7th Cir. 1996) (supervisory liability where knowledge and failure to act is shown).

A medical need is serious if diagnosed by a physician as mandating treatment or so obvious that a layperson would recognize the need for medical attention. *Greeno v. Daley*, 414 F.3d 645, 652-55 (7th Cir. 2005); *Petties*, 836 F.3d at 727-30. "It is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno*, 414 F.3d at 653.

Deliberate indifference is a mental state "approaching intentional wrongdoing," not mere negligence, and is established where a defendant knows of and disregards an excessive risk to inmate health or safety. *Petties*, 836 F.3d at 728-29; *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In the Seventh Circuit, deliberate indifference may be shown through a range of conduct that "depart[s] substantially from accepted professional judgment, practice, or standards," or that otherwise evidences conscious disregard of a known risk. *Petties*, 836 F.3d at 729-31; *Arnett v.*

5

*Webster*, 658 F.3d 742, 751-53 (7th Cir. 2011). Unnecessary delays in treatment may evidence deliberate indifference. *Petties*, 836 F.3d at 730-31; *see Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (holding that failing to provide inmate with treatment for gastro-esophageal reflux disease for over two months created a fact question over deliberate indifference); *see also Arnett*, 658 F.3d at 752 (medical personnel could not stand idly by for more than ten months while patients arthritis progressively worsened). Failure to follow a specialist's orders without medical justification can also constitute deliberate indifference. *Petties*, 836 F.3d at 729-31; *Perez v. Fenoglio*, 792 F.3d 768, 777-79 (7th Cir. 2015) (ignoring outside specialist recommendations and persistent complaints can constitute deliberate indifference).

A defendant's awareness may be inferred where the inmate repeatedly complains or where records reflect known diagnoses and recommended care. *Id.* Non-physician staff and physicians acting as gatekeepers to specialist care may be liable when they delay or refuse access to necessary treatment. *Id.* at 781-82; *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) (nurse could be liable for delaying referral). Supervisory or grievance officials who learn of ongoing constitutional violations and turn a blind eye to them may be liable. *Perez*, 792 F.3d at 781-83 (officials who reviewed grievances could be liable where they had actual knowledge of inadequate care and failed to act).

**ARGUMENT**

A common theme in the Defendants' arguments (in both Dr. South's Summary Judgment Brief and the State Defendants') is the claim that the acts or

omissions were not their responsibility. Prison staff and Dr. South both claim that they lacked authority to order off-site appointments. Jennings asserts that all Defendants shared responsibility because all had knowledge of his deteriorating condition and the recommendations of off-site specialists. This awareness either came through Jennings' repeated Health Services Requests ("HSRs") which repeat the recommended care and his deteriorating condition, or it came from the actual recommendations themselves. Whether serving in the role of a medical provider or in an administrative role, Defendants acted as gatekeepers to Jennings' medical care and contributed to the deleterious delay.

## I.    Eighth Amendment Claims

State Defendants argue that Jennings' Eighth amendment claims fail as a matter of law because: (1) Jennings cannot show that any delay in care caused the corneal transplant of which he complains; (2) the State Defendants did not act with deliberate indifference because they provided extensive and appropriate care; (3) the State Defendants lacked the power to control offsite scheduling; and (4) through qualified immunity. The first three arguments fail because they rely on disputed material facts more appropriate for a jury than for a summary judgment dismissal. The qualified immunity defense fails because the Seventh Circuit has ample controlling case law to put prison officials on notice that delays in medical care may constitute an Eighth Amendment violation. State Defendants do not dispute whether keratoconus was a serious injury.

7

**a. All available facts demonstrate that a reasonable juror could find that the delay in care was a substantial cause of Jennings' injuries.**

The State Defendants argue that Jennings has offered no medical evidence to show that his condition worsened due to the delay in treatment. This argument is rebutted by the statements made by many Defendants during deposition testimony and through the declaration of Jennings' treating physicians. This testimony reveals that untreated keratoconus can lead to permanent vision loss and necessitate a corneal transplant. (Dkt. No. 101 at 14-5, 18, 22.)

