# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DAMONTA JENNINGS,

        Plaintiff,

v.

CHARLES DOMBECK, LAURA SUKOWATY, ROBERT WEINMAN, MARY MOORE, BETHANY SOUTH, ASHLEY HASELEU, and DANIEL LAVOIE,

        Defendants.

Case No. 22-CV-1205-JPS

## ORDER

Plaintiff Damonta Jennings, ("Plaintiff") an inmate confined at Waupun Correctional Institution ("WCI"), filed a pro se complaint under 42 U.S.C. § 1983 alleging that Defendants Charles Dombeck ("Dombeck"), Dr. Laura Sukowaty ("Dr. Sukowaty"), Robert Weinman ("Weinman"), Mary Moore ("Moore"), Dr. Bethany South ("Dr. South") Ashley Haseleu ("Haseleu"), and Daniel LaVoie ("LaVoie") violated his Eighth Amendment and state-law rights. ECF No. 30. This case proceeds on the following three claims: (1) Eighth Amendment deliberate indifference to a serious medical need against all defendants; (2) state-law medical malpractice claim against Moore and South; and (3) state-law negligent supervision claim against Weinman and Haseleu. ECF No. 39 at 8. For the purposes of this Order, the Court will refer to Dombeck, Dr. Sukowaty, Weinman, Moore, Haseleu, and LaVoie collectively as the "State Defendants." The Court later appointed counsel to represent Plaintiff in this matter. ECF No. 60. On November 19, 2025, the Court denied the State

Defendants' and Defendant South's motions for summary judgment without prejudice and allowed the parties to refile summary judgment motions. ECF No. 97.

Now pending before the Court are Defendant South's renewed motion for summary judgment, ECF No. 98, and the State Defendants' renewed motion for summary judgment, ECF No. 102. The motions are now fully briefed and ready for disposition. ECF Nos. 99, 103, 105, 106, 107, 108. As described in detail below, the Court will grant Defendants' motions for summary judgment on the Eighth Amendment claim, will decline to exercise supplemental jurisdiction over the state-law claims, and will dismiss this case.

## 1.    LEGAL STANDARD – SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

**2.      FACTUAL BACKGROUND**

In compliance with the Court's scheduling order, the parties submitted a stipulated set of undisputed facts, ECF No. 101, and a separate filing list of disputed facts, ECF No. 100. As such, the Court takes the following facts from the parties' statement of undisputed facts except for minor changes and except where explicitly noted.

**2.1      Overview of Claims and Parties**

Plaintiff is a prisoner in the custody and care of the Wisconsin Department of Corrections ("DOC"). He has resided at WCI since approximately February 2019. Plaintiff's claims in this case arise from events occurring while he was a prisoner at the WCI from on or around March 1, 2021, through approximately December 11, 2023.

Moore is an adult resident of the state of Wisconsin. Moore was employed by the DOC as an Advanced Practice Nurse Prescriber ("APNP") at WCI from July 8, 2019, through April 8, 2022. Moore testified that as an APNP at WCI, she was responsible for the daily health care of an assigned panel of patients. Moore collaborated as needed with an on-site physician and was able to write prescriptions, give orders for treatment, and refer patients out to specialty. As a DOC APNP, Moore participated in the planning, development, implementation, and evaluation of care and educational programs and protocols used by the health staff to meet the needs of incarcerated individuals who exhibit health problems across the continuum from prevention to complex medical and/or psychiatric conditions. During her employment with the DOC, Moore was Plaintiff's primary care provider. Moore left WCI in April 2022.

Dombeck was, at all times relevant to this action, employed by the DOC as an APNP at Dodge Correctional Institution. As a DOC APNP,

Dombeck participated in the planning, development, implementation, and evaluation of care and educational programs and protocols used by the health staff to meet the needs of incarcerated individuals who exhibit health problems across the continuum from prevention to complex medical and/or psychiatric conditions. Dombeck worked with administrative direction from the Physician Supervisor.

Weinman was employed by the DOC as a Nursing Supervisor at WCI from January 31, 2021, through November 19, 2022. As the Nursing Supervisor at WCI, Weinman was responsible for providing administrative oversight and direction of the Health Services Unit ("HSU").

Haseleu was employed by the DOC as a Nurse Clinician 2 at WCI from April 29, 2019, through July 4, 2021. After working as a Nurse Clinician 2, Haseleu became a Nursing Supervisor at WCI. As a Nurse Clinician 2, Haseleu was responsible for providing skilled nursing care to incarcerated adults in the state correctional facilities including patient assessment and treating, assisting the physician in providing medical services, management of medications, and provision of emergency care and maintenance of medical records under the general supervision of the Nursing Supervisor. As a Nursing Supervisor, Haseleu was the Assistant Manager to the HSU, and her position duties included working "with the primary care physician, dentist, psychiatrist and specialists in a collaborative manner to provide quality health care at the assigned correctional facility in an efficient and effective manner." Haseleu's duties also included providing "the overall administrative oversight and direction of the unit."

In her declaration, Dr. Sukowaty testified that the Health Services Manager ("HSM") and Assistant Health Services Manager ("AHSM")

positions are administrative in nature, meaning the HSM/AHSM does not generally evaluate, diagnose, determine a course of treatment for, prescribe medications for, or have any direct patient care contact with an inmate patient. Instead, Dr. Sukowaty noted that medical care was provided by HSU nursing staff and Advanced Care Providers (physicians and nurse practitioners), within the scope and authority of their respective positions, and they do not provide direct care to patients. Dr. Sukowaty further indicated that as registered nurses, Weinman and Haseleu did not have the authority to prescribe medication (other than over-the-counter drugs), refer patients to offsite specialists, order imaging studies, or override the treatment decision of the dentists, physicians, nurse practitioners, and/or physician assistants. The same is true for an LPN.

Dr. Sukowaty is an adult resident of the state of Wisconsin. Dr. Sukowaty was, at all times relevant to this action, employed by the DOC as a Physician Supervisor at Dodge Correctional Facility. Dr. Sukowaty is a family medicine doctor. As a Physician Supervisor, Dr. Sukowaty supervised certain nurse practitioners and physicians at the DOC and saw patients.

LaVoie is an adult resident of the state of Wisconsin. LaVoie was, at all times relevant to this action, the Medical Director of the Wisconsin Division of Adult Institutions, Bureau of Health Services. As the Medical Director, LaVoie worked under the administrative direction of the Director of the Bureau of Health Services to direct the medical, mental health, dental, pharmaceutical, and optometric programs for offenders in the Division of Adult Institutions and the Wisconsin Correctional Center System. According to Dr. Sukowaty, LaVoie was not involved in the treatment of, nor decision-making regarding, Plaintiff's keratoconus.