Through depositions and declarations, the treating physicians, including State Defendants, have stated that keratoconus is a progressive and degenerative condition that can lead to a patient's vision being severely compromised. (*Id.* at 14, 20.) In fact, Defendant Dr. Bethany South, an optometrist, stated in her deposition that if a person does not treat keratoconus, then they would be "permanently unable to see." (*Id.* at 14.) Dr. South further testified that corneal cross linking is the standard of care for keratoconus and that a corneal transplant would be the "very worst-case scenario." (*Id.* at 15.) Defendant Dr. Laura Sukowaty testified in her deposition that "the hope is that [corneal cross-linking] will stop or slow down significantly the progression" of keratoconus. *(Id.* ¶ 14.) In fact, on March 28, 2022, Dr. Kevin Kurt, an off-site optometrist, wrote in his report that "corneal x-linking would be very beneficial to patient. Keratoconus is progressing . . . Corneal cross-linking may be able to prevent need for corneal transplant. Please approve ASAP." (*Id.* at 18).

These facts alone demonstrate that the treating physicians, including some Defendants, will testify that (1) corneal cross linking would have been beneficial to stop or slow the progression of Jennings' keratoconus; (2) that corneal cross linking is the standard of care for keratoconus; and (3) that corneal cross linking could have prevented the need for a corneal transplant. In fact, after Jennings finally did receive his corneal cross-linking treatment, he only needed a corneal transplant in one eye—strong evidence that the delay in treatment was a substantial factor in the need for a corneal transplant in Jennings' left eye.

In support of their argument that Jennings has not shown an injury, State Defendants assert a number of claims that present a genuine dispute of material fact. First, State Defendants assert that cross-linking "does not resolve the underlying keratoconus." (Dkt. No. 103 at 8.) This is directly contradicted by the declaration of Dr. Kevin Kurt who stated that "corneal cross-linking is the standard of care for keratoconus." (Dkt. No. 101 at 23.) It is further contradicted by Dr. Kurt's assessment of Jennings conducted on March 28, 2022, where he writes "corneal cross-linking would be very beneficial to patient," and "Corneal cross-linking may be able to prevent need for corneal transplant." (*Id.* at 18.)

State Defendants attempt to use the declaration of Defendant Dr. Sukowaty for the premise that "to a reasonable degree of medical certainty, Jennings would have needed the corneal transplant regardless" of whether he received the corneal cross-linking. (Dkt. No. 103 at 8.) Dr. Sukowaty is a family medicine doctor, not an optometrist or ophthalmologist. (Dkt. No. 101 at 4.) Two of the treating

9

physicians, both optometrists, stated that corneal cross-linking is the standard of care for keratoconus. (*Id.* at 14, 23.) Defendant Bethany South testified in deposition that she was aware that corneal cross-linking is the standard of care for keratoconus. (*Id.* at 14). Dr. Kevin Kurt, one of Jennings' treating physicians at University of Wisconsin, testified that corneal cross-linking is the standard of care and that it may prevent the need for a corneal transplant. (*Id.* at 23, 18-9.) Dr. South further testified that if keratoconus progresses then corneal cross-linking will become less effective. (*Id.* at 14.) As such, whether Jennings would have still required a corneal transplant after his corneal cross-linking is a disputed material fact that Plaintiff can prove through the testimony of treating physicians.

Further, keratoconus is a progressive disease that causes vision to worsen over time. (*Id.* at 13-4.) The standard treatment, corneal cross-linking, is intended to prevent the progression of keratoconus and is not intended to reverse the disease. (*Id.*) As such, permanent vision impairment is an injury Jennings suffered. A reasonable jury could infer that this permanent vision loss was the direct result of the unnecessary delay in his treatment. Additionally, Jennings underwent corneal topography throughout his treatment. Treating physicians can testify to the rate of deterioration in either eye, providing a jury with ample evidence to decide whether the delay in treatment was the cause of Jennings' injuries.