Dr. South is an adult resident of the state of Wisconsin. Dr. South is an optometrist licensed by the state of Wisconsin. Dr. South has never been employed by the DOC. Dr. South is not a medical provider and is not supervised by Dr. Sukowaty. Dr. South is not an ophthalmologist nor a surgeon. Rather, at all times relevant to this action, Dr. South was an independent contractor working within the State of Wisconsin Correctional Facilities on behalf of Richter Professional Services, with whom the DOC had a contract, pursuant to a March 22, 2016, Independent Contractor Agreement between Dr. South and Richter Professional Services (hereinafter the "Independent Contractor Agreement"). Dr. South testified that at all times relevant to this action, she was not the only optometrist working as an independent contractor with the DOC to provide optometry services to inmates.

Additionally, at all times relevant, as an independent contractor with the DOC, Dr. South worked within numerous correctional facilities throughout the state. Dr. South's obligations under the Independent Contractor Agreement included contacting the State facility and the clients therein for which she provided service and scheduling and providing such services as she determined in accord with professional services. As an optometrist working as an independent contractor with the DOC, Dr. South performed primary eye care including basic eye exams using the equipment available to her at the correctional institutions. Dr. South claimed that the extent of her impact on patient scheduling for care with her was providing her availability to the various correctional facilities that she worked in within the state. Plaintiff does not have any personal knowledge regarding Dr. South's Independent Contractor Agreement beyond his understanding

of eye care as stated within the WCI Inmate Handbook and Dr. South's written discovery responses in this case.

Dr. South provided Plaintiff with medical care on March 11, 2021, and May 10, 2022. Plaintiff claims that Dr. South was negligent and/or deliberately indifferent by: (1) not ordering him glasses after his March 11, 2021, basic eye exam appointment with her until August 3, 2021; (2) cancelling his corneal crosslinking procedure order on May 10, 2022; (3) Plaintiff being on a waiting list and not being seen by Dr. South from March 12, 2021, through May 10, 2022; (4) failing to acknowledge his Health Services Requests; and (5) failing to speak with DOC employees about the severity of Plaintiff's condition and advocating for him to be seen earlier for a crosslinking procedure.

### 2.2 General Background Regarding DOC's Policies and Procedures for Health Services Requests, Off-Site Visits, and Class III Medical Procedures

The State Defendants follow DOC's Division of Adult Institutions' ('DAI") policies, along with state laws and practice guidelines, in the performance of their job duties.

#### 2.2.1 Health Services Requests and Scheduling Patient Care Appointments with Dr. South

WCI issues a Rules & Information Handbook ("WCI Handbook") setting forth rules and policies for inmates to follow during their time at the WCI. The WCI Handbook provides the following procedure for inmates to obtain medical services:

1.  Obtain a Health Services Request form DOC-3035 from the officer in your housing unit.

2.  Completely fill out your name, DOC number, housing unit, cell number, and date at the top of the form.

3. Provide a brief, but specific, description of your problem (i.e., sore back, toothache, request to review medical file, etc.) in area provided; do not write in lower area.

4. Attach a completed Disbursement Request to the Health Services Request. If you do not have a Disbursement Request to attach to your Health Services Request, a Disbursement Request will be provided to you upon arriving at Health Services.

5. Place the completed form in the Health Services Request box located in each cell hall. The only exceptions are for those inmates housed in the Segregation Unit. Due to the nature of this area, the Officers are responsible for placing the Health Services Requests in the box. The HSU is not responsible for Health Services Requests handled any other way.

6. Health Services Requests are picked up at 7:30 a.m. by HSU staff, 7 days a week. A nurse reviews the requests and either schedules an appointment, sends a written response, or forwards the request to other staff (i.e., dental, optical, medical record reviews, medication reviews, etc).

7. You will be charged $7.50 for each inmate-initiated Health Service Request that results in a face-to-face assessment by a health care provider. This includes medical, dental, psychiatric and optical visits. You will not be charged a co-payment for appointments initiated by a health care provider or for referrals from one health care provider to another.

B. Appointments

1. You will initially be seen by the registered nurse. If the nurse determines it is necessary, an appointment will be scheduled with the physician. Referrals to outside specialists are made only if the physician deems it necessary.

2. Normal HSU business hours are 7:30 a.m. – 3:00 p.m., Monday through Friday, excluding holidays.

3. Unless your medical need is determined to be an emergency, an appointment is scheduled approximately 3-5 days after the Health Services Request is received.

4.    Medical emergencies will be handled as they arise. A medical emergency is defined as an unexpected, serious happening demanding immediate medical action. If you have a genuine medical emergency, notify your Housing Unit Officer or Shop Officer who will then contact the Health Service Unit. The on-duty nurse will determine whether or not a medical emergency actually exists. If you are unable to report to the Health Services Unit, medical personnel will come to your aid.

During the relevant time period, the DAI issued policy no. 500.30.11 entitled "Daily Handling of Non-Emergency Requests for Health Care" (hereinafter "DAI Non-Emergency Requests Policy".) The DAI Non-Emergency Requests Policy states that "HSRs [Health Services Requests] are picked up daily by health staff" and "are reviewed and prioritized daily by qualified health care professionals, or the health care liaison if applicable." The same policy further states that "[n]ot every written request is a health care request requiring a face-to-face evaluation;" however, "[r]equests for care identifying symptoms requiring a face-to-face encounter shall be conducted by a registered nurse, or the health care liaison, within 24 hours of receipt."

According to the testimony of Weinman, DOC nursing staff review Health Services Requests ("HSRs") submitted by inmates and determine whether to send a written response or schedule an appointment for the nurse to evaluate the inmate in a clinical setting.

In her declaration, Dr. South testified that she does not review HSRs unless a DOC staff member contacts her about an HSR. Dr. South further testified that if a DOC staff member contacted her about an HSR, she would either discuss with DOC staff that the HSR can be responded to with a written response or by scheduling an appointment.