### b. Defendants acted with deliberate indifference because they failed to take reasonable measures to address Jennings' keratoconus.

Jennings was first suspected of having corneal ectasia (keratoconus is a form of corneal ectasia) on March 11, 2021, by Defendant Dr. Bethany South. (Dkt.

No. 101 at 15). The standard care for his condition, corneal cross-linking, was not conducted until October 14, **2022**, more than **nineteen** months later. (*Id.* at 22.) State Defendants highlight certain steps they took during this nineteen-month period in to argue that the care Jennings received was adequate and appropriate. They omit, however, that there were unnecessary delays after both the September 22, 2021, and the March 28, 2022, off-site visits where physicians recommended corneal cross-linking to treat Jennings' keratoconus. Defendant Mary Moore admits that she received and signed the off-site reports from these doctors where the procedure was recommended, but still, no DOC staff followed up on these recommendations until April 8, 2022. (Dkt. No. 101 at 19.) When prison staff did follow up, Defendant Bethany South cancelled the procedure. (*Id.* at 20.) It was not until June 2, 2022, that prison staff confirmed scheduling the procedure. (*Id.* at 22.) During these protracted delays, Jennings submitted numerous HSRs complaining of his condition and asking about the recommended treatment. (Dkt. No. 100 at 1-2.)

State Defendants further argue that they provided Jennings with extensive and appropriate care. The facts of the case demonstrate that the recommendations by off-site specialists were not timely followed. Jennings was seen by an outside provider, Dr. Shipla Reddy, on June 2, 2021. (Dkt. No. 101 at 16.) During this visit, Dr. Reddy recommenced a topography (imaging of the curvature of the cornea). (*Id.*) Dr. Reddy saw Jennings again on September 22, 2021, and diagnosed him with keratoconus in both eyes and recommended corneal cross-linking. (*Id.* at 17.) Jennings would not be seen again by an outside provider until March 28,

11

2022, when Dr. Kevin Kurt determined that "corneal cross-linking would be very beneficial to the patient" and may prevent a corneal transplant. (*Id*. at 18.) Dr. Kurt asked for Jennings' corneal cross-linking to be approved "ASAP." (*Id*.) Despite this strong recommendation from Dr. Kurt, it would be nearly another two months before any DOC staff confirmed the procedure was scheduled and another seven months before the corneal cross-linking was performed on October 14, 2022. (*Id*. at 22.)

State Defendants portray Jennings' complaints as a disagreement over the course of his treatment between Jennings and the State Defendants. (Dkt. No. 103 at 10.) They state that "Jennings was 'not entitled to demand specific care,' and his mere disagreement with the treatment ordered by his doctors does not suffice." (*Id*.) This is a mischaracterization of the facts of this case. Jennings was aware that corneal cross-linking was recommended as early as September 22, 2021, for a condition that was suspected on March 11, 2021. During this period, he submitted numerous HSRs asking for follow-up treatment as per the specialists' recommendations. (Dkt. No. 100 at 1-2.) Despite admitting to receiving these recommendations, DOC staff made no efforts to schedule the treatment until April 8, 2022, at the very earliest—nine months after the first recommendation for corneal cross-linking. (Dkt. No. 101 at 19.) This was not a disagreement between Jennings and DOC providers over what care he needed. Both Jennings and DOC staff knew corneal cross-linking was the appropriate care. Jennings only insisted DOC staff schedule the recommended treatment—a task that was unnecessarily delayed for several months.

The Seventh Circuit has repeatedly "rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment." *Petties v. Carter,* 836 F.3d 722, 731 (7th Cir. 2016), <u>as amended</u> (Aug. 25, 2016) (*en banc*). The *Petties* court reasoned that "inexplicable delays or departures from common medical standards, or of course, the doctor's own testimony that indicates knowledge of necessary treatment he failed to provide" can show that prison staff acted with deliberate indifference. "Where evidence exists that defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to risk of harm they caused." *Id.* at 731.