According to the testimony of Dr. South and Weinman and DAI Policy 500.30.11, the DOC Health Services Unit staff members would complete written responses, or respond otherwise, to HSRs. Moore testified that "when nurses do the review of HSR slips, if its[sic] an eye concern, it goes right to the optometrists' mailbox and then they handle that." DOC Nurses review HSRs and either schedule an appointment, send a written response, or forward the request to other staff. Moore is not a DOC nurse, and she did not personally handle Jennings' HSRs. ECF No. 42, ¶ 2; ECF No. 72 at p. 7 [13: 19-23]. If an inmate submitted an HSR regarding a vision issue, the inmate could be scheduled for an appointment with Dr. South under the following circumstances:[1]

1. The nurse could schedule the patient with Dr. South without Dr. South ordering an assessment.

2. The nurse could first meet with the inmate and then refer the patient to optical as either an urgent referral if the nurse determined that there was urgency, and if non-urgent, then the nurse would place the inmate on a list for an optical appointment. Once an inmate was placed on a list for an optical appointment, a DOC medical program assistant scheduled those inmates generally based on the time of the inmate's request.

If an inmate was seen by an optometrist for regular routine care, the DOC's staff would put the inmate on the optometrist's schedule for that care. Dr. South testified that at all times relevant, Dr. South did not schedule inmates for optometry appointments. Rather, according to her testimony,

---

[1]According to Dr. South, she was not the only optometrist providing services as an independent contractor to the DOC during the relevant time. For purposes of this motion, the proposed facts will discuss only those processes for scheduling inmates' care with South.

Dr. South would provide the DOC institutions with her availability, and the DOC medical staff would create the schedule for which inmates she would see while she was at a particular correctional institution.[2]

### 2.2.2 Off-Site Specialist Visits.

During the relevant time period, the DAI issued policy no. 500.30.02, "Specialty Consultations," to "develop procedures to ensure the continuity of care when off-site providers, such as specialty consultation, emergency services and inpatient services make recommendations" ("Specialty Consultations Policy"). Pursuant to the DAI Specialty Consultations Policy, the "DOC ACP [Advanced Care Provider] shall consider outside recommendations and initiate orders as medically necessary." The DAI Specialty Consultations Policy provides the following procedure for ordering specialty consultations:

A. Specialty Consultations require an order and prior authorization if indicated.

   1. The ACP shall determine the need for off-site/specialty care and discuss this with the patient.

   2. All appointments shall be ordered in the HCR [Health Care Record].

   3. Processes shall be in place to assure timely scheduling of off-site visits.

   4. Timeframe delays or changes to scheduled appointments shall be communicated with an ACP and RHA [Responsible Health Authority].

   5. All communication between facility and off-site provider regarding scheduling of an appointment shall be documented in HCR.

---

[2]During the relevant time, South did not work exclusively at the WCI and worked within numerous correctional institutions across the state of Wisconsin.

Pursuant to the same policy, if an ACP determines the need for off-site specialty care, then the HSU Manager shall designate an appropriate HSU staff member to schedule consultations. The ACP shall then provide medical necessary information for health staff to complete the top portion of DOC-3001 – Offsite Service Request and Report ("Offsite Visit Report"). The WCI follows the practice of sending an Offsite Visit Report along with every inmate who is taken offsite to a hospital. During the off-site visit, the off-site provider then fills out the report to include their assessment and recommendations to the DOC. A security team member then brings back the Off-Site Visit Report and gives it to a DOC nurse.

However, sometimes the off-site provider will not fill out the report. In that instance, the RN would then need to access the electronic record and download the AVS. When a DOC patient is seen by an offsite provider, it can take a few days to receive and process the medical records from that offsite visit into HSU's electronic medical record system. It is the DOC's policy that the provider who receives and reviews an Off-Site Visit Report affixes their own initials on the report. Providers outside of the DOC cannot write orders for medical treatment within the DOC's system.

Pursuant to the DAI Specialty Consultations Policy, any patient returning from an off-site visit shall be seen by a Registered Nurse. The recommendations from off-site providers "shall be reviewed and ordered by a DOC ACP before implementation" and "[s]ome recommendations require prior authorization before implementation according to DAI Policy 500.10.12." As such, the DOC provider who ordered the off-site care should receive and review the Off-Site Report and determine whether the recommended care should be implemented and seeks prior authorization for that care if necessary. Assuming that the care recommended by an off-

site provider is approved by the DOC, the DOC provider then puts in an order, or referral, for the care and a DOC scheduler schedules the care. According to the testimony of Dr. Sukowaty, only DOC providers can make referrals for treatment. Outside providers can only make recommendations for treatment.

Offsite Advanced Care Providers do not have prescription authority within any Corrections institution. Therefore, according to Dr. Sukowaty, when an inmate patient returns from an offsite visit with a prescription, it is the Corrections ACP who is responsible for reviewing the offsite ACP's recommendations and deciding whether or not to follow them based on whether or not they are appropriate for use in an institution setting. ECF No. 78, ¶ 35. As an independent contractor with the DOC, Dr. South is not authorized to determine whether recommendations by off-site providers will be ordered. According to DAI policy, "deviation from off-site recommendations/orders require rationale and shall be documented in the HCR. If the ACP orders differ from recommendations, the patient shall be informed."

### 2.2.3 Prior Authorization for Medical Procedures

At all times relevant, the DAI issued policy no. 500.10.12, "Prior Authorization Guidelines for Non-Urgent Care (Class III)," to "utilize Prior Authorization Guidelines for non-urgent treatment" and arrange for hospital and specialty care for patients "in need of these services" ("Class III Policy"). The Class III board is a process for prior approvals because the State is self-insured. Pursuant to the Class III Policy, there are three classifications of "Medical and Surgical Conditions," including:

1. Class 1: Emergency Care

    a. An emergency is a potentially life-threatening condition requiring immediate care.
    b. A delay in treatment may result in death or permanent serious impairment of the patient's health.

2. Class II: Urgent Care

    a. Presently necessary urgent health care problem.

    b. An urgent medical health care problem, while not an emergency, is one in which prolonged delay of treatment could present a risk for serious bodily harm, disability, or further deterioration in the patient's condition resulting in worsening health.

3. Class III: Non-Urgent Medically Acceptable

    a. A non-urgent condition is one that does not represent a significant threat to the patient's general medical health and which is not likely to pose such a threat in the foreseeable future.

    b. Surgical procedures can be performed at the convenience of physicians, persons and institutions involved. Non-urgent cases are of two types and in both types, prior authorization is required.

4. Class III-A

    a. Cases involving persistent pain or dysfunction where pain or dysfunction have been progressive but do not pose an urgent threat to the health of the patient.

    b. The condition must be subject to medical correction or arrest.

    c. While no medical deferment is expected to result from a delay of several weeks to months, adequate care dictates the performance of medical or surgical procedure as soon as scheduling reasonably permits.