In *Petties*, the plaintiff claims that a prison doctor "acted with deliberate indifference to his injury when he failed to immobilize [plaintiff's] ruptured tendon for six weeks, delayed [plaintiff's] appointment with a specialist, and refused to order surgery to repair the tendon." *Id.* This is analogous to the present case where Jennings claims that DOC staff acted with deliberate indifference when they failed to follow up on the specialist's September 22, 2021, recommendation for corneal cross-linking, and further delayed the procedure after a second specialist recommended it on March 28, 2022. This Court should hold, as the *Petties* court did, that the delay in Jennings' treatment and failure to timely follow specialist's recommendations could be considered deliberate indifference by a reasonable jury.

### c. State Defendants' claim that they did not control scheduling by off-site providers fails to account for the delay.

State Defendants claim that they are not liable for any harm that came

from a delay in medical care because they do not control the scheduling at off-site providers. This argument fails to account for the entire delay and ignores the fact that a large portion of the delay was before prison staff even attempted to schedule the procedure.

Jennings first received a recommendation for corneal cross-linking on September 22, 2021. (Dkt. No. 101 at 17.) Defendant Moore admits to receiving this recommendation. (*Id.*) Jennings received another, more urgent, recommendation for corneal cross-linking on March 28, 2022. (*Id.* at 18.) Defendant Moore again admits to receiving the recommendation. (*Id.*) State Defendants claim to have scheduled the procedure on April 28, 2022. (*Id.* at 19.) Then, Defendant South cancelled the treatment. (*Id.* at 20.) She claims to have cancelled the treatment because she thought it was not an approved procedure. (*Id.*) South informed Jennings that she cancelled the treatment on May 10, 2022. (*Id.*) Jennings subsequently filed a formal inmate complaint regarding his denied treatment and delay. The procedure was finally confirmed to have been scheduled on June 2, 2022—more than fifteen months after an optometrist first suspected Jennings had corneal ectasia, and over nine months from when an off-site optometrist first recommended the procedure. (*Id.* at 22.)

State Defendants' claim they had no control over the scheduling of the procedure simply does not account for the delay. Even if viewed in a light favorable to the Movants, the off-site providers schedule would only account for the period between June 2, 2022 (when DOC staff confirmed the appointment was scheduled)

and October 14, 2022 (when the procedure was performed). The remaining months of delay were because Defendants did not follow up on the specialists' recommendations in a timely manner and because Defendant South cancelled the procedure. If viewed in a light favorable to Plaintiff (as Summary Judgment requires), then the only portion of the delay that was outside the control of DOC staff was the period between June 2, 2022, and August 25, 2022 (the date the procedure was first scheduled for).[2]

### d. Qualified Immunity

State Defendants claim they have qualified immunity over Jennings' claims. To overcome a qualified immunity a plaintiff must show that the facts demonstrate the violation of a constitutional right, and that that right was clearly established at the time of the alleged violation.

In the present case, Jennings asserts that State Defendants unreasonably delayed medical treatment recommended by specialists and that this delay resulted in Jennings needing a corneal transplant. The Seventh Circuit has consistently held that delays in medical treatment can be actionable under the Eighth Amendment when they exacerbate an inmate's condition or unnecessarily prolong pain. *See Petties*, 836 F.3d at 730-31 (holding that a six-week delay in treating a ruptured tendon could be an Eighth Amendment violation); *see also Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (holding that guards could be liable for

---

2 Initially, the appointment was scheduled for August 25, 2002, but the prison claims this appointment was cancelled for security concerns because Jennings learned the date of the appointment. Even if this Court determines this delay served a valid penological interest, it only accounts for the period between August 25 and October 13, 2022 (approx. 7 weeks).

delaying treatment of a broken nose for one day); *see also Williams v. Liefer,* 491 F.3d 710, 712 (7th Cir. 2007) (holding that a delay in treatment for high-blood pressure was actionable under the Eighth Amendment and denying qualified immunity).