5. Class III-B – No procedure or referral should be scheduled at the present.

    a. Cases not involving persistent pain, progressive disease, or impairment and not solely for the convenience of the patient.

    b. No medical effects are expected to result from the surgical delay of months to years.

6. Class IV: Elective Non-Covered Care Services.

    a. Services that are considered not medically necessary or required in accordance with acceptable medical standards for medical and surgical practice. No procedure or referral should be scheduled at the present.

Class I and Class II requests do not require prior approval. A Class II request is submitted by "the facility ACP [advanced care provider" in the electronic health record. A Class III request is approved by the DOC's medical director, designee, or the Class III committee. According to Dr. South's and Dr. Sukowaty's testimony, as an independent contractor, Dr. South did not have authority to initiate applications for Class III committee reviews and did not participate in Class III committee reviews. As an independent contractor, Dr. South did not approve or deny procedures for patients in the prison system.

### 2.3 Plaintiff's Medical Care

#### 2.3.1 Overview of Keratoconus Condition and Treatment

Keratoconus is a thinning disease of the cornea that causes it to bulge in certain ways. Dr. South testified that keratoconus is a type of corneal ectasia. Dr. South further testified that all forms of corneal ectasia are degenerative, meaning that typically, the corneal ectasia gets worse. The symptom of keratoconus is blurred vision. Keratoconus can be treated with

corneal crosslinking or corneal transplants. Dr. South testified that corneal crosslinking is the standard of care for keratoconus. Corneal cross-linking is an outpatient procedure that involves painting Vitamin A over tissue and then curing it with UV light to strengthen the cornea to prevent bulging. Corneal crosslinking often only delays further worsening of corneal ectasia rather than fully preventing it. If keratoconus progresses, corneal cross-linking becomes less effective. Dr. South testified that in Wisconsin, corneal crosslinking is performed only by surgeons and surgeons make the recommendation for corneal crosslinking.

At his deposition, Plaintiff testified that Dr. South could not and did not treat his keratoconus condition because she did not have the equipment to provide any treatment. According to the testimony of Dr. Sukowaty, corneal crosslinking is not guaranteed to reverse, stop, or slow down the progression of keratoconus.

Dr. Sukowaty testified that the hope for corneal cross-linking is that it will stop or slow down significantly the progression of keratoconus. A corneal transplant is an outpatient procedure removing the cornea and replacing it with a donor tissue from a cadaver. Dr. South testified that if someone with keratoconus does not have a corneal transplant they would be "permanently unable to see" in the form of "very blurry vision." Wearing contact lenses does not treat keratoconus, but it does offer clearer vision. If someone with keratoconus was completely untreated, they would have permanently blurred vision, which could be improved with contact lenses. Untreated keratoconus does not lead to blindness or no-light-perception vision loss.

### 2.3.2 Plaintiff's Medical Treatment

Prior to March 11, 2021, the extent of Plaintiff's eye care included fewer than ten basic eye exams. None of these prior eye exams resulted in a prescription for glasses or contacts. Upon his incarceration at Dodge Correctional Facility, Plaintiff had a required eye exam and did not need any glasses or contacts as a result; as such, he assumes that his vision was "good" at that time. Plaintiff provides that he submitted twenty-two health service requests from February 21, 2021 through August 24, 2022. ECF No. 100 at 1.

Plaintiff submitted a request for a visit for his vision on or around March 11, 2021, because he realized it was becoming "a little more difficult and blurry to read from a distance than usual." Dr. South performed a basic eye exam on Plaintiff on March 11, 2021. As a result of her March 11, 2021, basic eye exam, Dr. South suspected that Plaintiff had corneal ectasia. When asked at her deposition "what happens next after blurry vision if keratoconus goes untreated," Dr. South stated "[p]otentially a corneal transplant at the very worst-case scenario…. I think a corneal transplant would be the end of that." Dr. South did not have the equipment to diagnose Plaintiff with corneal ectasia because WCI did not have the equipment needed to conduct topography testing that gives more detailed information about the thinning. South submitted an internal referral for Plaintiff to be seen by an outside provider while he sat in her chair on March 11, 2021. Dr. South testified that she did not prescribe Plaintiff with a pair of glasses on March 11, 2021, because she knew that he was going to be seeing an offsite provider for testing and knew that his prescription could change based on that appointment. Further, according to her testimony, she knew that ordering glasses would take up to four

weeks at a minimum and that glasses are not effective for correcting the blurred vision symptoms of keratoconus and glasses would not have been a benefit to Plaintiff if he did in fact have keratoconus.

Pursuant to Dr. South's internal referral, Plaintiff had an appointment with Dr. Shipla Reddy ("Dr. Reddy") at UW-Health Ophthalmology on June 2, 2021. In her After Visit Summary ("AVS"), Dr. Reddy stated: "Corneal ectasia – Suspect keratoconus based on exam … Recommend glasses wear … Follow up with pentacam 1-2 months, repeat pentacam 4-5 months, then 6 mo security clinic with DFE to discuss management options." In the Offsite Visit Report regarding the June 2, 2021, offsite visit, Dr. Reddy stated "see AVS" in the recommendations section. Dr. Reddy suspected keratoconus and recommended glasses and topography, an imaging study which maps the surface curvature of the cornea. Crosslinking was not recommended at that time.

Moore received the Offsite Visit Report regarding Plaintiff's June 2, 2021, visit with Dr. Reddy and initialed the same report on the same date. As Plaintiff's primary care provider, Moore was responsible for reviewing Plaintiff's offsite record reports and ordering follow up appointments as necessary. At all times relevant, DOC employees Shelly Bloch and/or Haley Bassuener ("Ms. Bassuener") were the staff members responsible for scheduling medical appointments for the inmates at WCI. After receiving the June 2, 2021, Offsite Visit Report, Moore "would have given that [recommendation to wear glasses, follow up with Pentacam] to the scheduling person to return from Pentacam one to two months and then it would have gotten scheduled."

Plaintiff's next off-site appointment with Dr. Reddy occurred on September 22, 2021. Moore made the referral for Plaintiff's September 22,

2021, appointment with Dr. Reddy. After Plaintiff's September 22, 2021, offsite visit, Moore signed off on the September 22, 2021, Offsite Visit Report prepared by Dr. Reddy. In the September 22, 2021, Offsite Visit Report, Dr. Reddy wrote "see AVS" in the recommendations section. The AVS from Dr. Reddy's September 22, 2021, offsite visit with Plaintiff states:

> **Keratoconus both eyes**
>
> -Discussed etiology and management of these issues; due to severity, will send to Cornea
>
> -Of note, there is not corneal cross-linking available in a secure facility at UW, and it is likely that this procedure would help the patient. It would be preferable for the patient to see a non-UW cornea physician with cross- linking facilities available. I will set him up with our Cornea specialist, but if he can be sent to a non-UW provider with cross-linking instead, this would be optimal recommend this plan of action.