Because sufficient case law exists to put prison officials on notice that unnecessary delays in medical treatment can constitute an Eighth Amendment violation, this Court must hold that the State Defendants are not entitled to qualified immunity.

## II. State Law Claims

### a. Jennings does not need to name an expert.

Defendants argue that because Jennings did not name an expert witness, he cannot prove the standard of care.[3] This argument fails because treating physicians in this case—one of whom is a defendant—have testified that corneal cross-linking is the standard of care for keratoconus. While expert testimony may be helpful in a case such as this, it is unnecessary as Jennings will offer testimony from various treating physicians, including the Defendants themselves, that will demonstrate that keratoconus is a degenerative disease and that corneal cross-linking could have prevented the need for a corneal transplant.

In *Gil v. Reed,* 381 F.3d 649, 659 (7th Cir. 2004), the Seventh Circuit addressed whether the lack of an expert witness was dispositive of a plaintiff's ability

---

3 It should be noted that Jennings is a prisoner without the ability to pay for an expert on his own. In determining the appropriate legal strategy, his appointed counsel recommended spending the limited funds available ($6,000) on depositions and in obtaining testimony from treating physicians. Both the depositions and declarations of treating physicians provide sufficient evidence that the standard of care for Jennings' keratoconus is corneal cross-linking.

to prove the standard of care and causation. The *Gil* court held that the testimony of treating physicians can be sufficient to determine the standard of care. *Id.* at 559-60. The court also reasoned that it "is within a layperson's purview to know that when a serious infection at the site of a surgical wound is diagnosed and an antibiotic is prescribed, failure to supply or delay in supplying the antibiotic can result in unnecessary pain, discomfort and a spreading of the infection." *Id.* at 661.

The present case is analogous to *Gil*. Jennings has shown through the testimony of treating physicians that: (1) corneal cross-linking is the standard of care for keratoconus; (2) keratoconus is a degenerative disease; and (3) the longer keratoconus goes untreated the less effective corneal cross-linking will be. Jennings also underwent extensive testing on his cornea over the course of his treatment. A treating physician will be able to testify about the results of this testing and provide information about the rate of deterioration and the effects it had on Jennings' treatment options. This is more than enough to establish that a reasonable jury can find that a nineteen-month difference between when keratoconus was first suspected and when it was treated led to corneal cross-linking being ineffective and requiring a corneal transplant in Jennings' left eye.

In *Gil*, the court further explains that "nothing in Wisconsin law prevents a plaintiff from relying on the defendant . . . or the defendant's agents . . . to supply evidence regarding the appropriate standard of care." *Id.* at 659. The *Gil* court points to two Wisconsin cases for this assertion. *See Froh v. Milwaukee Medical Clinic*, S.C., 85 Wis. 2d 308, 270 N.W.2d 83, 87 (Ct. App. 1978) (opining that the

testimony of the surgeon accused of malpractice was 'sufficient to place this matter in the field of negligence and malpractice by a physician'); *see also Richards v. Mendivil*, 200 Wis. 2d 665, 548 N.W. 85, 89 (Ct. App. 1996) (relying on a physician defendant to establish one of the elements of *res ipsa loquitur*).

Finally, Plaintiff may still name an expert witness in this case. This Court's scheduling order (Dkt. No. 63) does not provide a deadline for expert witness disclosures. Further, Fed. R. Civ. P. 26(a)(2)(D) states that expert disclosures must be disclosed at least 90 days before trial. Trial has not yet been scheduled in the present case. As such, the fact that Plaintiff has not yet identified an expert should not be dispositive of his ability to prove this case.

### b. Jennings can show that the delay in care caused an injury.

State Defendants argue that Jennings cannot show that the delay in care caused his injuries. This is a flawed argument because, once again, State Defendants cherry picked the timeframe of the delay. State Defendants stated that "Jennings cannot show that he suffered an injury from ANP Moore not taking immediate action on Dr. Kurt's recommendation for corneal cross-linking." (Dkt. No. 103 at 15) (emphasis added). This completely ignores the fact that Jennings first received a recommendation from an off-site physician, Dr. Reddy, on September 22, 2021, and that Defendant Moore also admitted to receiving this recommendation. (Dkt. No. 101 at 16, 18.) State Defendants make no effort to explain this six-month delay.