Dr. Reddy diagnosed Plaintiff with keratoconus in both eyes and noted that it was "likely" that corneal cross-linking would help Plaintiff. However, she also noted there was no secure facility for corneal cross-linking at UW, and recommended it be done by non-UW provider. In her declaration, Dr. Sukowaty testified that Dr. Reddy did not request approval for the cross-linking procedure from DOC or state that the procedure was urgent. Per the September 22, 2021, off-site record, Moore ordered Plaintiff a referral to UW Optometry for a "CTL visit," which visit was conducted on March 28, 2022.

Plaintiff's next off-site visit was with Dr. Kevin Kurt ("Dr. Kurt") at UW-Health Ophthalmology on March 28, 2022. In the recommendations section of the Offsite Visit Report, Dr. Kurt wrote: "Corneal x-linking would be very beneficial to patient. Keratoconus is progressing. Will need to

return to office for scleral / [sic.] lens fitting. Corneal cross-linking may be able to prevent need for corneal transplant. Please approve ASAP." Plaintiff provides disputed evidence that an internal investigation of Plaintiff's complaint was conducted and written on September 8, 2022. ECF No. 100 at 2. The report indicates that Dr. South canceled the crosslinking order, that she reordered it on May 16, 2022, and that Moore received treatment recommendations from providers and did not order the treatment. *Id.*[3]

Moore received and initialed the Offsite Visit Report from Plaintiff's March 28, 2022, visit with Dr. Kurt. At her deposition, Moore testified that she had no recollection of providing the March 28, 2022, September 21, 2021, or June 2, 2022, Offsite Visit Reports to Dr. South. Dr. South did not review the March 28, 2022, September 21, 2021, or June 2, 2022, Offsite Visit Reports when Plaintiff returned from the offsite visits, and no DOC employees provided the Offsite Visit Reports to her for review.

On or around April 3, 2022, Plaintiff submitted an HSR stating that: "On my visit to UW Health on 3.28.22 they recommended I get cross link surgery to stop the keratoconus from damaging my corneal causing a full replacement of the cornea. Prior recommendations where not followed up on." DOC employee Ann York received Plaintiff's April 3, 2022, HSR on April 5, 2022. On or around April 6, 2022, Dombeck emailed Sukowaty and asked whether, in her judgment, UW Ophthalmology's request for a "patient [Plaintiff] be sent to a local non-secure site for corneal cross-linking procedure ASAP which they believe may prevent the need for a corneal transplant." Dr. Sukowaty had already discussed the need for Class III

---

[3]The Court recognizes Defendants' objection to these two facts. Taking the facts in the light most favorable to Plaintiff, however, the Court considers them and they are not dispositive to the Court's decision.

approval for corneal cross-linking with LaVoie and determined that pre-approval was not needed. Dr. Sukowaty determined that Class III was unnecessary for Plaintiff to receive corneal cross-linking. Dr. Sukowaty testified that corneal cross linking would have been a Class II, urgent care, procedure. As such, prior authorization by the Class III Committee was not necessary in order to proceed with Plaintiff's corneal crosslinking treatment. Sukowaty responded to Dombeck's email on April 7, 2022, and stated that the patient "can be approved for this." Dombeck responded on April 8, 2022, that he would order the consult.

Dr. Sukowaty asserted that because UW was recommending the procedure be completed by a non-UW provider, the responsibility fell on UW to find another specialist to refer Plaintiff to. Dr. Sukowaty also noted that only DOC providers can make referrals for treatment. Outside providers can only make recommendations for treatment. On April 8, 2022, Haley Bassuener, LPN, left a message with UW to have triage nurses call her back to discuss Plaintiff's scleral lens and corneal cross-linking procedure. On April 20, 2022, Bassuener followed up and called to get an update from UW regarding Plaintiff's corneal cross-linking procedure. Bassuener called on two separate occasions before UW returned her call. On April 28, 2022, UW informed Bassuener that UW was referring Plaintiff to Valley Eye Associates for the cross-linking.

On or around April 28, 2022, Ms. Bassuener emailed Dr. Sukowaty and Dombeck and stated that she had been trying to coordinate with UW where to have Plaintiff go for a corneal crosslinking, and as UW recommended, she made contact with Valley Eye in Appleton. She further stated that Valley Eye could not get Plaintiff in until November, and that she asked to be put on a call back list in the event a sooner date was to open

up. Sometime in April 2022, Plaintiff learned through HSR correspondence with the DOC that a crosslinking procedure had been approved and would be scheduled and ordered.

Plaintiff had an appointment with Dr. South on May 10, 2022, for Plaintiff to pick out the frame for his glasses. During this visit, Dr. South saw only an order awaiting a response, as such, she believed that the DOC had not yet determined whether the procedure was covered. During this visit, Dr. South notified Plaintiff that his corneal crosslinking was not a covered procedure and had been cancelled. Dr. South had cancelled the order for corneal crosslinking, and she testified she cancelled the order because "there was confusion about whether the cross-linking was an approved procedure through the DOC."

Specifically, at the time when she cancelled the order for Plaintiff's corneal crosslinking, she believed that the DOC understood corneal crosslinking to be a non-covered care service that was not medically necessary. This belief was based on her prior experience when the Class III Committee denied a patient's corneal crosslinking procedure in the past because the Class III Committee determined that the corneal crosslinking was an elective, non-covered service that was not medically necessary. To her knowledge, this denial did not cause the patient to suffer any further issues or progressive issues. Also, Dr. South understood at that time that while corneal crosslinking, if successful, could stop the progression of the underlying keratoconus disease, keratoconus symptoms can be addressed through non-surgical means including contact lenses. Dr. South further understood at that time, based on her experience, that patients can live with keratoconus without having a corneal crosslinking procedure or a corneal transplant for years and even decades without experiencing any significant

worsening of the disease. In her experience, some patients do not ever require corneal crosslinking or a corneal transplant at all.