State Defendants instead focus on the delay after Jennings visited Dr.

18

Kurt on March 28, 2022. While admittedly there was a shorter delay after this visit, it was still significant. If evaluating the sum total of the delays, a reasonable jury could find that when a degenerative condition is untreated, it will cause the injuries Jennings alleges. In fact, Defendant South testified that untreated keratoconus can lead to permanent vision loss and that if keratoconus progresses, then corneal cross-linking will become less effective. (Dkt. No. 101 at 14.)

Wisconsin law requires the following elements for medical malpractice claims: (1) a breach (2) of a duty owed (3) that results (4) in an injury or damages. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Jennings has adequately pled medical malpractice and can offer proof of each element through the available evidence. State Defendants appear to only attack the causation element of Jennings' state law claims. As such, Jennings will only address causation in this response.

"To establish causation in Wisconsin, the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm." *Ehlinger by Ehlinger v. Sipes*, 155 Wis. 2d 1, 12, 454 N.W.2d 754, 758 (1990). "One who creates a dangerous condition may be held liable even though another cause is also a substantial factor in contributing to the result." *Id.* (internal quotations and citations omitted). "The defendant's negligent conduct need not be the sole or primary factor in causing the plaintiff's harm." *Id.*

> Where the causal relationship between the defendant's alleged negligence and the plaintiff's harm can only be inferred by surmising as to what the plaintiff's condition would have been had the defendant exercised ordinary care, to satisfy his or her burden of production on causation, **the**

19

> *plaintiff need only show that the omitted treatment was intended to prevent the very type of harm which resulted, that the plaintiff would have submitted to the treatment, and that it is more probably than not the treatment could have lessened or avoided the plaintiff's injury had it been rendered*. It then is for the trier of fact to determine whether the defendant's negligence was a substantial factor in causing the plaintiff's harm.

*Id.* at 20 (emphasis added)

In the present case, the available deposition testimony demonstrates that the aim of corneal cross-linking is to prevent the need for a corneal transplant. Sufficient testimony exists to infer that delaying corneal cross-linking reduces the likelihood it will be effective. This is sufficient for Jennings to show that any delays caused by DOC staff's failure to follow the standard of care for keratoconus was the cause-in-fact of Jennings' injuries.

Furthermore, the corneal transplant and permanent vision loss are not the only injury Jennings has claimed. He also claims that as a result of not receiving a timely response to his HSR complaints of deteriorating vision, he spent months with severely compromised vision that resulted in his inability to read, see distant objects, and caused severe headaches. A reasonable jury could find that Dr. South's failure to prescribe corrective lenses for a protracted period was the cause-in-fact of these injuries.

Finally, treating physicians noted that corneal cross-linking is intended to prevent the progression of keratoconus, and that it "is not intended to reverse the disease or improve visual acuity." (Dkt. No. 101 at 14, 18-9.) As such, a reasonable juror could find that Jennings' permanent vision loss was exacerbated by delays in his care.

**CONCLUSION**

For the aforementioned reasons, this Court must deny summary judgment dismissal for Plaintiff's Eighth Amendment claims against all Defendants. Plaintiff concedes that he did not file a notice of claim within 120 days with the Attorney General. This failure to notice may affect his state claims of negligent supervision but should not affect his medical malpractice claims as conceded to by the State.

KRAVIT, HOVEL & KRAWCZYK s.c.

*s/ Wesley E. Haslam*
Wesley H. Haslam
 State Bar No. 1121993
*Attorneys for Plaintiff*

Kravit, Hovel & Krawczyk s.c.
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (telephone)
(414) 271-8135 (facsimile)
weh@kravitlaw.com

Dated: February 2, 2026