When she cancelled Plaintiff's corneal crosslinking procedure, Dr. South testified that she had, at most, briefly reviewed Plaintiff's off-site records during his May 10, 2022, appointment with her. Dr. South testified that she sees an average of 22 patients per day with the DOC and does not have time to study the patients' records in detail during each visit. Dr. South further testified that no DOC staff members consulted with Dr. South regarding Plaintiff's offsite recommendations. Dr. South did not review the March 28, 2022, September 21, 2021, or June 2, 2022, Offsite Visit Reports when Plaintiff returned from the offsite visits, and no DOC employees provided the Offsite Visit Reports to her for review. Further, at the same time, Dr. South testified that she did not have information regarding the specifics of Plaintiff's condition because she did not have the requisite equipment to map his keratoconus and did not study his off-site medical records in detail.

Plaintiff then wrote an inmate complaint to WCI regarding his denied treatment and an HSR to the HSU to "confirm that the treatment was not covered." South testified that she then received an email shortly thereafter stating that the crosslinking procedure was approved and she reinstated the order for the crosslinking procedure.

Plaintiff's crosslinking procedure was rescheduled after Dr. South reinstated the order. On or around June 2, 2022, the WCI HSU responded to a May 31, 2022, HSR from Plaintiff to confirm that his corneal crosslinking surgery was scheduled. Plaintiff had a consult appointment with Valley Eye Associates to evaluate his eyes and determine if he needed corneal crosslinking in July 2022. Valley Eye Associates had initially

indicated to the DOC that November was the earliest that Plaintiff could be scheduled for a crosslinking procedure, however, they ended up moving the visit date up to August 25, 2022. Plaintiff submitted two HSRs dated August 19, 2022, where he "makes reference to his upcoming surgical procedure being 'in less than 1 week from today's date' which was accurate.'" In an August 22, 2025, email to Dombeck, Ms. Bassuener stated that she "was instructed to contact the admin captain about the security breach and was told the surgical procedure needs to be rescheduled. Please review the new surgical date as it was the soonest the clinic had available." The HSU informed Plaintiff on August 26, 2022, that his crosslinking procedure was "rescheduled due to security breach of app[ointment] date." It is DOC policy that an inmate is not informed in advance of the time and date of offsite visits and procedures. The inmate possessing this information poses security risks to the institution and correctional staff. For example, an inmate could coordinate with individuals outside the prison to attempt escape or to meet and receive contraband. Valley Eye Associates performed a corneal crosslinking procedure on both of Plaintiff's eyes on or around October 13 or 14, 2022.

After his corneal crosslinking procedure, Dr. Sarah Nehls ("Nehls") at UW-Health decided that Plaintiff needed a corneal transplant in his left eye. At his deposition, Plaintiff testified that it was his belief that he needed a corneal transplant procedure because he did not have the corneal crosslinking procedure until October 2022. At his deposition, Plaintiff testified that Dr. Nehls did not tell him that he needed a corneal transplant due to when he had the corneal crosslinking procedure. Plaintiff does not have any medical training.

Dr. Sukowaty asserted that to a reasonable degree of medical certainty, it is not likely that the brief delays in Plaintiff undergoing the cross-linking procedure led to a need for corneal transplant. Dr. Sukowaty further indicated that is more likely than not that Plaintiff would have needed corneal transplant regardless of the cross-linking procedure.

Plaintiff's counsel produced a July 21, 2025,[4] declaration by Dr. Kurt in this case. In his declaration, Dr. Kurt stated that it is his "professional opinion that corneal cross-linking became the standard of care for keratoconus after the Food and Drug Administration ("FDA") approved corneal cross-linking to treat keratoconus."[5]

On or around July 18, 2023, Plaintiff submitted a Health Services Request stating that: "I would like to know why Im being told to wear glasses when offsite specialist and optometrist Bethany South know glasses DO NOT WORK. IM BLIND I CANT SEE WITH THEM!" (emphasis in original). Plaintiff underwent a corneal transplant procedure in his left eye on or around April 2024. Plaintiff's providers have indicated that his left eye corneal transplant was successful. Plaintiff continues to treat with UW-Health annually for new contacts and review of the stitches in his eye. At

---

[4]The parties identify the date of Dr. Kurt's declaration as July 21, 2021 in their joint undisputed facts. ECF No. 101 at 23. However, this appears to be a typographical error. The cited declaration in question, ECF No. 81-19, appears to have been signed on July 21, 2025. This 2025 date makes more sense in light of Dr. Kurt's first visit with Plaintiff in March 2022. As such, the Court has used the July 21, 2025 date.

[5]Dr. Kurt's July 21, 2025, declaration also states that he diagnosed Plaintiff for keratoconus on September 22, 2021, and recommended corneal cross-linking as a treatment for Plaintiff' keratoconus on September 22, 2021. Counsel stipulated that the September 22, 2021, date referenced therein is an error. As provided above, Plaintiff had an appointment with Dr. Reddy on September 22, 2021. Plaintiff's first appointment with Dr. Kurt was on March 28, 2022.

his deposition, Plaintiff testified that he experiences light sensitivity that causes eye pain and headaches and less than 20/20 vision in his left eye because of the care at issue and events alleged in his Second Amended Complaint. Plaintiff takes over-the-counter medication and wears approved tinted glasses to treat his headaches. Plaintiff did not submit any Notice of Claim regarding any of his claims in this case.

**3. ANALYSIS**

Defendant South and the State Defendants brought motions for summary judgment seeking dismissal of the Eighth Amendment claim for deliberate inference to a serious medical need and ask the Court to relinquish supplemental jurisdiction of the state-law claims. Based on the Court's review of the parties' submissions, and for the reasons explained below, the Court will grant Defendants' motions for summary judgment as to the Eighth Amendment claim, will decline to exercise supplemental jurisdiction over the state law claims, and will dismiss this case.

**3.1 Eighth Amendment Deliberate Indifference**

To prove that Defendants violated his rights under the Eighth Amendment, Plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Defendants were "'deliberately, that is subjectively, indifferent'" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when he or she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

"'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "'that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Proving deliberate indifference is a demanding standard to meet. Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[ ] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Defendants' motions for summary judgment, Plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously

aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting,* 839 F.3d at 662. The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Finally, "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640). To prevail on an Eighth Amendment

claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730–31. Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." *Id.* at 731; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

Here, and as to the first prong, Plaintiff alleges improper treatment and delays for his keratoconus. Defendants, for the purposes of summary judgment, do not argue that Plaintiff's keratoconus was not a serious medical condition. ECF No. 99 at 5; ECF No. 103. As such, the Court will assume for the purposes of this Order that Plaintiff's keratoconus qualifies as a serious medical condition.

Next, the Court finds that no reasonable juror could find that any defendant was deliberately indifferent to Plaintiff's medical needs. The Court briefly reviews the timeline of Plaintiff's care. The undisputed record shows that Plaintiff's care was extensive and that he saw numerous specialists outside of the prison during the relevant time period for his eye. Dr. South first suspected that Plaintiff could have keratoconus on March 11, 2021. It is undisputed that Dr. South did not have the equipment to make a diagnosis and that she submitted an internal referral that day for Plaintiff to be see an outside provider. ECF No. 101 at 15. Dr. South decided not to order Plaintiff new glasses as that time as new prescriptions took time to process; because Plaintiff's prescription might have changed by the time he saw a specialist; and because glasses are not effective for correcting blurred vision symptoms. *Id.* at 16. Plaintiff had his follow-up visit on June 2, 2021, where Dr. Reddy (not a defendant) recommended that Plaintiff follow up "with pentacam 1-2 months, repeat pentacam 4-5 months, then 6 mo

security clinic with DFE to discuss management options."[6] *Id.* at 14. Dr. Reddy also recommended glasses and topography, an imaging study which maps the surface of the curvature of the cornea; keratoconus was only suspected at that time and crosslinking was not recommended. *Id.* at 16. Moore reviewed his off-site appointment and would have sent that recommendation to scheduling for Plaintiff's follow-up visit. *Id.* at 17.

Plaintiff had a follow-up visit on September 22, 2021, with Dr. Reddy. At this appointment, Plaintiff was first diagnosed with keratoconus, and Dr. Reddy opined that it was "likely" that cross-linking would help the patient and that it would be "optimal". *Id.* Following this visit, Moore ordered Plaintiff a referral to UW Optometry, which was conducted with Dr. Kurt on March 28, 2022. *Id.* at 18. Dr. Kurt is the first provider who suggested that corneal crosslinking should be done with any urgency; he wrote: "Corneal x-linking would be very beneficial to patient. Keratoconus is progressing. Will need to return to office for scleral / [sic.] lens fitting. Corneal cross-linking may be able to prevent need for corneal transplant. Please approve ASAP." *Id.* Dombeck, Lavoie, and Dr. Sukowaty consulted on this matter shortly thereafter, and on April 8, 2022, Dombeck indicated in an email that he would "order the consult." *Id.* at 19.

DOC schedulers worked with UW to locate a proper referral for Plaintiff. *Id.* at 19. On April 28, 2022, UW informed the scheduler that Plaintiff was referred to Valley Eye Associates for the cross-linking. *Id.* The scheduler immediately told Dr. Sukowaty and Dombeck that Valley Eye could not schedule Plaintiff for the procedure until November and that he

---

[6]It is not clear from the record what "pentacam" means in this context. In any event, its specific meaning is not material to the Court's decision.

was on a call-back list if an earlier date became available. *Id.* at 19–20. On May 10, 2022, Plaintiff saw Dr. South to pick out the frame for his glasses. *Id.* At this visit, Dr. South cancelled Plaintiff's order for crosslinking due to confusion about it being an approved procedure. *Id.* at 20. It is undisputed that Plaintiff's appointment was reinstated shortly thereafter once Dr. South was informed that the crosslinking procedure was approved. *Id.* at 21.

Valley Eye moved up the November date to August 19, 2022. However, due to a security concern that Plaintiff knew the date of his off-site visit, Plaintiff's appointment was moved and he received the crosslinking procedure in October 2022. In April 2024, Plaintiff underwent a corneal transplant procedure in his left eye. *Id.* at 23.

Here, and most significantly, the record does not support a finding that any defendant caused Plaintiff harm by the delay in receiving the crosslinking procedure. To defeat summary judgment, Plaintiff must present "verifying medical evidence that shows his condition worsened because of the delay." *See Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009). He has not done so here. Plaintiff argues that "permanent vision impairment is an injury Plaintiff suffered." ECF No. 106 at 10. Plaintiff does not cite a fact in support of this proposition, and the undisputed facts do not include any suggestion by a medical provider that a delay in treatment caused Plaintiff permanent vision loss.

The record is lacking as to the recommended timeline for a patient to receive crosslinking to treat keratoconus. Plaintiff argues that the delay in Plaintiff receiving corneal crosslinking amounted to deliberate indifference. Plaintiff relies on Dr. South's statement in her deposition and Dr. Kurt's declaration that states corneal cross-linking is the standard of

care for keratoconus. ECF No. 106 at 8–9. The Court accepts that cross-linking is the standard of care. Indeed, that is not the question here because Plaintiff indisputably received this treatment. However, the general standard of care provides no information about the recommended timeline for receiving such care and what amount of delay is reasonable. Medical care—whether a person is in prison or not—usually does not happen instantaneously and rarely happens at the exact speed in which patients may desire. The failure to receive treatment on a patient's desired timeline certainly does not equate to deliberate indifference.

The Court considers Plaintiff's evidence to show the delay caused him harm. Plaintiff argues that the corneal crosslinking delay caused him to get the corneal transplant in his left eye. Plaintiff relies heavily on Dr. Kurt's declaration in this case and his March 28, 2022 recommendation that crosslinking should be scheduled as soon as possible. This evidence, however, is not the smoking gun evidence Plaintiff believes it to be. To begin, the State Defendants did take action to get Plaintiff's crosslinking procedure scheduled shortly after the March 28, 2022 visit when Dombeck said he would order the consult approximately only ten days later on April 8, 2022. The Court acknowledges that Dr. Kurt's use of the phrase "ASAP" certainly indicates a sense of urgency; however, Plaintiff has not submitted any evidence to suggest that the timeline of care in this case was unreasonable. Further, scheduling something quickly gives the Court no information on how soon a procedure should actually be *completed*. The record here supports the proposition that some wait for crosslinking is medically acceptable given that in late April 2022, Valley Eye's soonest availability to perform the crosslinking procedure was initially many months later in November 2022.

Dr. Kurt's declaration is further unpersuasive to show that the delay in Plaintiff's care caused him harm. Dr. Kurt's declaration is six short paragraphs in length and does not provide opinion on any of the specific care Plaintiff received or whether such care caused Plaintiff harm. *See* ECF No. 104-7. Instead, the declaration provides merely that corneal crosslinking became the standard of care for keratoconus after the Food and Drug Administration ("FDA") approved corneal cross-linking for treatment. Notably, it does not provide when the FDA approved this treatment, and it is therefore unclear whether this was the standard of care in 2021 and 2022. However, even assuming crosslinking was the standard of care in 2021, the declaration still provides no information on how quickly that care must be provided in any given case. Some medical conditions logically require immediate medical attention, and this could possibly be discerned without expert opinion. For example, a wound with significant blood loss would likely seem obvious to a layperson that immediate treatment is needed to avoid death or serious complications. Here, however, it is not intuitive or remotely obvious how keratoconus progresses and how quickly certain types of treatment are needed.

Dr. Sukowaty provided her medical opinion that corneal crosslinking is not guaranteed to reverse, stop, or slow down the progression of keratoconus. ECF No. 101 at 14. Dr. South noted that corneal crosslinking often only delays further worsening of corneal ectasia rather than fully preventing it. *Id.* Plaintiff believes that he needed a corneal transplant procedure because he did not receive the crosslinking procedure until October 2022. *Id.* at 22–23. Plaintiff, however, does not have any medical training and his opinion therefore cannot satisfy the "verifying medical evidence" needed to show that his condition worsened because of

the delay." *See Knight*, 590 F.3d at 466. Dr. Sukowaty, in contrast, provided that, to a reasonable degree of medical certainty, it is not likely that the brief delay in Plaintiff's crosslinking procedure led to a need for corneal transplant. ECF No. 101 at 23.

How long is too long for a patient with keratoconus to wait for the crosslinking treatment? When Dr. South first suspected keratoconus in March 2021—should she have reasonably demanded that Plaintiff see a specialist the next day? Was a month wait appropriate? A year? The record here is completely silent on this issue and herein lies Plaintiff's hurdle that he cannot overcome on summary judgment. It is undisputed that an eye specialist, Dr. Reddy, did not order crosslinking or state that it was medically necessary for Plaintiff's care in September 2021. It would therefore be unreasonable to expect any of the defendants—who are not eye surgeons or able to treat keratoconus themselves—to require any different treatment. Defendants' failure to take action on Dr. Reddy's recommendation that crosslinking "would be optimal" is insufficient to establish deliberate indifference. The Eighth Amendment does not require that prisoners receive optimal or the best treatment available.

Additionally, the record does not support a finding that any defendant was personally responsible for any unreasonable delay in Plaintiff receiving the crosslinking procedure. In addressing a delay in medical care, a plaintiff must show that the defendant caused the delay through his actions or inaction. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019*) (citing Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005)). In *Walker*, the Seventh Circuit considered whether a doctor was deliberately indifferent for not immediately referring the plaintiff, an inmate in the custody of IDOC, to an outside medical facility to

assess his difficulties in recovering from spinal surgery. *See id.* at 957–59. The court held that the doctor was not deliberately indifferent due to the delay in the plaintiff's care. *Id.* at 965. The court reasoned that although "an immediate referral would have been beneficial," the doctor "made a reasonable medical judgement to delay referring [the plaintiff] until he had more information so that he could make a more informed referral request." *Id.* Further, the court explained that, despite the clear delays in the plaintiff's treatment, the doctor "did what he could within the limits of his role to move the ball forward" and could not be blamed for scheduling delays outside of his control. *Id.* at 966.

Here, there is no evidence that Defendants intentionally delayed Plaintiff's appointments with eye specialists or that he could or should have been able to see a provider sooner for corneal crosslinking. Dr. South scheduled Plaintiff quickly to see an outside eye specialist to check for suspected keratoconus. Moore reviewed his off-site appointments and scheduled follow-up appointments with specialists. Once the specialist, Dr. Kurt, recommended crosslinking on March 28, 2022, the State Defendants took action to schedule Plaintiff's procedure. The outside specialist, Valley Eye, initially did not have an opening for Plaintiff until months later in November 2022. Dr. South's mistake in canceling Plaintiff's procedure did not result in a delay because it was rescheduled quickly, and the rescheduled date allowed for Plaintiff to receive the crosslinking procedure earlier than initially scheduled (in October 2022, rather than in November 2022). Like *Walker*, Defendants here cannot be blamed for scheduling delays outside their control. The Court does not deny that Plaintiff's wait to receive the crosslinking procedure appears to be long; however, the majority of the lengthy wait cannot be attributed to Defendants' actions. The Court finds

that Plaintiff has not provided evidence to show that no minimally competent professional would have responded to Plaintiff's condition differently than Defendants did. Thus, all defendants are entitled to summary judgment on the Eighth Amendment claim because the undisputed facts do not support a finding of deliberate indifference.

Finally, the Court will grant summary judgment as to Defendant Haseleu and Defendant Weinman for an additional reason. Notably, these defendants are not mentioned once in Plaintiff's opposition brief aside from the introduction. *See* ECF No. 106. The undisputed facts establish that they were not personally involved in Plaintiff's care, and that in their nursing roles, they could not override treatment and medication decisions of Plaintiff's primary care providers and specialists As the Court concluded above, Plaintiff received ongoing medical treatment, and the treatment decisions did not rise to the level of deliberate indifference. As such, even assuming Weinman and Haseleu could have overridden medical decisions, Weinman and Haseleu's deference to the doctors' and specialists' decisions would similarly not amount to deliberate indifference. Nothing in the record suggests that no competent medical professional would have responded differently than Weinman and Haseleu did. As such, the Court finds that no reasonable jury could find that these defendants were deliberately indifferent to Plaintiff's serious medical needs.

In sum, the Court finds that no reasonable juror could find that any defendant was deliberately indifferent to Plaintiff's serious medical needs. The Court will accordingly grant the Defendants' motions for summary judgment with respect to the Eighth Amendment deliberate-indifference claim.

### 3.2 State-Law Claims

As noted above, Plaintiff has alleged a state-law medical malpractice claim and a state-law negligent supervision claim, the intricacies of which need not be elaborated on because the Court declines to exercise supplemental jurisdiction over those claims. *See Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims."). As such, the Court relinquishes jurisdiction over Plaintiff's state-law claims, which will be dismissed without prejudice.

### 4. CONCLUSION

For the reasons explained above, the Court grants Defendant South's and the State Defendants' motions for summary judgment as to the Eighth Amendment claim and dismisses such claim with prejudice. Additionally, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims and thus will dismiss these claims without prejudice.

Accordingly,

**IT IS ORDERED** that Defendant South's renewed motion for summary judgment, ECF No. 98, be and the same is hereby **GRANTED** as provided in this Order;

**IT IS FURTHER ORDERED** that the State Defendants' renewed motion for summary judgment, ECF No. 102, be and the same is hereby **GRANTED** as provided in this Order;

**IT IS FURTHER ORDERED** that Plaintiff's Eighth Amendment deliberate-indifference claim against all defendants be and the same is hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over the state-law medical malpractice claim and state-law negligent supervision claim and that these claims be and the same are hereby **DISMISSED without prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of March, 2026.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge

---

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.